UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
MARIBEL RODRIGUEZ,                        :
                                          :
                    Plaintiff,            :
                                          :          REPORT & RECOMMENDATION
           -against-                      :
                                          :
MICHAEL J. ASTRUE,                        :          11 Civ. 7720 (CM)(MHD)
Commissioner of Social Security,          :
                                          :
                    Defendant.            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

TO THE HONORABLE COLLEEN MCMAHON, U.S.D.J.:


     Plaintiff Maribel Rodriguez filed this action pursuant to
section 1631(c)(3) of the Social Security Act ("the Act"), as
amended, 42 U.S.C. § 1383(c)(3). (See Compl. ¶ 1). She challenges
the May 13, 2011 decision of Administrative Law Judge ("ALJ") Seth
I. Grossman, denying her April 30, 2009 application for
Supplemental Security Income ("SSI"). (Admin. R. Tr. ("Tr.") at 18-
28, 67). ALJ Grossman's decision became the final decision of the
Commissioner of Social Security ("the Commissioner") on August 31,
2011, when the Social Security Administration ("SSA") Appeals
Council denied plaintiff's request for review. (Tr. at 1-3).
Plaintiff seeks an order reviewing the Commissioner's determination
and granting her monthly maximum SSI benefits retroactively to the
date of her claimed initial disability, March 1, 2002. (Compl. ¶¶
5, 9(c)). Alternatively, she requests an order remanding her claim

1

for reconsideration of the evidence. (See id. ¶ 9(c)).

The Commissioner has moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Mem. of Law in Supp. of the Commissioner's Mot. for J. on the Pleadings ("Def.'s Mot.") 1). He asserts that his denial of SSI benefits was supported by substantial evidence and based upon the applicable legal standards. (Id.).

For the reasons set forth below, we recommend that defendant's motion for judgment on the pleadings be denied, and that the case be remanded for further development of the record and additional findings.

<u>PROCEDURAL HISTORY</u>

On April 30, 2009, plaintiff filed an application for SSI under Title XVI of the Act. (Tr. at 67, 157-60). The SSA denied her application on initial review on June 26, 2009, concluding that plaintiff was "not disabled" under the Act. (Tr. at 68-72).

Subsequently, on July 22, 2009, plaintiff requested a hearing on her application before an ALJ. (See Tr. at 18, 77-78). On January 29, 2010, plaintiff requested that her hearing be scheduled

2

so that she could appear in person before an ALJ, rather than via teleconference. (Tr. at 103). The hearing took place before ALJ Grossman on November 15, 2010, with plaintiff represented by counsel, Daniel Berger, Esq., and with a vocational expert, Raymond Cester, present. (Tr. at 33-66). Ms. Rodriguez testified with the assistance of a Spanish interpreter. (Tr. at 33).

On May 13, 2011, ALJ Grossman issued a decision unfavorable to plaintiff. (Tr. at 18-28). Though he found that plaintiff had severe impairments -- specifically, a "non-union fracture of the right leg with derangement" and "a depressive disorder with anxiety" (Tr. at 20) -- he determined that plaintiff had the residual functional capacity to perform "sedentary work," provided that she "only perform simple, repetitive tasks that involve limited contact with the public and with supervisors." (Tr. at 22). In light of plaintiff's age, education, work experience, and residual functional capacity, ALJ Grossman determined that "jobs . . . exist in significant numbers in the national economy that" plaintiff could perform. (Tr. at 27). Therefore, he concluded, plaintiff had not been under a disability as defined by the Act, and was not entitled to any benefits under the Act. (Tr. at 28).

On May 31, 2011, plaintiff filed a request for review of ALJ

Grossman's decision with the SSA Appeals Council. (Tr. at 11). The SSA Appeals Council denied her request for review on August 21, 2011. (Tr. at 1-3).

On October 28, 2011, plaintiff filed this lawsuit requesting review of SSA's denial of benefits. (Compl. ¶ 1). Plaintiff alleges that the ALJ's decision is erroneous because it is neither supported by substantial evidence on the record nor in accordance with the law. (Id. ¶ 9). The Commissioner responded on April 9, 2012 by moving for judgment on the pleadings under Rule 12(c), asserting that the ALJ's decision is supported by substantial evidence. (Def.'s Mem. 1, 14-25).

FACTUAL BACKGROUND

I. Medical Evidence Before the ALJ[1]

The record before the ALJ reflects an extensive history of treatment for plaintiff's medical and psychiatric conditions. Specifically, it shows that in the period between 2002 and 2011,

---

[1] We note that the administrative transcript contains repeats of certain pages. After page 503, the pages in the record revert to number 484, after which the pages again continue in proper order.

Ms. Rodriguez was treated principally for right-lower-extremity derangement, depression, and anxiety.

A. Plaintiff's Medical Contacts

The City of New York Human Resources Administration ("HRA") issued plaintiff a letter on an unspecified date prior to September 10, 2002 noting that she was "too ill to participate in an HRA Approved Work activity" and subsequently scheduled a medical examination for her at HS Systems, Inc. in order to help determine an appropriate work activity. (Tr. at 216).

On September 24, 2002, Ms. Rodriguez visited HS Systems, Inc., where she was examined by Dr. Peter E. Graham. (Tr. at 205).[2] Plaintiff described to Dr. Graham that she had experienced a

---

[2] Plaintiff filled out a comprehensive-medical-history questionnaire at this visit in Spanish. (See Tr. at 210-12). She indicated on that form that she had emotional problems, such as depression or anxiety, that affected her ability to work. (Tr. at 211). She also indicated that she participated in activities of normal daily living, including washing clothes and dishes, making the bed, cooking, watching television, and socializing. (Tr. at 212).

"fracture of the right tibia[3] [and] fibula[4] 16 years ago." (<u>Id.</u>).
She indicated that she had undergone "a number of surgeries" for
the problem. (<u>Id.</u>). At the time of the examination, plaintiff
described "some pain" in the lower part of her right leg, which was
induced by walking. (<u>Id.</u>). Additionally, the doctor noted that she
claimed to suffer from "poor weight bearing" and "swelling" in the
same leg, although she did not use a cane to aid ambulation. (<u>Id.</u>).
She reported that she was on no pain medication. (<u>Id.</u>).

Dr. Graham recounted that plaintiff had suffered an episode of
phlebitis prior to her examination, although she was not
hospitalized.[5] (<u>Id.</u>). The doctor observed that Ms. Rodriguez
"walk[ed] with a slight limp due to slight shortening of the right
lower extremity," and he noted about a one centimeter difference in
the length of her legs. (Tr. at 206). Plaintiff's right leg also
exhibited "anterior bowing of the mid-tibial area." (<u>Id.</u>). An x-ray
of the right tibia and fibula revealed "residue of previous

---

[3] A tibia is "the shin bone: the inner and larger bone of the
leg below the knee; it articulates with the femur and head of the
fibula above and with the talus below." <u>Dorland's Illustrated
Medical Dictionary</u>, 1840 (29th ed. 2000).

[4] "A bone of the lower leg." Dan J. Tennenhouse, <u>Attorneys'
Medical Deskbook</u> § 5:8 (4th ed. 2006-2011), available at Westlaw
MEDDESK.

[5] Phlebitis is the "inflammation of a vein." <u>Dorland's</u>,
<u>supra</u> note 3, at 1374.

6

fracture." (Id.).

During Dr. Graham's evaluation, plaintiff described a "history of anxiety and depression disorder," which included "feelings of sadness" and "episodes of inappropriate crying." (Tr. at 205). Plaintiff indicated, however, that she had never attempted suicide. (Id.). Plaintiff also reported that she did "not recall when she [had] last worked." (Id.).

Ultimately, the doctor concluded that Ms. Rodriguez's prognosis was "stable." (Tr. at 206). He observed that she was able to "sit, stand, walk, lift, carry, handle objects, hear, speak and travel," although any "prolonged walking may be limited by right leg pain." (Id.). The doctor crossed out an indication that she was able to do "sedentary to light activity" -- what he wrote in its place in illegible. (Id.). Dr. Graham ordered an x-ray of her distal right leg and laboratory tests. (Tr. at 213). On this date, plaintiff also agreed to be a part of the HHS Medical Examination Program. (Tr. at 218-19).

The results of plaintiff's laboratory work were available the next day. (Tr. at 208). The pertinent report reflects that she had

low glucose and "BUN,"[6] and high LDH cholesterol, a high white blood cell count,[7] and "hematocrit."[8] (Id.).

On September 26, 2002, Dr. Seymour Sprayregen of HS Systems, Inc. provided his interpretation of the radiographic examination of the distal portion of the plaintiff's right leg, including her ankle. (Tr. at 209). The doctor observed "a healed fracture of the midtibial shaft with anterior bowing at the fracture site" and "areas of selerosis in the proximal tibia and distal tibia which [he] considered to be related to traction pins." (Id.). He observed further that "[t]here [was] a healed fracture of the distal fibula and a fracture of the midfibula at the tibial fracture level with no good bony union at this site." (Id.). Ultimately, his impression of the plaintiff's leg was that "[r]esidua of previous fractures of the tibia and fibula" were present. (Id.).

On September 27, 2002, Dr. Graham wrote to the HRA and indicated that plaintiff was to follow up with her primary care

---

[6] "BUN" is "Blood urea nitrogen — A laboratory test for kidney disease." Tennenhouse, supra note 4, at § 5:4.

[7] Plaintiff's white blood cell count was reported as 13.3 k/ul, with the normal range indicated as 3.9-11.3 k/ul. (Tr. at 208).

[8] "Hematocrit [is] [a] laboratory test of the blood." Tennenhouse, supra note 4, § 5:10.

provider within a week, and that she had an abnormally high white blood cell count and high LDH levels. (Tr. at 214-15).

On October 1, 2002, plaintiff participated in a rehabilitation program at HS Systems, Inc. to address her abnormal LFT[9] and white blood cell count. (Tr. at 201-04, 219, 221).[10] The program was expected to be completed by January 1, 2003. (Tr. at 203).[11] The HSS Wellness Program's Rehabilitation Plan noted that Ms. Rodriguez was suffering from "hematologic diseases/disorder," and also had the goal of "[e]valuat[ing] and stabiliz[ing] hepatic disease" such as hepatitis, and evaluating the need for a biopsy or surgery. (Tr. at 203-04).[12]

Dr. Maruthi M. Sunkara at HS Systems Wellness Program noted that plaintiff had fractured her right leg in 1986. (Tr. at 222, 228-29). He determined that plaintiff was capable of doing "clerical work," such as "answering phones" and "making

---

[9] A liver-function test. Tennenhouse, supra note 4, § 5:14.

[10] Lab reports generated on October 2, 2002 reflected high cholesterol and LDL levels. (Tr. at 223).

[11] The plan was ultimately completed on December 18, 2002. (Tr. at 203, 225-228 (rehabilitation plan treatment notes)).

[12] Hematology is defined as the "branch of medical science that deals with the blood and blood-forming tissues." Dorland's, supra note 3, at 796.

appointments," as of January 8, 2003. (Tr. at 222, 228-29). He noted that Ms. Rodriguez could not "stand or walk for prolonged periods." (Id.). He also noted that she was not currently on any medications and that she had high cholesterol and an elevated white blood cell count. (Id.). A blood test taken on January 23, 2003 reflected a high white blood cell count (12.2 k/ul). (Tr. at 224).

At the close of plaintiff's Rehabilitation Program, HS Systems concluded that her high cholesterol and LFT count had "reached maximim medical improvement," and she was cleared to "participate in a work related activity." (Tr. at 221, 230). On February 6, 2003, HS Systems published a specific report of its findings regarding plaintiff's ability to work. (Tr. at 220, 231). It found that she could perform a job that involved "[n]o [l]ifting and minimal walking/bending/standing, pushing, [] pulling . . . [and] [o]perating [m]achinery." (Tr. at 220). She was also instructed to avoid travel during rush hour. (Id.). The report reflects a list of HRA jobs that were "suitable" for plaintiff, including answering phones, making appointments, making and collating copies, sewing costumes, interpreting, greeting visitors, data entry, and simple bookkeeping. (Id.). On February 21, 2003 HS Systems sent plaintiff a notice of plan completion, informing her that her treating physician had cleared her to participate in a work-related

10

activity. (Tr. at 230).

On March 18, 2003, the HRA provided notice to plaintiff that she was required to have a medical functional assessment evaluation in order to assess her ability to work. (Tr. at 242). Her appointment was scheduled for April 2, 2003. (Id.).

On April 2, 2003, Dr. Graham again examined Ms. Rodriguez. (Tr. at 233, 243).[13] He noted that plaintiff demonstrated "slight anterior bowing with slight shortening of the right lower extremity." (Tr. at 234). However, he found that all of her joints and her spine exhibited a full range of motion without pain, and that she was able to perform a full squat. (Id.). He noted that prior to the examination, Ms. Rodriguez had had a "[h]istory of recurrent phlebitis in the right lower extremity," but she did not show evidence of post-phlebitic syndrome. (Tr. at 235). He determined that while "prolonged standing or prolonged walking may be limited by pain in the right lower extremity," her prognosis was "stable" and she was "able to do sedentary work." (Id.).

---

[13] Plaintiff again filled out a medical history questionnaire at this visit in Spanish. (Tr. at 237-39). She indicated that she was not on any medication at that time, and that she was not experiencing any emotional problems, such as depression or anxiety, that would interfere with her ability to work. (Tr. at 238).

11

Dr. Graham also revisited the fact that plaintiff had a history of anxiety and depression disorder, although the symptoms were mild and stable. (Id.). Finally, he diagnosed her with leukocytosis (an elevated white blood cell count). (Id.).

That same date, Dr. Graham ordered that plaintiff undergo more lab testing. (Tr. at 240). It reflected normal results save for an abnormally high white blood cell count. (Tr. at 236 (April 3, 2003 report)).

On April 7, 2003, HS Systems again issued a report regarding plaintiff's medical condition. (Tr. at 241). The report indicates that she continued to have an abnormal white blood cell count, and recommended that she follow up with a primary care provider within a week. (Id.). On that same date, HS Systems also issued a recommendation regarding her functional work capacity. (Tr. at 232). The report indicates that she could perform work that involved no lifting and minimal walking, bending, standing, pushing, and pulling, but that she should avoid rush hour travel. (Id.). The report again listed a number of HRA jobs that would be suitable for plaintiff, such as answering phones, interpreting,

12

keeping simple records, and making and collating copies. (Id.).[14]

On November 30, 2004, Dr. Elliot Wein examined an MRI of Ms. Rodriguez's right tibia and fibula. (Tr. at 271, 274, 322, 375). He observed "[o]ld healed fractures of the mid shafts of the [right] tibia and fibula, . . . [and] an old fracture or dislocation." (Id.). Most pertinently, he noted the nonunion of the fracture at the mid-shaft of the fibula. (Id.). The doctor also did not observe radiographic evidence of osteomyelitis.[15] (Id.).

On June 14, 2005, plaintiff visited Dr. Albert Panozzo in the division of ambulatory care at Montefiore Medical Center ("Montefiore"), claiming that she had experienced increasing pain for the prior three to four months in her right leg "over the midshaft of the tibia," and that she wanted to have "something done" to improve the position of the malunited fracture. (Tr. at 198, 270-71). Dr. Panozzo noted that this complaint was "inconsistent with the radiological picture," and he therefore "plan[ned] to investigate it further with a CT scan and a full

_____

[14] HS Systems also issued a report reflecting some of these limitations on April 2, 2003. (Tr. at 244).

[15] "A bone infection, often chronic and difficult to treat, sometimes seen following compound fractures and open reductions." Tennenhouse, supra note 4, § 12:5.

blood count, ESR, and CRP." (Id.). He planned to see her again after he received the results of the testing. (Id.).[16]

On August 30, 2005 Dr. Nnawmezie G. Umeasor ordered a uranalysis of plaintiff. (Tr. at 261). The results of that test do not indicate whether any findings were abnormal. (Id.).

The record then reflects an approximate nineteen-month gap in treatment following the August 2005 visit.[17]

In the period between March 30, 2007 and April 10, 2007, a Federation Employment and Guidance Service ("F.E.G.S.")[18] Biopsychosocial Summary was prepared for Ms. Rodriguez on behalf of

---

[16] This testing was also intended to rule out "pathology causing referred pain" versus "infection at [the] fracture site." (Tr. at 270).

[17] The ALJ did not mention this gap of treatment in reaching his disability determination. (See Tr. 20-28).

[18] "The mission of FEGS Health and Human Services System has remained constant for almost three-quarters of a century: To meet the needs of the Jewish and broader community through a diverse network of high quality, cost-efficient health and human services that help each person achieve greater independence at work, at home, at school and in the community, and meet the ever-changing needs of business and our society." About FEGS, http://www.fegs.org/#/about_fegs/ (Last visited Aug. 13, 2012).

14

the HRA. (Tr. at 245-60).[19] On April 10, 2007, at her first F.E.G.S. appointment, plaintiff reported receiving cash and rent assistance, and food stamps, and that she had applied for Medicaid. (Tr. at 246-47). She also reported living with two of her six children in a three-bedroom apartment. (Tr. at 247, 251). She described her housing situation as "stable." (Tr. at 247). Plaintiff also indicated that she had completed high school in Puerto Rico prior to relocating to the United States, and that she is able to read and write well in Spanish. (Tr. at 249).

The F.E.G.S. report notes that plaintiff's ex-husband had physically, sexually, and emotionally abused her approximately fifteen years prior. (Tr. at 250). In the wake of that abuse, plaintiff had received domestic-violence counseling. (Id.). Plaintiff also reported no history of substance abuse. (Tr. at 251). With respect to her depressive symptoms, the summary noted that she was "feeling depressed" due to "economical" problems but was not suicidal. (Id.). She reported feeling "down, depressed, or hopeless" and having difficulty sleeping "[n]early [e]veryday [sic]." (Id.). She reported feeling tired or having little energy more than half the time. (Id.). Ms. Rodriguez also stated that she

---

[19] She was treated at the Bronx-Lebanon Hospital Center ("Bronx Lebanon"). (Tr. at 245).

15

was "feeling bad about" herself and that she had let herself and
her family down "several days" at a time. (Tr. at 252). Based on
these symptoms, Ms. Rodriguez stated that her problems made it
"[s]omewhat [d]ifficult" for her to perform her work, take care of
things at home, and get along with other people. (Id.). The
F.E.G.S. social worker offered plaintiff mental health services,
and she declined. (Id.).

    With respect to her ability to travel, plaintiff noted that
she cannot travel independently because of her "leg problem," and
that "she f[a]lls down when she walks." (Tr. at 252-53). As far as
her daily living activities, plaintiff reported that she was able
to cook, clean, watch television, read, get dressed, socialize, and
groom herself. (Tr. at 253). She was unable to sweep or mop the
floor, and to vacuum. (Id.). She also reported needing assistance
with grocery shopping due to right-leg pain. (Id.).

    As for her work history, plaintiff reported that she was last
employed as a receptionist in 2005, and that she was "interested in
clerical work." (Tr. at 249). The F.E.G.S. summary noted that Ms.
Rodriguez claimed that she could not work at the time because she
was suffering from right-leg pain, back pain, and right-leg
swelling. (Tr. at 254). However, plaintiff indicated interest in

learning English and computer skills. (Id.). The report notes that
plaintiff was taking "pain meds," but does not specify which ones.
(Id.). A physical examination revealed no abnormal findings except
for pain and deformity in the right leg. (Tr. at 254, 256-57).
Plaintiff provided medical documentation, and disclosed that the
leg pain stemmed from a non-union fracture resulting from a 1985
car accident. (Tr. at 254, 257).

Plaintiff also underwent a pain assessment on March 30, 2007.
She described her right-leg pain at a 4 out of 10; however, she
indicated that the pain varied from a 0 (no pain) to a 6. (Tr. at
257). She indicated that a 4 was an "[a]cceptable" pain level.
(Id.). That same day, plaintiff underwent multiple laboratory
tests, which revealed that she had high triglycerides -- she
measured 246 mg/dL when the normal range was indicated at 40-150
mg/dL -- and an elevated white blood cell count (13.2 k/ul) and
MCV.[20] (Tr. at 262-66).

Ultimately, the F.E.G.S. summary concluded that plaintiff
suffered from "[m]oderate" depression, and that her medical
provider should "follow up" on her right-leg pain, back pain, heart

---

[20] "Mean corpuscular volume [is a] laboratory test."
Tennenhouse, supra note 4, § 5:15.

condition, left-shoulder pain, and the swelling in her right leg.
(Tr. at 252, 254). The final diagnoses in the summary indicated
that Ms. Rodriguez suffered from right-leg pain and
hyperlipidemia.[21] (Tr. at 259-60). In light of plaintiff's
limitations, it was determined that she could only be employed in
a position that required limited walking, standing, pulling, and
climbing -- in short, that she could perform "sedentary work"
without any "stren[u]ous activities." (Id.).[22]

A second F.E.G.S. report was prepared to reflect treatment for
the time period between September 23, 2008 and November 4, 2008.
(Tr. at 273, 275-82, 328-48). Plaintiff mentioned that she had
worked in December 2007 as a child-care provider. (Tr. at 334). In
pertinent part, the report noted that Ms. Rodriguez suffered from
"suicidal ideation thoughts" and had planned "to drink 15
depression pills." (Tr. at 336). As of that date, she reported that

---

[21] Hyperlipidemia is "a general term for elevated
concentrations of any or all of the lipids in the plasma,
including hypertriglyceridemia, hypercholesterolemia, etc."
Dorland's, supra note 3, at 852.

[22] Specifically, the report evaluated how many hours out of
eight plaintiff could perform a specific activity. She could sit
for 4-5 hours, kneel for 1-3 hours, stand for 1-3 hours, reach
for 6-8 hours, walk for 1-3 hours, bend for 1-3 hours, and grasp
for 6-8 hours. She was unable to pull or climb. (Tr. at 258). It
was also determined that she could not lift, carry, or push more
than ten pounds. (Id.).

her last suicidal thought had occurred around the end of July 2008. (Id.). Plaintiff also reported feeling down, depressed, and hopeless, and that she had had trouble concentrating for "[s]everal [d]ays." (Id.). Moreover, on September 23, 2009, plaintiff had scored an eight on the PHQ-9[23] depression scale (Tr. at 337), prompting Karen Perez -- a F.E.G.S. social worker -- to conclude that plaintiff suffered from mild depression. (Tr. at 336-37).

Ms. Perez reported that plaintiff had stated that she was unable to travel independently due to dizziness and problems with her right leg. (Tr. at 337). Similarly, Ms. Rodriguez claimed that she fell often. (Id.). Plaintiff noted that she did not work; she stayed home to care for her two fifteen-year-old daughters, and did not report limitations in performing activities of daily living. (Id.). With respect to her current ailments, plaintiff reported a broken right leg, heart problem, and migraines. (Tr. at 339). The report indicates that she was "ON MEDS" as of September 23, 2008, but it does not specify which medications. (Tr. at 341). A medical examination on that same date revealed pain in plaintiff's right leg, a bony elevation and mild tenderness at the mid-tibial region, and depression. (Tr. at 342, 344). Lab test results from samples

---

[23] A screening tool for depression. See Paulino v. Astrue, 2010 WL 3001752, at *3 (S.D.N.Y. July 30, 2010).

collected on September 23, 2009 indicated a high white blood cell
and triglyceride count. (Tr. at 267-69, 342, 350-54).


The 2008 F.E.G.S. report also noted that Ms. Rodriguez was
suffering from pain in her right leg, which she assessed as a 6 on
a scale from one to ten. (Tr. at 344). According to notes taken by
Dr. Rama Kompella, plaintiff's pain ranged from two to eight on a
scale of ten. (Id.). Plaintiff indicated that a level of 0, or no
pain, was her "acceptable" pain level. (Id.). It was noted that
plaintiff could not stand or sit "for some time" due to the pain in
her right leg. (Tr. at 348).


Dr. Kompella diagnosed plaintiff with hypertension, migraines,
a prior right tibial fracture, and right leg pain. (Id.). The
doctor also concluded that Ms. Rodriguez suffered from "[u]nstable
[m]edical and/or [m]ental [h]ealth [c]onditions [t]hat [r]equire[d]
[t]reatment" before a functional-capacity determination could be
reached. (Id.). She also suggested that plaintiff follow up with
her primary care physician to address the abnormal lab results.
(Id.).


Plaintiff was referred to a three-month wellness plan at Bronx
Lebanon for her right-leg pain and tibial fracture. (Tr. at 276,

278). The intended outcome was "reduction of symptoms with medication." (Tr. at 277). Plaintiff also indicated that her primary care doctor, Dr. Barakat, had ordered a right-leg tibia-fibula exam, the results of which were expected in early October 2008. (Tr. at 278). As of September 24, 2008, plaintiff was taking Lexapro[24] and Tylenol, and wearing a Lipoderm 5% patch. (Id.).

On September 29, 2008, plaintiff again visited Bronx-Lebanon Hospital Center. (Tr. at 284, 288 (same)). She was referred by Dr. Barakat from the Wellness Clinic for complaints of a depressed mood and crying spells. (Id.). Plaintiff denied suicidal or homicidal ideation, and requested medication for depression. (Id.). Dr. Srikanth Reddy determined that plaintiff's mood and affect were "depressed," and diagnosed her with "[d]epressive disorder not otherwise specified." (Id.). She prescribed plaintiff two-weeks worth of Lexapro, and advised her to follow up with "OPD" for continuity of care. (Id.).

On October 1, 2008, plaintiff was a no-show for an intake at

---

[24] Lexapro is a "selective serotonin reuptake inhibitor" used to treat "depression, panic disorder, anxiety disorders, obsessive-compulsive disorder, post-traumatic stress disorder, premenstrual dysphoric disorder, [and] social anxiety disorder." Tennenhouse, supra note 4, § 40:8.

Bronx Lebanon. (Tr. at 595). On October 5, 2008, plaintiff completed a form in Spanish regarding her use of drugs and alcohol. (Tr. at 590-91). She denied use of drugs and alcohol, but indicated that she was on unidentified prescription medication. (Tr. at 590).

On October 8, 2008, Ms. Rodriguez returned to see Dr. Richard J. Adam at Bronx Lebanon. (Tr. at 286). The doctor described a radiology report from that visit as demonstrating that plaintiff had "[c]hronic fracture deformities of the tibia and fibula" in the right lower leg, in addition to "anterior angulation of the proximal to mid shaft fractures." (Id.). The report reflected a number of additional abnormalities, including "nonunion of the midshaft fibula fracture," "an additional healed fracture of the distal fibula shaft," "sclerosis at the tibia fracture with lucency,"[25] "cortical thickening of the tibia shaft extending superiorly and inferiorly," "lucency . . . surrounding sclerosis in the proximal tibia shaft above the fracture," and "a sclerotic focus bulging into the marrow cavity." (Id.). The doctor noted that the "[m]ultiple abnormalities of the tibia" were "very concerning

---

[25] "Material is 'lucent' or 'radiolucent' if it permits x-rays to pass through it, leaving dark areas on the x-ray film." Rosas v. Hertz Corp., 1997 WL 736723, at *1 n.2 (S.D.N.Y. Nov. 24, 1997) (citing Mosby's Medical, Nursing, and Allied Health Dictionary, 1328 (Kenneth N. Anderson et al. eds., 4th ed. 1994)).

22

for osteomyelitis." (Id.). The doctor suggested an enhanced MRI to further evaluate plaintiff's condition. (Id.).

Bronx Lebanon's Comprehensive Psychiatric Emergency Programs ("CPEP") then referred plaintiff for ongoing outpatient mental-health treatment with Bronx Lebanon's Adult Psychiatry Outpatient Division. (Tr. at 604). Plaintiff's first visit was on November 5, 2008. (Id.). At that visit, she complained of increased stress, anxiety, and insomnia. (Id.). She indicated that she had come to New York from Puerto Rico eight years earlier. (Id.). She had initially lived in a shelter but then got section 8 housing. (Id.). She also reported that she worked though public assistance at an unspecified job soon after she arrived in the states. (Id.).

That same date, Dr. Braham Harneja of Bronx Lebanon completed a Comprehensive Treatment Plan for plaintiff. (Tr. at 492-99, 586, 588).[26] Plaintiff's Axis I diagnosis was Anxiety Disorder. (Tr. at 492). He rated her current and prior GAF at 60. (Id.). Plaintiff was not employed at the time, but the doctor noted that she was motivated for treatment, and had good social skills and a stable home. (Id.).

───────────────

[26] The signature page of this Treatment Plan is not included in the record.

23

    The Treatment Plan outlines all of plaintiff's goals for her
treatment at Bronx Lebanon. The first was to improve her
depression, specifically her mood, sleep, and anxiety. (Tr. at
493). The doctor hoped that plaintiff would improve her sadness for
"5/7" days per week by taking medication, improve her anxiety "4/7"
days per week by taking mediation, and improve her sleep "4/7"
days. (Id.). Plaintiff was to continue taking antidepressants and
to undergo individual psychotherapy. (Id.). She was also to meet
with her doctor and social worker twice per month. (Id.).


    Plaintiff also hoped to improve her general health. (Id.). The
doctor instructed her to take her medications as prescribed[27] and
follow up with her primary care physician once a month for regular
care. (Tr. at 496). At that visit, plaintiff did not meet the
discharge criteria, and "require[d] treatment at a different level
of care." (Tr. at 499).[28] Plaintiff requested to be seen bi-weekly.

_____

[27] As of that date, plaintiff was taking Lexapro 10 mg once a
day; Trazodone 50 mg once a day; Diclopen twice a day; Tobramycin
eye drops six times per day; and Lidocaine 5% topical cream once
a day. (Tr. at 592).

[28] Plaintiff also completed a mental health status form on
that date. (Tr. at 585). She indicated that she did not hear
voices or believe in witchcraft. (Id.). She also had to fill out
a nutrition screening form, on which she indicated that she did
not have prolonged periods of poor appetite or large fluctuations
in weight over the proceeding three months. (Tr. at 587).
Finally, plaintiff indicated that she smoked and was not
intending to quit. (Tr. at 593).

(Tr. at 594, 605).

That date, the Bronx Lebanon Department of Psychiatry completed a Psycho-Social History form for plaintiff. (Tr. at 596-600, 603). She reported having six children, four girls and two boys, and having been the victim of domestic violence. (Tr. at 597-98). The form indicates that her target symptoms were anxiety, depressed mood, appetite disorder, crying spells, a feeling of hopelessness, and sleep disorder. (Tr. at 596). Her functional deficit areas were considered to be coping skills and problem solving. (Id.). In summarizing her monthly income, plaintiff reported that she received $87.00 in section 8 rent, $400.00 in food stamps, and $192.00 in public assistance. (Tr. at 599). Plaintiff reported that she had previously been employed as a security guard. (Id.).

On December 2, 2008, plaintiff visited with Dr. Miriam A. Ewaskio, a psychiatrist with the Bronx Lebanon outpatient clinic. (Tr. 601).[29] Plaintiff was worried about being evicted, but reported decreased anxiety and improved sleep with the help of Lexapro (10

---

[29] According to plaintiff, she has been seeing Dr. Ewaskio on a monthly basis since December 2, 2008. (Response ("Pl.'s Opp'n") 5).

mg) and Trazodone (50 mg). (Id.).


Ms. Rodriguez next visited Bronx Lebanon on December 3, 2008.
(Tr. at 411, 602).[30] Social worker ("SW") Allison Arce initially
noted that plaintiff reported feeling "ok," although she was
suffering from a depressed mood and was "anxious." (Id.). The
follow-up appointment with the Social Worker was set for January 9,
2009. (Id.). Plaintiff failed to attend her January 9, 2009
appointment, and rescheduled that visit for February 2, 2009.
(Id.).


Plaintiff next visited with her treating psychiatrist, Dr.
Ewaskio, on January 13, 2009. (Tr. at 412, 607). Treatment notes
reflect an increase in plaintiff's "panic/anxiety" and problems
sleeping based on fear from a recent fire that had affected two
nearby homes. (Id.). As of that date, plaintiff was taking Lexapro
and Trazodone. (Id.). Plaintiff also informed the doctor that
welfare had closed her case and had asked her for a letter
regarding her current treatment. (Id.).


Dr. Ewaskio and SW Arce completed a Treatment Plan Review on

---

[30] Treatment records reflect notes from both Dr. Ewaskio and
Dr. Braham Harneja. (Tr. at 411-13).

behalf of plaintiff on February 5, 2009. (Tr. at 483-91).

Plaintiff's diagnosis was indicated as Anxiety Disorder with mixed

emotions. (Tr. at 483). They indicated that plaintiff's current

Global Assessment Functioning ("GAF")[31] was 55, and her prior GAF

was 60. (Tr. at 483). The report reflects that plaintiff had a

stable home and good social skills, and was able to read and write.

However, she was unemployed. (Id.).


One goal of treatment was to improve plaintiff's depression,

mood, and anxiety. (Tr. at 484). The treating sources hoped to

improve her feeling of sadness and anxiety for "4/7" days per week.

(Id.). To meet that goal, plaintiff was to remain on antidepressant

drugs and continue individual therapy. (Id.). Plaintiff also was to

improve her general health. (Tr. at 487). To do so, she was to

---

[31] "GAF [is measured on a 100-point scale, and] covers the
range from positive mental health to severe psychopathology . . .
." IH Monrad Aas, Global Assessment of Functioning (GAF):
Properties and Frontier of Current Knowledge, 9 Annals of Gen.
Psychiatry 20 (2010), available at
http://www.annals-general-psychiatry.com/content/pdf/1744-859X-9-
20.pdf. The 100-point scale is "divided into intervals, or
sections, each with 10 points (for example 31-40 and 51-60) . . .
. The anchor points for interval 1-10 describe the most severely
ill and the anchor points for interval 91-100 describe the
healthiest . . . . For example, patients with occasional panic
attacks are given a symptom score in the interval 51-60 (moderate
symptoms), and patients with conflicts with peers or coworkers
and few friends, a functioning score in the interval 51-60
(moderate difficulty in social, occupational or school
functioning)." Id.

continue taking her medicines as prescribed and see her doctor once
per month. (Id.). The report notes that as of that date, plaintiff
required "treatment at a different level of care," and would be
able to manage her symptoms in a "general health setting once
stable." (Tr. at 490). Plaintiff reported no other specific
concerns at the visit. (Tr. at 491).

Plaintiff had an appointment scheduled at Bronx Lebanon for
February 10, 2009, which she called to cancel. (Id.). She indicated
that she would follow up to reschedule. (Id.). Her next appointment
at Bronx Lebanon was on March 30, 2009. (Tr. at 413, 562, 606). She
reported feeling "sad" and overwhelmed, but felt "good" when she
attended church. (Tr. at 606).

On March 31, 2009, plaintiff saw Dr. Ewaskio. (Id.). The
doctor noted that plaintiff was off Lexapro and Trazodone. (Id.).
She still complained of trouble sleeping and increased anxiety and
depression. (Id.). Dr. Ewaskio restarted plaintiff on Lexapro and
Trazodone. (Id.).

On April 20, 2009, plaintiff visited Bronx Lebanon without an
appointment to request a letter for "SSD" – presumably Social
Security disability insurance. (Id.). On April 21, 2009, plaintiff

28

visited SW Arce at Bronx Lebanon. (Tr. at 561). She reported
feeling "OK," but complained that she was coping with stressors due
to a need to relocate to a section 8 apartment. (Id.).

On April 21, 2009, plaintiff again saw Dr. Ewaskio. (Tr. at
317, 319 (same), 320 (same), 374 (same)). She diagnosed plaintiff
as suffering from adjustment disorder, mixed emotions, and
depression. (Id.). She described plaintiff as calm, alert, and
cooperative, but also "anxious" with an "overwhelmed mood." (Id.).
Plaintiff was still taking Lexapro and Trazodone. (Id.). The doctor
indicated that plaintiff had a "fair" prognosis, and that her
"mental health condition [had] impacted her daily activities and
[she was] not able to work at th[at] time." (Id.).

Ms. Rodriguez again visited with her treating psychiatrist,
Dr. Ewaskio, on April 29, 2009. (Tr. at 318, 373 (same)). Dr.
Ewaskio diagnosed plaintiff with "mixed emotions" and "adjustment
[disorder]," with an onset date of November 5, 2008. (Id.). She
described plaintiff as "anxious, feeling overwhelmed," with a "sad
mood." (Id.). Plaintiff explained that she had a "low tolerance to
stress." (Id.). The doctor noted that plaintiff was taking Lexapro
and Trazodone, and that her response to those medications was
"fair," but that they were "being adjusted." (Id.). She also

29

determined that, at the time of the examination, plaintiff was "temporarily unemployable." (Id.).

On May 5, 2009, SW Maine and Dr. Ewaskio filled out a Treatment Plan review for plaintiff. (Tr. at 474-82). At the time, her diagnosis was "[m]ixed anxiety disorder." (Tr. at 474). The report indicates that plaintiff's current GAF was 55, and her prior GAF was 60. (Id.). The report describes plaintiff as motivated for treatment, with family and social support, and as capable of insight. (Id.). The treatment plan's primary goal was to improve plaintiff's depression, so that she felt less depressed and less anxious for "5/7 days per week for the next 3 months." (Tr. at 475). To meet that goal, plaintiff was to continue to see SW Maine and Dr. Ewaskio monthly over the subsequent three months. (Id.). A second goal of treatment was improving plaintiff's general health by ensuring that she was compliant with her medications. (Tr. at 478). As of that date, plaintiff did not meet the discharge criteria. (Tr. at 481).

On May 29, 2009, plaintiff visited SW Arce at Bronx Lebanon. (Tr. at 414, 608). She reported feeling "ok," and that she was regularly taking her medications. (Id.). Her mood was stable. (Id.). SW Arce filled out a Treatment Plan Review of plaintiff on

that date. (Tr. at 609-17). She was being seen for mixed-symptom anxiety disorder, and remained unemployed. (Tr. at 607). The plan's primary goal was to improve plaintiff's depression, by limiting her feelings of depression to "4/7 days" with the help of medication, and by limiting her anxiety. (Tr. at 610). She was to continue taking antidepressants and attending individual therapy. (Tr. at 610, 613). As of that date, plaintiff was not ready for discharge. (Tr. at 616).

On June 8, 2009, plaintiff visited a physician, Dr. Herb Meadow, at Industrial Medicine Associates, PA, in Bronx, New York for a consultive psychiatric examination, at the instruction of the SSA. (Tr. at 290-93). With respect to her psychiatric history, plaintiff reported that she had no history of psychiatric hospitalization, but that she had been in counseling for about one and a half years, and was presently seeing Dr. Ewaskio at F.E.G.S. once every month. (Tr. at 290). With respect to her medications, she stated that she was taking Fioricet/APAP[32] with Codeine,

_____

[32] Fioricet with Codeine is medication used to treat pain. Tennenhouse, supra note 4, § 40:9.

31

Ciprofloxacin,[33] Ibuprofen, Lexapro, Hydroxyzine,[34] Arthrotec,[35] and Patanol.[36] (Id.). As for her current functional capacity, she complained that she had "difficulty falling asleep," had "a poor appetite," and had lost ten pounds in the year prior to the visit. (Id.). The doctor noted that she described symptoms of "depression[,] of dysphoric moods, crying spells, irritability, low energy, diminished self-esteem, and difficulty concentrating." (Id.). She had had suicidal thoughts in the past, but not at the time of the visit. (Id.). She denied any panic attacks, manic symptoms, thought disorder, or cognitive deficits. (Id.). Dr. Meadow described her mood as "[d]epressed" and "anxious." (Tr. at 291). Dr. Meadow also noted that Ms. Rodriguez had had a history of "domestic violence" and suffered from related "flashbacks and nightmares." (Tr. at 290).

Dr. Meadow noted that her attention and concentration were intact, as were her recent and remote memory skills. (Tr. at 291).

---

[33] An antibiotic. Tennenhouse, supra note 4, § 40:19.

[34] An antihistamine. Tennenhouse, supra note 4, § 25:29.10.

[35] A medication used to treat osteoarthritis and rheumatoid arthritis. Tennenhouse, supra note 4, § 40:4.

[36] Patanol is a "H1-blocker antihistamine" used to treat "itching of allergic conjunctivitis [and] seasonal allergic rhinitis." Tennenhouse, supra note 4, § 40:18.

He considered her cognitive functioning to be "[a]verage," with the "[g]eneral fund of information limited," and her insight and judgement to be "[f]air." (Tr. at 291-92).

With respect to her daily living activities, plaintiff reported that she "[took] care of her personal hygiene, [did] all her household chores, . . . socialize[d] primarily with her immediate family . . . [and] spen[t] her days watching television and listening to music." (Tr. at 292). The doctor concluded that "[t]he claimant would be able to perform all tasks necessary [for] vocational functioning." (Id.). While he noted that the examination results appeared "to be consistent with psychiatric problems," he concluded that they did "not appear to be significant enough to interfere with [plaintiff's] ability to function on a daily basis." (Id.).

Nonetheless, he diagnosed plaintiff as suffering from posttraumatic stress disorder, "[a]djustment disorder with mixed anxiety with depressed mood," right-leg pain, and hypertension. (Id.). The doctor recommended that Ms. Rodriguez continue with psychiatric treatment, and gave her a "[f]air" prognosis. (Id.).

That same day, plaintiff also met with consultative physician

33

Dr. William Lathan, also of Industrial Medicine Associates, PA, for an internal medicine consultation. (Tr. at 294-97). Plaintiff was referred to Dr. Lathan by the Division of Disability Determinations for a disability evaluation. (Tr. at 294). Dr. Lathan initially recorded her medical history with respect to her leg, and noted that she had last worked in 2006 in a child-care position. (Id.). As of that date, plaintiff was taking Acetaminophen with Codeine, Ciprofloxacin, Ibuprofen, Trazodone, Lexapro, Hydroxyzine, Arthrotec, and Tactinal. (Id.). Plaintiff reported that she could "perform all activities of personal care and daily living." (Tr. at 295).


Dr. Lathan also performed a physical examination of plaintiff on that date. (Id.). His examination revealed a limp favoring the right leg, but he noted that she could "walk on her heels and toes without difficulty" and perform a "full squat." (Id.). She did not require any assistantive devises and was able to climb on and off the examination table without help. (Id.). She had a full range of motion in the hips, knees, and ankles bilaterally, but showed "anterior bowing at the midportioning of the right tibia." (Tr. at 296). However, she suffered from no loss in strength in her lower extremities, nor did the doctor observe swelling in her legs. (Id.).

34

Dr. Lathan's ultimate impression of Ms. Rodriguez was that she had a history of hypertension, right-lower-extremity derangement, and a history of depression. (Id.). He gave her a "[s]table" prognosis. (Id.). The doctor further opined that "[t]here is a severe restriction for prolonged standing and walking," and he recommended a psychiatric consultation. (Id.).

On June 23, 2009, a Dr. B. Lightner[37] examined plaintiff and subsequently filled out a Physical Residual Functional Capacity Assessment for the SSA. (Tr. at 298-303). Plaintiff was alleging a disability due to a right-leg fracture in 1985 that failed to heal properly. (Tr. at 299). Dr. Lightner reported that an x-ray of her right light performed on October 8, 2008 reflected chronic fracture deformities of the tibia and fibula, anterior angulation of the proximal-to-mid-shaft fracture, non-union of the midshaft fibula, and a healed fracture of the distal fibula shaft. (Id.). Dr. Lightner reported that plaintiff's primary diagnosis was a past right-leg fracture with derangement, and a secondary diagnosis of hypertension. (Tr. at 298).

---

[37] The record reflects potential confusion as to Dr. Lightner's first name, as a New York State Office of Temporary & Disability Assistance Division of Disability Determination's form notes a document from a Dr. E. Lightner. (See Tr. at 197).

He made several relevant findings with respect to plaintiff's exertional limitations. He concluded that plaintiff could occasionally lift and/or carry ten pounds; frequently lift and/or carry less than ten pounds; stand and/or walk for a total of at least two hours in an eight-hour work day; sit with normal breaks for a total of about six hours in an eight-hour work day; and push and/or pull in only limited capacity in her lower extremities. (Tr. at 299).

With respect to postural limitations, Dr. Lightner noted that plaintiff could occasionally climb stairs, balance, stoop, kneel, crouch, and crawl. (Tr. at 300). He reported no manipulative limitations, visual limitations, communicative limitations, or environmental limitations. (Tr. at 300-01). Plaintiff stated that she could not stand or sit "too long" due to pain. However, the doctor reported that she did not explain how her symptoms limited her functioning, and thus he could not make a statement regarding her credibility. (Tr. at 301).

On June 23, 2009, plaintiff visited Bronx Lebanon to address her depression and anxiety. (Tr. at 416, 418, 619-20). She reported that she felt depressed, and that she had good and bad days. She reported at times feeling "very anxious," and stated that she was

36

"not doing well" physically. (Tr. at 416). However, she also stated
that she was "feeling good" because her daughters were doing well
in school. (Tr. at 418).

On June 24, 2009, a Dr. M. Apacible filled out an SSA
Psychiatric Review Technique form after assessing plaintiff's
residual functional capacity. (Tr. at 304-14). He based his
assessment on two pertinent SSA regulations -- Listing 12.04,
Affective Disorders, and Listing 12.06, Anxiety-Related Disorders.
(Tr. at 304). The doctor noted that plaintiff had a medically
determinable impairment, consisting of adjustment disorder with
mixed anxiety and a depressed mood. (Tr. at 305). He also found
that plaintiff suffered from post-traumatic stress disorder. (Tr.
at 306). However, Dr. Apacible determined that plaintiff's
impairments would not limit her activities of daily living, and
would cause only a mild limitation in maintaining social
functioning, and in maintaining concentration, persistence, or
pace. (Tr. at 307). He found that she was not significantly limited
in understanding, memory, sustained concentration, or persistence,
except with respect to the ability to understand, remember, and
carry out detailed instructions, for which she had moderate
limitations. (Tr. at 311). Dr. Apacible ultimately concluded that
Ms. Rodriguez was "able to perform all tasks necessary for

37

vocational training" at the time of the examination. (Tr. at 313).

Plaintiff was seen by Dr. Ewaskio on June 25, 2009. (Tr. at 417, 621). The doctor noted plaintiff's complaints of "frequent fearfulness," increased anxiety, difficulty sleeping, and eating when anxious. (Id.). Accordingly, the doctor increased the dosage of plaintiff's Lexapro from 10 mg to 20 mg and the dosage of her Trazodone from 50 mg to 100 mg. (Tr. at 415, 417).[38] She ordered plaintiff to return in four weeks to reassess her condition. (Tr. at 417).

Dr. Ewaskio again saw plaintiff on July 7, 2009. (Id. at 355-59). She determined that Ms. Rodriguez was suffering from depression. Plaintiff claimed that she had been feeling anxious, overwhelmed, and, at times, depressed. (Tr. at 355, 358). She noted that plaintiff was on psychotropic medication, Trazodone,[39] and that she was receiving individual psychotherapy once a month. (Id.). Dr. Ewaskio noted that plaintiff's depression had not "resolved or

_____

[38] A medication report generated on that date shows that plaintiff was to continue taking Trazodone (100 mg) and Lexapro (20 mg). (Tr. at 618).

[39] Trazodone is a "serotonin antagonist and reuptake inhibitor" used to treat "major depressive disorder (MDD)." Tennenhouse, supra note 4, § 40:23.

stabilized" since her last visit, and concluded that Ms. Rodriguez was still temporarily unemployable. (Tr. at 357, 359). However, Dr. Ewaskio did not specify for how long she believed that plaintiff would remain unemployable. (Id.).

Plaintiff saw SW Maine on that same date. (Tr. at 624-25). She indicated that she had been "feeling anxious" and "found [herself] crying a lot for no reason at all." (Tr. at 419, 624).

On July 3, 2009, plaintiff had a biopsy of her right cheek. (Tr. at 442-43). Pursuant to a July 6, 2009 report from Dr. Hyun-Soo Lee at GenPath Laboratory, plaintiff was diagnosed with basal cell carcinoma, a form of skin cancer. (Tr. at 463). On July 17, 2009, the biopsy revealed basal cell carcinoma that extended to the base and lateral edge of plaintiff's cheek. (Tr. at 444, 447, 463). Dr. Lee performed an operation on Ms. Rodriguez on July 23, 2009 to remove the cancer from plaintiff's right cheek. (Tr. at 323-27, 364-66, 376-77, 378, 379, 445-46). The doctor observed that "[d]ue to the large defect left by the excision of the lesion, simple closure could not be performed. The deeper layers of the def[]ect had to be approximated to reduce tension on and to achieve an optimal healing of the suture line." (Tr. at 327).

39

On July 28, 2009, plaintiff again visited SW Maine at Bronx Lebanon. (Tr. at 420, 559-60, 625). She indicated that she was experiencing mood instability. (Id.). She was depressed and anxious because she had been unable to find section 8 housing, and she had recently undergone surgery to remove skin cancer from her face. (Id.).

On August 5, 2009 SW Maine and Dr. Ewaskio completed a Treatment Plan Review for plaintiff. (Tr. at 465-73). They diagnosed her with "[m]ixed" anxiety disorder. (Tr. at 465). They indicated that she had good social and communication skills, was motivated for treatment, and had a stable home. (Id.). The report identifies goals of plaintiff's treatment, the first of which was to improve her mood and anxiety. (Tr. at 466). Specifically, the hope was that plaintiff would feel less anxious and depressed "6/7 days per week for the next 3 months." (Id.). To reach this goal, plaintiff was to continue to see both Dr. Ewaskio and SW Maine once a month for three months. (Id.). Plaintiff also had the goal of improving her general health. (Tr. at 469). She was to take all medications as prescribed, and follow up with medical appointments as needed. (Id.). The report indicates that plaintiff did not meet discharge criteria at that time. (Tr. at 472).

40

On August 6, 2009, plaintiff had a fibroma removed from her
right inner thigh. (Tr. at 380, 451-52). She saw Dr. Lee for a
post-excision visit, at which she reported that she was "very
happy" with the results. (Tr. at 450).

On August 13, 2009, plaintiff was again seen at Bronx Lebanon
with a main diagnosis of bipolar disorder with mood instability.
(Tr. at 421, 513-14). She indicated that she was very happy to have
found section 8 housing and was feeling "less depressed," although
she was "still not sleeping." (Id.). Plaintiff also brought
paperwork to that visit from her lawyer in connection with her
attempt to obtain SSI benefits. (Id.).

On September 2, 2009, plaintiff again saw Dr. Lee. (Tr. at
453). The purpose of the visit was to reevaluate the scar on her
right cheek. (Id.).

On September 8, 2009, Dr. Ewaskio reexamined Ms. Rodriguez.
(Tr. at 360-61, 362-63 (same)). The doctor opined that plaintiff
was still suffering from depression. (Tr. at 360). Plaintiff
reported that her depressive symptoms were persisting, and that she
at times became "very anxious" and experienced "heart palpitation."
(Id.). She was still taking both Lexapro and Trazodone, but Dr.

41

Ewaskio noted that her medication was "still being adjusted"
because her depression had not yet stabilized. (Tr. at 360-61). Dr.
Ewaskio also concluded that Ms. Rodriguez was unable to work for at
least twelve months and could be eligible for long-term disability
benefits. (Tr. at 361). She also noted that plaintiff had already
applied for SSI. (Id.).

Plaintiff saw SW Maine that same date to address her mood
instability. (Tr. at 515-16). Plaintiff was feeling anxious and
depressed at the thought of having to move to her new apartment.
(Tr. at 515). Her next appointment with Ms. Maine was set for
October 12, 2009. (Tr. at 516).

On October 5, 2009, plaintiff again saw Dr. Ewaskio. (Tr. at
430, 500). She had been out of her medications for two weeks and
was thus referred as a walk-in patient by Ms. Maine. (Id.).
Plaintiff complained of increased anxiety that had predated her
exhausting her supply of both Lexapro and Trazodone. (Id.). She
also reported that she had not been sleeping, but was happy to have
found a new apartment for herself and her children. (Id.).
Plaintiff also showed Dr. Ewaskio the scar from her skin-cancer
removal procedure; the doctor observed that the scar was mostly
covered by her glasses. (Id.). At that visit, Dr. Ewaskio

42

prescribed plaintiff .5 mg of Klonopin in addition to the Lexapro
and Trazodone that she was already taking. (Id.).

On October 12, 2009, plaintiff was again seen by SW Maine at
Bronx Lebanon. Her principal diagnosis was bipolar disorder with
mood instability. (Tr. at 422, 517-18). She indicated that she was
feeling "mildly depressed at times" and "anxious." (Tr. 422). She
also indicated that she had moved to a "nice 3 bedroom apartment
[and her] kids [were] doing okay," so she should have been "very
happy instead of feeling depressed." (Id.).

On October 15, 2009, plaintiff again saw Dr. Lee to follow up
regarding the scar on her right cheek. (Tr. at 454). Plaintiff
complained that the area was dry and that there was a "little dark
spot" remaining. (Id.).

On November 5, 2009 SW Maine and Dr. Ewaskio completed a
Treatment Plan Review for plaintiff. (Tr. at 394-402, 501-09). They
indicated that she had mixed anxiety disorder, and rated her
current GAF as 55, with a prior rating of 60. (Tr. at 394, 501).
Plaintiff was not employed at the time. (Tr. at 394). The report
also indicates that plaintiff had good social skills, a stable
home, and was motivated for treatment. (Id.). The review indicates

43

that one of the goals of treatment was to improve plaintiff's mood and anxiety, specifically, that plaintiff would report feeling less depressed and anxious for "7/7 days per week for the next 3 months." (Tr. at 395). To meet that goal, she was to continue to see both SW Maine and Dr. Ewaskio on a monthly basis. (Id.). A second goal identified was to improve plaintiff's general health, especially to ensure compliance with medications. (Tr. at 398). Plaintiff was directed to attend all medical appointments and take her medications as prescribed. (Id.). The treating sources concluded that plaintiff did not meet discharge criteria at that time. (Tr. at 401).

On November 9, 2009, plaintiff had a visit with the Social Worker, Ms. Maine, at Bronx Lebanon. (Tr. at 423-24, 425-26 (same), 519-20 (same), 521-22 (same)). The problems that were addressed at that visit were plaintiff's "[d]epressed [m]ood" and "[a]nxiety." (Tr. 423). Ms. Maine rated plaintiff's GAF at 60, and identified the goals of treatment as eliminating plaintiff's "depressed symptoms," identifying her "triggers of depression," and limiting her anxiety to less than three out of seven days each week. (Tr. at 423-24). Plaintiff reported feeling "mildly depressed" and experiencing anxiety and loss of sleep when faced with "financial problems." (Id.). Her mood was "sad, tearful with feeling of

44

frustration." (Tr. at 424).

She also reported that she had applied for SSI but had been denied, and that she had been referred to an SSI lawyer. (<u>Id.</u>). Plaintiff had brought to the meeting paperwork related to her SSI application. (<u>Id.</u>). The report indicated that she would continue to attend therapy once a month, and would be "considered for discharge to a lower level of care when her depressive symptoms are in remission." (<u>Id.</u>).

On November 16, 2009, Dr. Ewaskio completed a Psychiatric Assessment of plaintiff in connection with her application for social security disability benefits. (Tr. at 367-68, 404-05). Dr. Ewaskio noted that plaintiff was a forty-year-old Hispanic woman who had been born in Puerto Rico. (<u>Id.</u>). She had been receiving outpatient treatment at the Bronx Lebanon hospital since November 5, 2008, and had had monthly psychiatric and social worker visits. (Tr. at 367, 404). The doctor noted that plaintiff's symptoms included depression and anxiety disorder. (<u>Id.</u>). These disorders at times made her very stressed and irritable, and caused her difficulty sleeping. (<u>Id.</u>). The doctor rater her GAF at 50/50, which is superimposed over a rating of 60/60. (Tr. at 368, 405). The doctor observed that her attitude, mood, and judgment were

45

"good." (Tr. at 367, 404). Moreover, she noted that plaintiff

suffered from skin cancer,[40] adjustment disorder with mixed

emotions, a broken leg, migraines, and a heart condition. (Tr. at

368). She reported that plaintiff continued to need treatment for

depression and anxiety that had lasted "many years." (Tr. at 368).

The doctor concluded that psychiatric treatment "has been the most

appropriate course of action to prevent decompensation." (Tr. at

369). Her prognosis was "[f]air." (Id.).

On November 30, 2009, plaintiff again saw Dr. Ewaskio. (Tr. at

427, 510, 511). Plaintiff complained of increased anxiety, sadness,

and inability to sleep because her daughter's husband had been

diagnosed with cancer. (Id.). As of that date, she was taking .75

mg of Klonopin daily; the doctor told her that she could double the

dosage and take up to 1.5 mg total per day. (Id.).

On December 8, 2009, Dr. Ewaskio performed a medical

assessment of plaintiff's abilities to do work-related activities.

(Tr. at 369-71, 406-08 (same)). According to Dr. Ewaskio, the

cumulative effect of her conditions was such that Ms. Rodriguez had

---

[40] She highlighted the fact that surgery had been performed
on plaintiff's face, which deepened Ms. Rodriguez's depression.
(Tr. at 370-71).

"poor" or no ability to relate to co-workers, to deal with the public, to deal with work stresses, to function independently, and to maintain attention concentration. (Tr. at 369-70, 406-07).[41] Moreover, Dr. Ewaskio noted that Ms. Rodriguez's ability to follow work rules and simple job instructions, use judgment, behave in an emotionally stable manner, relate predictably in social situation, demonstrate reliability, and interact with supervisors was "fair." (Id.).[42] She elaborated that plaintiff "has problems concentrating and is not capable of following instructions." (Tr. at 370, 407). Despite the foregoing, Dr. Ewaskio concluded that plaintiff would be able to "manage benefits in her own best interest." (Tr. at 371, 408).

On that same date, plaintiff had another visit with SW Maine. (Tr. at 428-29). Treatment notes indicate that Ms. Maine continued with the treatment goal of eliminating depressive symptoms and decreasing anxiety. (Tr. at 428). Ms. Maine observed that plaintiff was anxious and depressed over her "financial situation," and rated her GAF at 60. (Tr. at 429). Plaintiff agreed to continue

---

[41] A rating of "poor/none" indicates that the patient has "no useful ability to function" in the specified area. (Tr. at 369).

[42] A rating of "fair" indicates that the patient's ability to function in the specified area "is seriously limited, but not precluded." (Tr. at 369).

counseling and to take her medication as prescribed. (Id.).

On January 7, 2010, plaintiff saw Dr. Lee to check on her facial scar. (Tr. at 455). She stated that it was "much better." (Id.). She also complained of dry skin and face, and of hair loss. (Id.). Lab specimens that Dr. Lee had collected on January 7, 2010 reflected low "BUN" levels, a high white blood cell count (18.88 k/ul), and high triglycerides. (Tr. at 381-84, 388-91 (same)).

On January 8, 2010, plaintiff again saw SW Maine for her depression and anxiety. (Tr. at 431-32, 523-25 (same)). Plaintiff indicated that she was feeling depressed and remained unable to sleep despite taking her medication. (Tr. at 431). She reported being anxious because she was planning to help one of her daughters move from Louisiana to Puerto Rico. (Id.). SW Maine noted that plaintiff's mood was "sad" and "tearful," and she recommended that plaintiff attend therapy "bi-monthly." (Tr. at 432). She also rated plaintiff's GAF as 60. (Id.). Treatment notes also indicate that plaintiff would not be seen in February 2010 as she would be away helping her daughter move; her next appointment was set for March 12, 2010. (Id.).

On January 26, 2010, prior to the Louisiana trip, plaintiff

48

again saw Dr. Lee for persisting dermatological issues. (Tr. at 456). She complained of "white spots appearing all over" her body and of a "black spot appearing around" her lip. (Id.).

On January 28, 2010, plaintiff again saw Dr. Ewaskio. (Tr. at 233, 534). She indicated that her family had had a difficult Christmas because her daughter's husband had a bag to drain his liver. (Id.). Plaintiff therefore had experienced a "great" increase of anxiety and sadness, and complained of low energy, lack of motivation, and feelings of sadness. (Id.). She reported that the increased dosage of Lexapro to 20 mg helped "a little." (Id.). She also reported that she could not sleep, so she would take Klonopin. (Id.). She reported that it also helped "a little" but still kept her awake. (Id.). Dr. Ewaskio decided to prescribe plaintiff Ambien and Wellbutrin,[43] and set a follow-up appointment for March 11, 2010 to reassess her response to the new drugs. (Id.). Finally, the doctor noted that plaintiff was applying for SSI through an attorney who had requested her medical records. (Id.).

---

[43] Wellbutrin is a "norepinephrine-dopamine reuptake inhibitor" used to treat "depression, nicotine addiction, chronic neuropathic pain (such as pain from diabetic neuropathy, HIV, Herpes zoster, stroke, multiple sclerosis, etc), attention deficit hyperactivity disorder, bipolar disorder, [and] sexual dysfunction." Tennenhouse, supra note 4, at § 40.26.

On February 5, 2010, SW Maine and Dr. Ewaskio filled out another Treatment Review for plaintiff with respect to treating her mixed anxiety disorder. (Tr. 526-33, 548).[44] Plaintiff was still unemployed as of that date. (Tr. at 548). The first treatment goal identified was to reduce plaintiff's depression and anxiety, which would decrease as she continued to take her medication. (Tr. at 526). She was also to continue to take all of her medications to improve her general health. (Tr. at 529). Plaintiff did not meet discharge criteria as of that date, but would be considered for discharge "to a lower level of care when [she] [was] able to manage symptoms in a general health setting once stable." (Tr. at 532).

On March 19, 2010, plaintiff again met with SW Maine. (Tr. 535-36). She indicated that plaintiff was being seen for depressed mood and anxiety. (Tr. at 535). Plaintiff's short-term goals were to report having no depressed symptoms, be able to identify the triggers of her depression, and to experience anxiety less than three days per week. (Id.). Plaintiff reported that she had returned from Louisiana, and was "feeling okay . . . not depressed." (Id.). She would still continue to attend individual therapy bi-monthly. (Tr. at 536).

---

[44] The first page of this record is included at page 548.

50