

RECEIVED
AUG 27 2012
CHAMBERS OF
COLLEEN McMAHON

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
MARIBEL RODRIGUEZ,                    :
                                      :
                    Plaintiff,        :
                                      :    REPORT & RECOMMENDATION
          -against-                   :
                    MEMO ENDORSED     :
MICHAEL J. ASTRUE,                    :    11 Civ. 7720 (CM)(MHD)
Commissioner of Social Security,      :
                                      :
                    Defendant.        :
------------------------------------x

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9/28/12

TO THE HONORABLE COLLEEN MCMAHON, U.S.D.J.:

     Plaintiff Maribel Rodriguez filed this action pursuant to
section 1631(c)(3) of the Social Security Act ("the Act"), as
amended, 42 U.S.C. § 1383(c)(3). (See Compl. ¶ 1). She challenges
the May 13, 2011 decision of Administrative Law Judge ("ALJ") Seth
I. Grossman, denying her April 30, 2009 application for
Supplemental Security Income ("SSI"). (Admin. R. Tr. ("Tr.") at 18-
28, 67). ALJ Grossman's decision became the final decision of the
Commissioner of Social Security ("the Commissioner") on August 31,
2011, when the Social Security Administration ("SSA") Appeals
Council denied plaintiff's request for review. (Tr. at 1-3).
Plaintiff seeks an order reviewing the Commissioner's determination
and granting her monthly maximum SSI benefits retroactively to the
date of her claimed initial disability, March 1, 2002. (Compl. ¶¶
5, 9(c)). Alternatively, she requests an order remanding her claim

*9/27/2012 — No objections have been filed. I find the Magistrate Judge's thorough and comprehensive report, which I adopt as the opinion of the court. The case is remanded for further proceedings in accordance with this opinion. Defendant's motion for judgment on the pleadings is DENIED.*

*Colleen McMahon   USDJ*

for reconsideration of the evidence. (<u>See</u> <u>id.</u> ¶ 9(c)).

The Commissioner has moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Mem. of Law in Supp. of the Commissioner's Mot. for J. on the Pleadings ("Def.'s Mot.") 1). He asserts that his denial of SSI benefits was supported by substantial evidence and based upon the applicable legal standards. (<u>Id.</u>).

For the reasons set forth below, we recommend that defendant's motion for judgment on the pleadings be denied, and that the case be remanded for further development of the record and additional findings.

<u>PROCEDURAL HISTORY</u>

On April 30, 2009, plaintiff filed an application for SSI under Title XVI of the Act. (Tr. at 67, 157-60). The SSA denied her application on initial review on June 26, 2009, concluding that plaintiff was "not disabled" under the Act. (Tr. at 68-72).

Subsequently, on July 22, 2009, plaintiff requested a hearing on her application before an ALJ. (<u>See</u> Tr. at 18, 77-78). On January 29, 2010, plaintiff requested that her hearing be scheduled

so that she could appear in person before an ALJ, rather than via teleconference. (Tr. at 103). The hearing took place before ALJ Grossman on November 15, 2010, with plaintiff represented by counsel, Daniel Berger, Esq., and with a vocational expert, Raymond Cester, present. (Tr. at 33-66). Ms. Rodriguez testified with the assistance of a Spanish interpreter. (Tr. at 33).

On May 13, 2011, ALJ Grossman issued a decision unfavorable to plaintiff. (Tr. at 18-28). Though he found that plaintiff had severe impairments -- specifically, a "non-union fracture of the right leg with derangement" and "a depressive disorder with anxiety" (Tr. at 20) -- he determined that plaintiff had the residual functional capacity to perform "sedentary work," provided that she "only perform simple, repetitive tasks that involve limited contact with the public and with supervisors." (Tr. at 22). In light of plaintiff's age, education, work experience, and residual functional capacity, ALJ Grossman determined that "jobs . . . exist in significant numbers in the national economy that" plaintiff could perform. (Tr. at 27). Therefore, he concluded, plaintiff had not been under a disability as defined by the Act, and was not entitled to any benefits under the Act. (Tr. at 28).

On May 31, 2011, plaintiff filed a request for review of ALJ

Grossman's decision with the SSA Appeals Council. (Tr. at 11). The SSA Appeals Council denied her request for review on August 21, 2011. (Tr. at 1-3).

On October 28, 2011, plaintiff filed this lawsuit requesting review of SSA's denial of benefits. (Compl. ¶ 1). Plaintiff alleges that the ALJ's decision is erroneous because it is neither supported by substantial evidence on the record nor in accordance with the law. (Id. ¶ 9). The Commissioner responded on April 9, 2012 by moving for judgment on the pleadings under Rule 12(c), asserting that the ALJ's decision is supported by substantial evidence. (Def.'s Mem. 1, 14-25).

## FACTUAL BACKGROUND

I. Medical Evidence Before the ALJ[1]

The record before the ALJ reflects an extensive history of treatment for plaintiff's medical and psychiatric conditions. Specifically, it shows that in the period between 2002 and 2011,

---

[1] We note that the administrative transcript contains repeats of certain pages. After page 503, the pages in the record revert to number 484, after which the pages again continue in proper order.

Ms. Rodriguez was treated principally for right-lower-extremity derangement, depression, and anxiety.

### A. Plaintiff's Medical Contacts

The City of New York Human Resources Administration ("HRA") issued plaintiff a letter on an unspecified date prior to September 10, 2002 noting that she was "too ill to participate in an HRA Approved Work activity" and subsequently scheduled a medical examination for her at HS Systems, Inc. in order to help determine an appropriate work activity. (Tr. at 216).

On September 24, 2002, Ms. Rodriguez visited HS Systems, Inc., where she was examined by Dr. Peter E. Graham. (Tr. at 205).[2] Plaintiff described to Dr. Graham that she had experienced a

---

[2] Plaintiff filled out a comprehensive-medical-history questionnaire at this visit in Spanish. (See Tr. at 210-12). She indicated on that form that she had emotional problems, such as depression or anxiety, that affected her ability to work. (Tr. at 211). She also indicated that she participated in activities of normal daily living, including washing clothes and dishes, making the bed, cooking, watching television, and socializing. (Tr. at 212).

"fracture of the right tibia[3] [and] fibula[4] 16 years ago." (Id.).
She indicated that she had undergone "a number of surgeries" for
the problem. (Id.). At the time of the examination, plaintiff
described "some pain" in the lower part her right leg, which was
induced by walking. (Id.). Additionally, the doctor noted that she
claimed to suffer from "poor weight bearing" and "swelling" in the
same leg, although she did not use a cane to aid ambulation. (Id.).
She reported that she was on no pain medication. (Id.).

Dr. Graham recounted that plaintiff had suffered an episode of
phlebitis prior to her examination, although she was not
hospitalized.[5] (Id.). The doctor observed that Ms. Rodriguez
"walk[ed] with a slight limp due to slight shortening of the right
lower extremity," and he noted about a one centimeter difference in
the length of her legs. (Tr. at 206). Plaintiff's right leg also
exhibited "anterior bowing of the mid-tibial area." (Id.). An x-ray
of the right tibia and fibula revealed "residue of previous

---

[3] A tibia is "the shin bone: the inner and larger bone of the
leg below the knee; it articulates with the femur and head of the
fibula above and with the talus below." Dorland's Illustrated
Medical Dictionary, 1840 (29th ed. 2000).

[4] "A bone of the lower leg." Dan J. Tennenhouse, Attorneys'
Medical Deskbook § 5:8 (4th ed. 2006-2011), available at Westlaw
MEDDESK.

[5] Phlebitis is the "inflammation of a vein." Dorland's,
supra note 3, at 1374.

6

fracture." (Id.).


During Dr. Graham's evaluation, plaintiff described a "history
of anxiety and depression disorder," which included "feelings of
sadness" and "episodes of inappropriate crying." (Tr. at 205).
Plaintiff indicated, however, that she had never attempted suicide.
(Id.). Plaintiff also reported that she did "not recall when she
[had] last worked." (Id.).


Ultimately, the doctor concluded that Ms. Rodriguez's
prognosis was "stable." (Tr. at 206). He observed that she was able
to "sit, stand, walk, lift, carry, handle objects, hear, speak and
travel," although any "prolonged walking may be limited by right
leg pain." (Id.). The doctor crossed out an indication that she was
able to do "sedentary to light activity" -- what he wrote in its
place in illegible. (Id.). Dr. Graham ordered an x-ray of her
distal right leg and laboratory tests. (Tr. at 213). On this date,
plaintiff also agreed to be a part of the HHS Medical Examination
Program. (Tr. at 218-19).


The results of plaintiff's laboratory work were available the
next day. (Tr. at 208). The pertinent report reflects that she had

low glucose and "BUN,"[6] and high LDH cholesterol, a high white blood cell count,[7] and "hematocrit."[8] (Id.).

On September 26, 2002, Dr. Seymour Sprayregen of HS Systems, Inc. provided his interpretation of the radiographic examination of the distal portion of the plaintiff's right leg, including her ankle. (Tr. at 209). The doctor observed "a healed fracture of the midtibial shaft with anterior bowing at the fracture site" and "areas of selerosis in the proximal tibia and distal tibia which [he] considered to be related to traction pins." (Id.). He observed further that "[t]here [was] a healed fracture of the distal fibula and a fracture of the midfibula at the tibial fracture level with no good bony union at this site." (Id.). Ultimately, his impression of the plaintiff's leg was that "[r]esidua of previous fractures of the tibia and fibula" were present. (Id.).

On September 27, 2002, Dr. Graham wrote to the HRA and indicated that plaintiff was to follow up with her primary care

---

[6] "BUN" is "Blood urea nitrogen — A laboratory test for kidney disease." Tennenhouse, supra note 4, at § 5:4.

[7] Plaintiff's white blood cell count was reported as 13.3 k/ul, with the normal range indicated as 3.9-11.3 k/ul. (Tr. at 208).

[8] "Hematocrit [is] [a] laboratory test of the blood." Tennenhouse, supra note 4, § 5:10.

provider within a week, and that she had an abnormally high white blood cell count and high LDH levels. (Tr. at 214-15).

On October 1, 2002, plaintiff participated in a rehabilitation program at HS Systems, Inc. to address her abnormal LFT[9] and white blood cell count. (Tr. at 201-04, 219, 221).[10] The program was expected to be completed by January 1, 2003. (Tr. at 203).[11] The HSS Wellness Program's Rehabilitation Plan noted that Ms. Rodriguez was suffering from "hematologic diseases/disorder," and also had the goal of "[e]valuat[ing] and stabiliz[ing] hepatic disease" such as hepatitis, and evaluating the need for a biopsy or surgery. (Tr. at 203-04).[12]

Dr. Maruthi M. Sunkara at HS Systems Wellness Program noted that plaintiff had fractured her right leg in 1986. (Tr. at 222, 228-29). He determined that plaintiff was capable of doing "clerical work," such as "answering phones" and "making

---

[9] A liver-function test. Tennenhouse, supra note 4, § 5:14.

[10] Lab reports generated on October 2, 2002 reflected high cholesterol and LDL levels. (Tr. at 223).

[11] The plan was ultimately completed on December 18, 2002. (Tr. at 203, 225-228 (rehabilitation plan treatment notes)).

[12] Hematology is defined as the "branch of medical science that deals with the blood and blood-forming tissues." Dorland's, supra note 3, at 796.

9

appointments," as of January 8, 2003. (Tr. at 222, 228-29). He noted that Ms. Rodriguez could not "stand or walk for prolonged periods." (Id.). He also noted that she was not currently on any medications and that she had high cholesterol and an elevated white blood cell count. (Id.). A blood test taken on January 23, 2003 reflected a high white blood cell count (12.2 k/ul). (Tr. at 224).

At the close of plaintiff's Rehabilitation Program, HS Systems concluded that her high cholesterol and LFT count had "reached maximim medical improvement," and she was cleared to "participate in a work related activity." (Tr. at 221, 230). On February 6, 2003, HS Systems published a specific report of its findings regarding plaintiff's ability to work. (Tr. at 220, 231). It found that she could perform a job that involved "[n]o [l]ifting and minimal walking/bending/standing, pushing, [] pulling . . . [and] [o]perating [m]achinery." (Tr. at 220). She was also instructed to avoid travel during rush hour. (Id.). The report reflects a list of HRA jobs that were "suitable" for plaintiff, including answering phones, making appointments, making and collating copies, sewing costumes, interpreting, greeting visitors, data entry, and simple bookkeeping. (Id.). On February 21, 2003 HS Systems sent plaintiff a notice of plan completion, informing her that her treating physician had cleared her to participate in a work-related

10

activity. (Tr. at 230).

On March 18, 2003, the HRA provided notice to plaintiff that she was required to have a medical functional assessment evaluation in order to assess her ability to work. (Tr. at 242). Her appointment was scheduled for April 2, 2003. (Id.).

On April 2, 2003, Dr. Graham again examined Ms. Rodriguez. (Tr. at 233, 243).[13] He noted that plaintiff demonstrated "slight anterior bowing with slight shortening of the right lower extremity." (Tr. at 234). However, he found that all of her joints and her spine exhibited a full range of motion without pain, and that she was able to perform a full squat. (Id.). He noted that prior to the examination, Ms. Rodriguez had had a "[h]istory of recurrent phlebitis in the right lower extremity," but she did not show evidence of post-phlebitic syndrome. (Tr. at 235). He determined that while "prolonged standing or prolonged walking may be limited by pain in the right lower extremity," her prognosis was "stable" and she was "able to do sedentary work." (Id.).

_____

[13] Plaintiff again filled out a medical history questionnaire at this visit in Spanish. (Tr. at 237-39). She indicated that she was not on any medication at that time, and that she was not experiencing any emotional problems, such as depression or anxiety, that would interfere with her ability to work. (Tr. at 238).

Dr. Graham also revisited the fact that plaintiff had a history of anxiety and depression disorder, although the symptoms were mild and stable. (Id.). Finally, he diagnosed her with leukocytosis (an elevated white blood cell count). (Id.).

That same date, Dr. Graham ordered that plaintiff undergo more lab testing. (Tr. at 240). It reflected normal results save for an abnormally high white blood cell count. (Tr. at 236 (April 3, 2003 report)).

On April 7, 2003, HS Systems again issued a report regarding plaintiff's medical condition. (Tr. at 241). The report indicates that she continued to have an abnormal white blood cell count, and recommended that she follow up with a primary care provider within a week. (Id.). On that same date, HS Systems also issued a recommendation regarding her functional work capacity. (Tr. at 232). The report indicates that she could perform work that involved no lifting and minimal walking, bending, standing, pushing, and pulling, but that she should avoid rush hour travel. (Id.). The report again listed a number of HRA jobs that would be suitable for plaintiff, such as answering phones, interpreting,

12

keeping simple records, and making and collating copies. (Id.).[14]

On November 30, 2004, Dr. Elliot Wein examined an MRI of Ms. Rodriguez's right tibia and fibula. (Tr. at 271, 274, 322, 375). He observed "[o]ld healed fractures of the mid shafts of the [right] tibia and fibula, . . . [and] an old fracture or dislocation." (Id.). Most pertinently, he noted the nonunion of the fracture at the mid-shaft of the fibula. (Id.). The doctor also did not observe radiographic evidence of osteomyelitis.[15] (Id.).

On June 14, 2005, plaintiff visited Dr. Albert Panozzo in the division of ambulatory care at Montefiore Medical Center ("Montefiore"), claiming that she had experienced increasing pain for the prior three to four months in her right leg "over the midshaft of the tibia," and that she wanted to have "something done" to improve the position of the malunited fracture. (Tr. at 198, 270-71). Dr. Panozzo noted that this complaint was "inconsistent with the radiological picture," and he therefore "plan[ned] to investigate it further with a CT scan and a full

---

[14] HS Systems also issued a report reflecting some of these limitations on April 2, 2003. (Tr. at 244).

[15] "A bone infection, often chronic and difficult to treat, sometimes seen following compound fractures and open reductions." Tennenhouse, supra note 4, § 12:5.

blood count, ESR, and CRP." (Id.). He planned to see her again after he received the results of the testing. (Id.).[16]

On August 30, 2005 Dr. Nnawmezie G. Umeasor ordered a uranalysis of plaintiff. (Tr. at 261). The results of that test do not indicate whether any findings were abnormal. (Id.).

The record then reflects an approximate nineteen-month gap in treatment following the August 2005 visit.[17]

In the period between March 30, 2007 and April 10, 2007, a Federation Employment and Guidance Service ("F.E.G.S.")[18] Biopsychosocial Summary was prepared for Ms. Rodriguez on behalf of

---

[16] This testing was also intended to rule out "pathology causing referred pain" versus "infection at [the] fracture site." (Tr. at 270).

[17] The ALJ did not mention this gap of treatment in reaching his disability determination. (See Tr. 20-28).

[18] "The mission of FEGS Health and Human Services System has remained constant for almost three-quarters of a century: To meet the needs of the Jewish and broader community through a diverse network of high quality, cost-efficient health and human services that help each person achieve greater independence at work, at home, at school and in the community, and meet the ever-changing needs of business and our society." About FEGS, http://www.fegs.org/#/about_fegs/ (Last visited Aug. 13, 2012).

14

the HRA. (Tr. at 245-60).[19] On April 10, 2007, at her first F.E.G.S. appointment, plaintiff reported receiving cash and rent assistance, and food stamps, and that she had applied for Medicaid. (Tr. at 246-47). She also reported living with two of her six children in a three-bedroom apartment. (Tr. at 247, 251). She described her housing situation as "stable." (Tr. at 247). Plaintiff also indicated that she had completed high school in Puerto Rico prior to relocating to the United States, and that she is able to read and write well in Spanish. (Tr. at 249).

The F.E.G.S. report notes that plaintiff's ex-husband had physically, sexually, and emotionally abused her approximately fifteen years prior. (Tr. at 250). In the wake of that abuse, plaintiff had received domestic-violence counseling. (Id.). Plaintiff also reported no history of substance abuse. (Tr. at 251). With respect to her depressive symptoms, the summary noted that she was "feeling depressed" due to "economical" problems but was not suicidal. (Id.). She reported feeling "down, depressed, or hopeless" and having difficulty sleeping "[n]early [e]veryday [sic]." (Id.). She reported feeling tired or having little energy more than half the time. (Id.). Ms. Rodriguez also stated that she

---

[19] She was treated at the Bronx-Lebanon Hospital Center ("Bronx Lebanon"). (Tr. at 245).

was "feeling bad about" herself and that she had let herself and her family down "several days" at a time. (Tr. at 252). Based on these symptoms, Ms. Rodriguez stated that her problems made it "[s]omewhat [d]ifficult" for her to perform her work, take care of things at home, and get along with other people. (Id.). The F.E.G.S. social worker offered plaintiff mental health services, and she declined. (Id.).

With respect to her ability to travel, plaintiff noted that she cannot travel independently because of her "leg problem," and that "she f[a]lls down when she walks." (Tr. at 252-53). As far as her daily living activities, plaintiff reported that she was able to cook, clean, watch television, read, get dressed, socialize, and groom herself. (Tr. at 253). She was unable to sweep or mop the floor, and to vacuum. (Id.). She also reported needing assistance with grocery shopping due to right-leg pain. (Id.).

As for her work history, plaintiff reported that she was last employed as a receptionist in 2005, and that she was "interested in clerical work." (Tr. at 249). The F.E.G.S. summary noted that Ms. Rodriguez claimed that she could not work at the time because she was suffering from right-leg pain, back pain, and right-leg swelling. (Tr. at 254). However, plaintiff indicated interest in

16

learning English and computer skills. (Id.). The report notes that
plaintiff was taking "pain meds," but does not specify which ones.
(Id.). A physical examination revealed no abnormal findings except
for pain and deformity in the right leg. (Tr. at 254, 256-57).
Plaintiff provided medical documentation, and disclosed that the
leg pain stemmed from a non-union fracture resulting from a 1985
car accident. (Tr. at 254, 257).

Plaintiff also underwent a pain assessment on March 30, 2007.
She described her right-leg pain at a 4 out of 10; however, she
indicated that the pain varied from a 0 (no pain) to a 6. (Tr. at
257). She indicated that a 4 was an "[a]cceptable" pain level.
(Id.). That same day, plaintiff underwent multiple laboratory
tests, which revealed that she had high triglycerides -- she
measured 246 mg/dL when the normal range was indicated at 40-150
mg/dL -- and an elevated white blood cell count (13.2 k/ul) and
MCV.[20] (Tr. at 262-66).

Ultimately, the F.E.G.S. summary concluded that plaintiff
suffered from "[m]oderate" depression, and that her medical
provider should "follow up" on her right-leg pain, back pain, heart

---

[20] "Mean corpuscular volume [is a] laboratory test."
Tennenhouse, supra note 4, § 5:15.

17

condition, left-shoulder pain, and the swelling in her right leg. (Tr. at 252, 254). The final diagnoses in the summary indicated that Ms. Rodriguez suffered from right-leg pain and hyperlipidemia.[21] (Tr. at 259-60). In light of plaintiff's limitations, it was determined that she could only be employed in a position that required limited walking, standing, pulling, and climbing -- in short, that she could perform "sedentary work" without any "stren[u]ous activities." (Id.).[22]

A second F.E.G.S. report was prepared to reflect treatment for the time period between September 23, 2008 and November 4, 2008. (Tr. at 273, 275-82, 328-48). Plaintiff mentioned that she had worked in December 2007 as a child-care provider. (Tr. at 334). In pertinent part, the report noted that Ms. Rodriguez suffered from "suicidal ideation thoughts" and had planned "to drink 15 depression pills." (Tr. at 336). As of that date, she reported that

---

[21] Hyperlipidemia is "a general term for elevated concentrations of any or all of the lipids in the plasma, including hypertriglyceridemia, hypercholesterolemia, etc." Dorland's, supra note 3, at 852.

[22] Specifically, the report evaluated how many hours out of eight plaintiff could perform a specific activity. She could sit for 4-5 hours, kneel for 1-3 hours, stand for 1-3 hours, reach for 6-8 hours, walk for 1-3 hours, bend for 1-3 hours, and grasp for 6-8 hours. She was unable to pull or climb. (Tr. at 258). It was also determined that she could not lift, carry, or push more than ten pounds. (Id.).

her last suicidal thought had occurred around the end of July 2008. (Id.). Plaintiff also reported feeling down, depressed, and hopeless, and that she had had trouble concentrating for "[s]everal [d]ays." (Id.). Moreover, on September 23, 2009, plaintiff had scored an eight on the PHQ-9[23] depression scale (Tr. at 337), prompting Karen Perez -- a F.E.G.S. social worker -- to conclude that plaintiff suffered from mild depression. (Tr. at 336-37).

Ms. Perez reported that plaintiff had stated that she was unable to travel independently due to dizziness and problems with her right leg. (Tr. at 337). Similarly, Ms. Rodriguez claimed that she fell often. (Id.). Plaintiff noted that she did not work; she stayed home to care for her two fifteen-year-old daughters, and did not report limitations in performing activities of daily living. (Id.). With respect to her current ailments, plaintiff reported a broken right leg, heart problem, and migraines. (Tr. at 339). The report indicates that she was "ON MEDS" as of September 23, 2008, but it does not specify which medications. (Tr. at 341). A medical examination on that same date revealed pain in plaintiff's right leg, a bony elevation and mild tenderness at the mid-tibial region, and depression. (Tr. at 342, 344). Lab test results from samples

---

[23] A screening tool for depression. See Paulino v. Astrue, 2010 WL 3001752, at *3 (S.D.N.Y. July 30, 2010).

19

collected on September 23, 2009 indicated a high white blood cell
and triglyceride count. (Tr. at 267-69, 342, 350-54).


The 2008 F.E.G.S. report also noted that Ms. Rodriguez was
suffering from pain in her right leg, which she assessed as a 6 on
a scale from one to ten. (Tr. at 344). According to notes taken by
Dr. Rama Kompella, plaintiff's pain ranged from two to eight on a
scale of ten. (Id.). Plaintiff indicated that a level of 0, or no
pain, was her "acceptable" pain level. (Id.). It was noted that
plaintiff could not stand or sit "for some time" due to the pain in
her right leg. (Tr. at 348).


Dr. Kompella diagnosed plaintiff with hypertension, migraines,
a prior right tibial fracture, and right leg pain. (Id.). The
doctor also concluded that Ms. Rodriguez suffered from "[u]nstable
[m]edical and/or [m]ental [h]ealth [c]onditions [t]hat [r]equire[d]
[t]reatment" before a functional-capacity determination could be
reached. (Id.). She also suggested that plaintiff follow up with
her primary care physician to address the abnormal lab results.
(Id.).


Plaintiff was referred to a three-month wellness plan at Bronx
Lebanon for her right-leg pain and tibial fracture. (Tr. at 276,

20

278). The intended outcome was "reduction of symptoms with medication." (Tr. at 277). Plaintiff also indicated that her primary care doctor, Dr. Barakat, had ordered a right-leg tibia-fibula exam, the results of which were expected in early October 2008. (Tr. at 278). As of September 24, 2008, plaintiff was taking Lexapro[24] and Tylenol, and wearing a Lipoderm 5% patch. (Id.).

On September 29, 2008, plaintiff again visited Bronx-Lebanon Hospital Center. (Tr. at 284, 288 (same)). She was referred by Dr. Barakat from the Wellness Clinic for complaints of a depressed mood and crying spells. (Id.). Plaintiff denied suicidal or homicidal ideation, and requested medication for depression. (Id.). Dr. Srikanth Reddy determined that plaintiff's mood and affect were "depressed," and diagnosed her with "[d]epressive disorder not otherwise specified." (Id.). She prescribed plaintiff two-weeks worth of Lexapro, and advised her to follow up with "OPD" for continuity of care. (Id.).

On October 1, 2008, plaintiff was a no-show for an intake at

---

[24] Lexapro is a "selective serotonin reuptake inhibitor" used to treat "depression, panic disorder, anxiety disorders, obsessive-compulsive disorder, post-traumatic stress disorder, premenstrual dysphoric disorder, [and] social anxiety disorder." Tennenhouse, supra note 4, § 40:8.

Bronx Lebanon. (Tr. at 595). On October 5, 2008, plaintiff completed a form in Spanish regarding her use of drugs and alcohol. (Tr. at 590-91). She denied use of drugs and alcohol, but indicated that she was on unidentified prescription medication. (Tr. at 590).

On October 8, 2008, Ms. Rodriguez returned to see Dr. Richard J. Adam at Bronx Lebanon. (Tr. at 286). The doctor described a radiology report from that visit as demonstrating that plaintiff had "[c]hronic fracture deformities of the tibia and fibula" in the right lower leg, in addition to "anterior angulation of the proximal to mid shaft fractures." (Id.). The report reflected a number of additional abnormalities, including "nonunion of the midshaft fibula fracture," "an additional healed fracture of the distal fibula shaft," "sclerosis at the tibia fracture with lucency,"[25] "cortical thickening of the tibia shaft extending superiorly and inferiorly," "lucency . . . surrounding sclerosis in the proximal tibia shaft above the fracture," and "a sclerotic focus bulging into the marrow cavity." (Id.). The doctor noted that the "[m]ultiple abnormalities of the tibia" were "very concerning

---

[25] "Material is 'lucent' or 'radiolucent' if it permits x-rays to pass through it, leaving dark areas on the x-ray film." Rosas v. Hertz Corp., 1997 WL 736723, at *1 n.2 (S.D.N.Y. Nov. 24, 1997) (citing Mosby's Medical, Nursing, and Allied Health Dictionary, 1328 (Kenneth N. Anderson et al. eds., 4th ed. 1994)).

for osteomyelitis." (Id.). The doctor suggested an enhanced MRI to further evaluate plaintiff's condition. (Id.).

Bronx Lebanon's Comprehensive Psychiatric Emergency Programs ("CPEP") then referred plaintiff for ongoing outpatient mental-health treatment with Bronx Lebanon's Adult Psychiatry Outpatient Division. (Tr. at 604). Plaintiff's first visit was on November 5, 2008. (Id.). At that visit, she complained of increased stress, anxiety, and insomnia. (Id.). She indicated that she had come to New York from Puerto Rico eight years earlier. (Id.). She had initially lived in a shelter but then got section 8 housing. (Id.). She also reported that she worked though public assistance at an unspecified job soon after she arrived in the states. (Id.).

That same date, Dr. Braham Harneja of Bronx Lebanon completed a Comprehensive Treatment Plan for plaintiff. (Tr. at 492-99, 586, 588).[26] Plaintiff's Axis I diagnosis was Anxiety Disorder. (Tr. at 492). He rated her current and prior GAF at 60. (Id.). Plaintiff was not employed at the time, but the doctor noted that she was motivated for treatment, and had good social skills and a stable home. (Id.).

---

[26] The signature page of this Treatment Plan is not included in the record.

The Treatment Plan outlines all of plaintiff's goals for her treatment at Bronx Lebanon. The first was to improve her depression, specifically her mood, sleep, and anxiety. (Tr. at 493). The doctor hoped that plaintiff would improve her sadness for "5/7" days per week by taking medication, improve her anxiety "4/7" days per week by taking mediation, and improve her sleep "4/7" days. (Id.). Plaintiff was to continue taking antidepressants and to undergo individual psychotherapy. (Id.). She was also to meet with her doctor and social worker twice per month. (Id.).

Plaintiff also hoped to improve her general health. (Id.). The doctor instructed her to take her medications as prescribed[27] and follow up with her primary care physician once a month for regular care. (Tr. at 496). At that visit, plaintiff did not meet the discharge criteria, and "require[d] treatment at a different level of care." (Tr. at 499).[28] Plaintiff requested to be seen bi-weekly.

---

[27] As of that date, plaintiff was taking Lexapro 10 mg once a day; Trazodone 50 mg once a day; Diclopen twice a day; Tobramycin eye drops six times per day; and Lidocaine 5% topical cream once a day. (Tr. at 592).

[28] Plaintiff also completed a mental health status form on that date. (Tr. at 585). She indicated that she did not hear voices or believe in witchcraft. (Id.). She also had to fill out a nutrition screening form, on which she indicated that she did not have prolonged periods of poor appetite or large fluctuations in weight over the proceeding three months. (Tr. at 587). Finally, plaintiff indicated that she smoked and was not intending to quit. (Tr. at 593).

(Tr. at 594, 605).

That date, the Bronx Lebanon Department of Psychiatry completed a Psycho-Social History form for plaintiff. (Tr. at 596-600, 603). She reported having six children, four girls and two boys, and having been the victim of domestic violence. (Tr. at 597-98). The form indicates that her target symptoms were anxiety, depressed mood, appetite disorder, crying spells, a feeling of hopelessness, and sleep disorder. (Tr. at 596). Her functional deficit areas were considered to be coping skills and problem solving. (Id.). In summarizing her monthly income, plaintiff reported that she received $87.00 in section 8 rent, $400.00 in food stamps, and $192.00 in public assistance. (Tr. at 599). Plaintiff reported that she had previously been employed as a security guard. (Id.).

On December 2, 2008, plaintiff visited with Dr. Miriam A. Ewaskio, a psychiatrist with the Bronx Lebanon outpatient clinic. (Tr. 601).[29] Plaintiff was worried about being evicted, but reported decreased anxiety and improved sleep with the help of Lexapro (10

---

[29] According to plaintiff, she has been seeing Dr. Ewaskio on a monthly basis since December 2, 2008. (Response ("Pl.'s Opp'n") 5).

25

mg) and Trazodone (50 mg). (Id.).


Ms. Rodriguez next visited Bronx Lebanon on December 3, 2008.
(Tr. at 411, 602).[30] Social worker ("SW") Allison Arce initially
noted that plaintiff reported feeling "ok," although she was
suffering from a depressed mood and was "anxious." (Id.). The
follow-up appointment with the Social Worker was set for January 9,
2009. (Id.). Plaintiff failed to attend her January 9, 2009
appointment, and rescheduled that visit for February 2, 2009.
(Id.).


Plaintiff next visited with her treating psychiatrist, Dr.
Ewaskio, on January 13, 2009. (Tr. at 412, 607). Treatment notes
reflect an increase in plaintiff's "panic/anxiety" and problems
sleeping based on fear from a recent fire that had affected two
nearby homes. (Id.). As of that date, plaintiff was taking Lexapro
and Trazodone. (Id.). Plaintiff also informed the doctor that
welfare had closed her case and had asked her for a letter
regarding her current treatment. (Id.).


Dr. Ewaskio and SW Arce completed a Treatment Plan Review on

---

[30] Treatment records reflect notes from both Dr. Ewaskio and
Dr. Braham Harneja. (Tr. at 411-13).

behalf of plaintiff on February 5, 2009. (Tr. at 483-91).
Plaintiff's diagnosis was indicated as Anxiety Disorder with mixed
emotions. (Tr. at 483). They indicated that plaintiff's current
Global Assessment Functioning ("GAF")[31] was 55, and her prior GAF
was 60. (Tr. at 483). The report reflects that plaintiff had a
stable home and good social skills, and was able to read and write.
However, she was unemployed. (Id.).


One goal of treatment was to improve plaintiff's depression,
mood, and anxiety. (Tr. at 484). The treating sources hoped to
improve her feeling of sadness and anxiety for "4/7" days per week.
(Id.). To meet that goal, plaintiff was to remain on antidepressant
drugs and continue individual therapy. (Id.). Plaintiff also was to
improve her general health. (Tr. at 487). To do so, she was to

---

[31] "GAF [is measured on a 100-point scale, and] covers the
range from positive mental health to severe psychopathology . . .
." IH Monrad Aas, Global Assessment of Functioning (GAF):
Properties and Frontier of Current Knowledge, 9 Annals of Gen.
Psychiatry 20 (2010), available at
http://www.annals-general-psychiatry.com/content/pdf/1744-859X-9-
20.pdf. The 100-point scale is "divided into intervals, or
sections, each with 10 points (for example 31-40 and 51-60) . . .
. The anchor points for interval 1-10 describe the most severely
ill and the anchor points for interval 91-100 describe the
healthiest . . . . For example, patients with occasional panic
attacks are given a symptom score in the interval 51-60 (moderate
symptoms), and patients with conflicts with peers or coworkers
and few friends, a functioning score in the interval 51-60
(moderate difficulty in social, occupational or school
functioning)." Id.

27

continue taking her medicines as prescribed and see her doctor once per month. (Id.). The report notes that as of that date, plaintiff required "treatment at a different level of care," and would be able to manage her symptoms in a "general health setting once stable." (Tr. at 490). Plaintiff reported no other specific concerns at the visit. (Tr. at 491).

Plaintiff had an appointment scheduled at Bronx Lebanon for February 10, 2009, which she called to cancel. (Id.). She indicated that she would follow up to reschedule. (Id.). Her next appointment at Bronx Lebanon was on March 30, 2009. (Tr. at 413, 562, 606). She reported feeling "sad" and overwhelmed, but felt "good" when she attended church. (Tr. at 606).

On March 31, 2009, plaintiff saw Dr. Ewaskio. (Id.). The doctor noted that plaintiff was off Lexapro and Trazodone. (Id.). She still complained of trouble sleeping and increased anxiety and depression. (Id.). Dr. Ewaskio restarted plaintiff on Lexapro and Trazodone. (Id.).

On April 20, 2009, plaintiff visited Bronx Lebanon without an appointment to request a letter for "SSD" - presumably Social Security disability insurance. (Id.). On April 21, 2009, plaintiff

28

visited SW Arce at Bronx Lebanon. (Tr. at 561). She reported feeling "OK," but complained that she was coping with stressors due to a need to relocate to a section 8 apartment. (Id.).

On April 21, 2009, plaintiff again saw Dr. Ewaskio. (Tr. at 317, 319 (same), 320 (same), 374 (same)). She diagnosed plaintiff as suffering from adjustment disorder, mixed emotions, and depression. (Id.). She described plaintiff as calm, alert, and cooperative, but also "anxious" with an "overwhelmed mood." (Id.). Plaintiff was still taking Lexapro and Trazodone. (Id.). The doctor indicated that plaintiff had a "fair" prognosis, and that her "mental health condition [had] impacted her daily activities and [she was] not able to work at th[at] time." (Id.).

Ms. Rodriguez again visited with her treating psychiatrist, Dr. Ewaskio, on April 29, 2009. (Tr. at 318, 373 (same)). Dr. Ewaskio diagnosed plaintiff with "mixed emotions" and "adjustment [disorder]," with an onset date of November 5, 2008. (Id.). She described plaintiff as "anxious, feeling overwhelmed," with a "sad mood." (Id.). Plaintiff explained that she had a "low tolerance to stress." (Id.). The doctor noted that plaintiff was taking Lexapro and Trazodone, and that her response to those medications was "fair," but that they were "being adjusted." (Id.). She also

29

determined that, at the time of the examination, plaintiff was "temporarily unemployable." (Id.).

On May 5, 2009, SW Maine and Dr. Ewaskio filled out a Treatment Plan review for plaintiff. (Tr. at 474-82). At the time, her diagnosis was "[m]ixed anxiety disorder." (Tr. at 474). The report indicates that plaintiff's current GAF was 55, and her prior GAF was 60. (Id.). The report describes plaintiff as motivated for treatment, with family and social support, and as capable of insight. (Id.). The treatment plan's primary goal was to improve plaintiff's depression, so that she felt less depressed and less anxious for "5/7 days per week for the next 3 months." (Tr. at 475). To meet that goal, plaintiff was to continue to see SW Maine and Dr. Ewaskio monthly over the subsequent three months. (Id.). A second goal of treatment was improving plaintiff's general health by ensuring that she was compliant with her medications. (Tr. at 478). As of that date, plaintiff did not meet the discharge criteria. (Tr. at 481).

On May 29, 2009, plaintiff visited SW Arce at Bronx Lebanon. (Tr. at 414, 608). She reported feeling "ok," and that she was regularly taking her medications. (Id.). Her mood was stable. (Id.). SW Arce filled out a Treatment Plan Review of plaintiff on

30

that date. (Tr. at 609-17). She was being seen for mixed-symptom anxiety disorder, and remained unemployed. (Tr. at 607). The plan's primary goal was to improve plaintiff's depression, by limiting her feelings of depression to "4/7 days" with the help of medication, and by limiting her anxiety. (Tr. at 610). She was to continue taking antidepressants and attending individual therapy. (Tr. at 610, 613). As of that date, plaintiff was not ready for discharge. (Tr. at 616).

On June 8, 2009, plaintiff visited a physician, Dr. Herb Meadow, at Industrial Medicine Associates, PA, in Bronx, New York for a consultive psychiatric examination, at the instruction of the SSA. (Tr. at 290-93). With respect to her psychiatric history, plaintiff reported that she had no history of psychiatric hospitalization, but that she had been in counseling for about one and a half years, and was presently seeing Dr. Ewaskio at F.E.G.S. once every month. (Tr. at 290). With respect to her medications, she stated that she was taking Fioricet/APAP[32] with Codeine,

---

[32] Fioricet with Codeine is medication used to treat pain. Tennenhouse, supra note 4, § 40:9.

31

Ciprofloxacin,[33] Ibuprofen, Lexapro, Hydroxyzine,[34] Arthrotec,[35] and Patanol.[36]  (Id.). As for her current functional capacity, she complained that she had "difficulty falling asleep," had "a poor appetite," and had lost ten pounds in the year prior to the visit. (Id.). The doctor noted that she described symptoms of "depression[,] of dysphoric moods, crying spells, irritability, low energy, diminished self-esteem, and difficulty concentrating." (Id.). She had had suicidal thoughts in the past, but not at the time of the visit. (Id.). She denied any panic attacks, manic symptoms, thought disorder, or cognitive deficits. (Id.). Dr. Meadow described her mood as "[d]epressed" and "anxious." (Tr. at 291). Dr. Meadow also noted that Ms. Rodriguez had had a history of "domestic violence" and suffered from related "flashbacks and nightmares." (Tr. at 290).

Dr. Meadow noted that her attention and concentration were intact, as were her recent and remote memory skills. (Tr. at 291).

---

[33] An antibiotic. Tennenhouse, supra note 4, § 40:19.

[34] An antihistamine. Tennenhouse, supra note 4, § 25:29.10.

[35] A medication used to treat osteoarthritis and rheumatoid arthritis. Tennenhouse, supra note 4, § 40:4.

[36] Patanol is a "H1-blocker antihistamine" used to treat "itching of allergic conjunctivitis [and] seasonal allergic rhinitis." Tennenhouse, supra note 4, § 40:18.

32

He considered her cognitive functioning to be "[a]verage," with the "[g]eneral fund of information limited," and her insight and judgement to be "[f]air." (Tr. at 291-92).

With respect to her daily living activities, plaintiff reported that she "[took] care of her personal hygiene, [did] all her household chores, . . . socialize[d] primarily with her immediate family . . . [and] spen[t] her days watching television and listening to music." (Tr. at 292). The doctor concluded that "[t]he claimant would be able to perform all tasks necessary [for] vocational functioning." (Id.). While he noted that the examination results appeared "to be consistent with psychiatric problems," he concluded that they did "not appear to be significant enough to interfere with [plaintiff's] ability to function on a daily basis." (Id.).

Nonetheless, he diagnosed plaintiff as suffering from posttraumatic stress disorder, "[a]djustment disorder with mixed anxiety with depressed mood," right-leg pain, and hypertension. (Id.). The doctor recommended that Ms. Rodriguez continue with psychiatric treatment, and gave her a "[f]air" prognosis. (Id.).

That same day, plaintiff also met with consultative physician

33

Dr. William Lathan, also of Industrial Medicine Associates, PA, for an internal medicine consultation. (Tr. at 294-97). Plaintiff was referred to Dr. Lathan by the Division of Disability Determinations for a disability evaluation. (Tr. at 294). Dr. Lathan initially recorded her medical history with respect to her leg, and noted that she had last worked in 2006 in a child-care position. (Id.). As of that date, plaintiff was taking Acetaminophen with Codeine, Ciprofloxacin, Ibuprofen, Trazodone, Lexapro, Hydroxyzine, Arthrotec, and Tactinal. (Id.). Plaintiff reported that she could "perform all activities of personal care and daily living." (Tr. at 295).

Dr. Lathan also performed a physical examination of plaintiff on that date. (Id.). His examination revealed a limp favoring the right leg, but he noted that she could "walk on her heels and toes without difficulty" and perform a "full squat." (Id.). She did not require any assistantive devises and was able to climb on and off the examination table without help. (Id.). She had a full range of motion in the hips, knees, and ankles bilaterally, but showed "anterior bowing at the midportioning of the right tibia." (Tr. at 296). However, she suffered from no loss in strength in her lower extremities, nor did the doctor observe swelling in her legs. (Id.).

34

Dr. Lathan's ultimate impression of Ms. Rodriguez was that she had a history of hypertension, right-lower-extremity derangement, and a history of depression. (Id.). He gave her a "[s]table" prognosis. (Id.). The doctor further opined that "[t]here is a severe restriction for prolonged standing and walking," and he recommended a psychiatric consultation. (Id.).

On June 23, 2009, a Dr. B. Lightner[37] examined plaintiff and subsequently filled out a Physical Residual Functional Capacity Assessment for the SSA. (Tr. at 298-303). Plaintiff was alleging a disability due to a right-leg fracture in 1985 that failed to heal properly. (Tr. at 299). Dr. Lightner reported that an x-ray of her right light performed on October 8, 2008 reflected chronic fracture deformities of the tibia and fibula, anterior angulation of the proximal-to-mid-shaft fracture, non-union of the midshaft fibula, and a healed fracture of the distal fibula shaft. (Id.). Dr. Lightner reported that plaintiff's primary diagnosis was a past right-leg fracture with derangement, and a secondary diagnosis of hypertension. (Tr. at 298).

---

[37] The record reflects potential confusion as to Dr. Lightner's first name, as a New York State Office of Temporary & Disability Assistance Division of Disability Determination's form notes a document from a Dr. E. Lightner. (See Tr. at 197).

35

He made several relevant findings with respect to plaintiff's exertional limitations. He concluded that plaintiff could occasionally lift and/or carry ten pounds; frequently lift and/or carry less than ten pounds; stand and/or walk for a total of at least two hours in an eight-hour work day; sit with normal breaks for a total of about six hours in an eight-hour work day; and push and/or pull in only limited capacity in her lower extremities. (Tr. at 299).

With respect to postural limitations, Dr. Lightner noted that plaintiff could occasionally climb stairs, balance, stoop, kneel, crouch, and crawl. (Tr. at 300). He reported no manipulative limitations, visual limitations, communicative limitations, or environmental limitations. (Tr. at 300-01). Plaintiff stated that she could not stand or sit "too long" due to pain. However, the doctor reported that she did not explain how her symptoms limited her functioning, and thus he could not make a statement regarding her credibility. (Tr. at 301).

On June 23, 2009, plaintiff visited Bronx Lebanon to address her depression and anxiety. (Tr. at 416, 418, 619-20). She reported that she felt depressed, and that she had good and bad days. She reported at times feeling "very anxious," and stated that she was

36

"not doing well" physically. (Tr. at 416). However, she also stated that she was "feeling good" because her daughters were doing well in school. (Tr. at 418).

On June 24, 2009, a Dr. M. Apacible filled out an SSA Psychiatric Review Technique form after assessing plaintiff's residual functional capacity. (Tr. at 304-14). He based his assessment on two pertinent SSA regulations -- Listing 12.04, Affective Disorders, and Listing 12.06, Anxiety-Related Disorders. (Tr. at 304). The doctor noted that plaintiff had a medically determinable impairment, consisting of adjustment disorder with mixed anxiety and a depressed mood. (Tr. at 305). He also found that plaintiff suffered from post-traumatic stress disorder. (Tr. at 306). However, Dr. Apacible determined that plaintiff's impairments would not limit her activities of daily living, and would cause only a mild limitation in maintaining social functioning, and in maintaining concentration, persistence, or pace. (Tr. at 307). He found that she was not significantly limited in understanding, memory, sustained concentration, or persistence, except with respect to the ability to understand, remember, and carry out detailed instructions, for which she had moderate limitations. (Tr. at 311). Dr. Apacible ultimately concluded that Ms. Rodriguez was "able to perform all tasks necessary for

vocational training" at the time of the examination. (Tr. at 313).

Plaintiff was seen by Dr. Ewaskio on June 25, 2009. (Tr. at 417, 621). The doctor noted plaintiff's complaints of "frequent fearfulness," increased anxiety, difficulty sleeping, and eating when anxious. (Id.). Accordingly, the doctor increased the dosage of plaintiff's Lexapro from 10 mg to 20 mg and the dosage of her Trazodone from 50 mg to 100 mg. (Tr. at 415, 417).[38] She ordered plaintiff to return in four weeks to reassess her condition. (Tr. at 417).

Dr. Ewaskio again saw plaintiff on July 7, 2009. (Id. at 355-59). She determined that Ms. Rodriguez was suffering from depression. Plaintiff claimed that she had been feeling anxious, overwhelmed, and, at times, depressed. (Tr. at 355, 358). She noted that plaintiff was on psychotropic medication, Trazodone,[39] and that she was receiving individual psychotherapy once a month. (Id.). Dr. Ewaskio noted that plaintiff's depression had not "resolved or

---

[38] A medication report generated on that date shows that plaintiff was to continue taking Trazodone (100 mg) and Lexapro (20 mg). (Tr. at 618).

[39] Trazodone is a "serotonin antagonist and reuptake inhibitor" used to treat "major depressive disorder (MDD)." Tennenhouse, supra note 4, § 40:23.

38

stabilized" since her last visit, and concluded that Ms. Rodriguez was still temporarily unemployable. (Tr. at 357, 359). However, Dr. Ewaskio did not specify for how long she believed that plaintiff would remain unemployable. (Id.).

Plaintiff saw SW Maine on that same date. (Tr. at 624-25). She indicated that she had been "feeling anxious" and "found [herself] crying a lot for no reason at all." (Tr. at 419, 624).

On July 3, 2009, plaintiff had a biopsy of her right cheek. (Tr. at 442-43). Pursuant to a July 6, 2009 report from Dr. Hyun-Soo Lee at GenPath Laboratory, plaintiff was diagnosed with basal cell carcinoma, a form of skin cancer. (Tr. at 463). On July 17, 2009, the biopsy revealed basal cell carcinoma that extended to the base and lateral edge of plaintiff's cheek. (Tr. at 444, 447, 463). Dr. Lee performed an operation on Ms. Rodriguez on July 23, 2009 to remove the cancer from plaintiff's right cheek. (Tr. at 323-27, 364-66, 376-77, 378, 379, 445-46). The doctor observed that "[d]ue to the large defect left by the excision of the lesion, simple closure could not be performed. The deeper layers of the def[]ect had to be approximated to reduce tension on and to achieve an optimal healing of the suture line." (Tr. at 327).

On July 28, 2009, plaintiff again visited SW Maine at Bronx Lebanon. (Tr. at 420, 559-60, 625). She indicated that she was experiencing mood instability. (Id.). She was depressed and anxious because she had been unable to find section 8 housing, and she had recently undergone surgery to remove skin cancer from her face. (Id.).

On August 5, 2009 SW Maine and Dr. Ewaskio completed a Treatment Plan Review for plaintiff. (Tr. at 465-73). They diagnosed her with "[m]ixed" anxiety disorder. (Tr. at 465). They indicated that she had good social and communication skills, was motivated for treatment, and had a stable home. (Id.). The report identifies goals of plaintiff's treatment, the first of which was to improve her mood and anxiety. (Tr. at 466). Specifically, the hope was that plaintiff would feel less anxious and depressed "6/7 days per week for the next 3 months." (Id.). To reach this goal, plaintiff was to continue to see both Dr. Ewaskio and SW Maine once a month for three months. (Id.). Plaintiff also had the goal of improving her general health. (Tr. at 469). She was to take all medications as prescribed, and follow up with medical appointments as needed. (Id.). The report indicates that plaintiff did not meet discharge criteria at that time. (Tr. at 472).

40

On August 6, 2009, plaintiff had a fibroma removed from her right inner thigh. (Tr. at 380, 451-52). She saw Dr. Lee for a post-excision visit, at which she reported that she was "very happy" with the results. (Tr. at 450).

On August 13, 2009, plaintiff was again seen at Bronx Lebanon with a main diagnosis of bipolar disorder with mood instability. (Tr. at 421, 513-14). She indicated that she was very happy to have found section 8 housing and was feeling "less depressed," although she was "still not sleeping." (Id.). Plaintiff also brought paperwork to that visit from her lawyer in connection with her attempt to obtain SSI benefits. (Id.).

On September 2, 2009, plaintiff again saw Dr. Lee. (Tr. at 453). The purpose of the visit was to reevaluate the scar on her right cheek. (Id.).

On September 8, 2009, Dr. Ewaskio reexamined Ms. Rodriguez. (Tr. at 360-61, 362-63 (same)). The doctor opined that plaintiff was still suffering from depression. (Tr. at 360). Plaintiff reported that her depressive symptoms were persisting, and that she at times became "very anxious" and experienced "heart palpitation." (Id.). She was still taking both Lexapro and Trazodone, but Dr.

41

Ewaskio noted that her medication was "still being adjusted" because her depression had not yet stabilized. (Tr. at 360-61). Dr. Ewaskio also concluded that Ms. Rodriguez was unable to work for at least twelve months and could be eligible for long-term disability benefits. (Tr. at 361). She also noted that plaintiff had already applied for SSI. (Id.).

Plaintiff saw SW Maine that same date to address her mood instability. (Tr. at 515-16). Plaintiff was feeling anxious and depressed at the thought of having to move to her new apartment. (Tr. at 515). Her next appointment with Ms. Maine was set for October 12, 2009. (Tr. at 516).

On October 5, 2009, plaintiff again saw Dr. Ewaskio. (Tr. at 430, 500). She had been out of her medications for two weeks and was thus referred as a walk-in patient by Ms. Maine. (Id.). Plaintiff complained of increased anxiety that had predated her exhausting her supply of both Lexapro and Trazodone. (Id.). She also reported that she had not been sleeping, but was happy to have found a new apartment for herself and her children. (Id.). Plaintiff also showed Dr. Ewaskio the scar from her skin-cancer removal procedure; the doctor observed that the scar was mostly covered by her glasses. (Id.). At that visit, Dr. Ewaskio

prescribed plaintiff .5 mg of Klonopin in addition to the Lexapro and Trazodone that she was already taking. (Id.).

On October 12, 2009, plaintiff was again seen by SW Maine at Bronx Lebanon. Her principal diagnosis was bipolar disorder with mood instability. (Tr. at 422, 517-18). She indicated that she was feeling "mildly depressed at times" and "anxious." (Tr. 422). She also indicated that she had moved to a "nice 3 bedroom apartment [and her] kids [were] doing okay," so she should have been "very happy instead of feeling depressed." (Id.).

On October 15, 2009, plaintiff again saw Dr. Lee to follow up regarding the scar on her right cheek. (Tr. at 454). Plaintiff complained that the area was dry and that there was a "little dark spot" remaining. (Id.).

On November 5, 2009 SW Maine and Dr. Ewaskio completed a Treatment Plan Review for plaintiff. (Tr. at 394-402, 501-09). They indicated that she had mixed anxiety disorder, and rated her current GAF as 55, with a prior rating of 60. (Tr. at 394, 501). Plaintiff was not employed at the time. (Tr. at 394). The report also indicates that plaintiff had good social skills, a stable home, and was motivated for treatment. (Id.). The review indicates

43

that one of the goals of treatment was to improve plaintiff's mood and anxiety, specifically, that plaintiff would report feeling less depressed and anxious for "7/7 days per week for the next 3 months." (Tr. at 395). To meet that goal, she was to continue to see both SW Maine and Dr. Ewaskio on a monthly basis. (Id.). A second goal identified was to improve plaintiff's general health, especially to ensure compliance with medications. (Tr. at 398). Plaintiff was directed to attend all medical appointments and take her medications as prescribed. (Id.). The treating sources concluded that plaintiff did not meet discharge criteria at that time. (Tr. at 401).

On November 9, 2009, plaintiff had a visit with the Social Worker, Ms. Maine, at Bronx Lebanon. (Tr. at 423-24, 425-26 (same), 519-20 (same), 521-22 (same)). The problems that were addressed at that visit were plaintiff's "[d]epressed [m]ood" and "[a]nxiety." (Tr. 423). Ms. Maine rated plaintiff's GAF at 60, and identified the goals of treatment as eliminating plaintiff's "depressed symptoms," identifying her "triggers of depression," and limiting her anxiety to less than three out of seven days each week. (Tr. at 423-24). Plaintiff reported feeling "mildly depressed" and experiencing anxiety and loss of sleep when faced with "financial problems." (Id.). Her mood was "sad, tearful with feeling of

frustration." (Tr. at 424).

She also reported that she had applied for SSI but had been denied, and that she had been referred to an SSI lawyer. (Id.). Plaintiff had brought to the meeting paperwork related to her SSI application. (Id.). The report indicated that she would continue to attend therapy once a month, and would be "considered for discharge to a lower level of care when her depressive symptoms are in remission." (Id.).

On November 16, 2009, Dr. Ewaskio completed a Psychiatric Assessment of plaintiff in connection with her application for social security disability benefits. (Tr. at 367-68, 404-05). Dr. Ewaskio noted that plaintiff was a forty-year-old Hispanic woman who had been born in Puerto Rico. (Id.). She had been receiving outpatient treatment at the Bronx Lebanon hospital since November 5, 2008, and had had monthly psychiatric and social worker visits. (Tr. at 367, 404). The doctor noted that plaintiff's symptoms included depression and anxiety disorder. (Id.). These disorders at times made her very stressed and irritable, and caused her difficulty sleeping. (Id.). The doctor rater her GAF at 50/50, which is superimposed over a rating of 60/60. (Tr. at 368, 405). The doctor observed that her attitude, mood, and judgment were

45

"good." (Tr. at 367, 404). Moreover, she noted that plaintiff suffered from skin cancer,[40] adjustment disorder with mixed emotions, a broken leg, migraines, and a heart condition. (Tr. at 368). She reported that plaintiff continued to need treatment for depression and anxiety that had lasted "many years." (Tr. at 368). The doctor concluded that psychiatric treatment "has been the most appropriate course of action to prevent decompensation." (Tr. at 369). Her prognosis was "[f]air." (Id.).

On November 30, 2009, plaintiff again saw Dr. Ewaskio. (Tr. at 427, 510, 511). Plaintiff complained of increased anxiety, sadness, and inability to sleep because her daughter's husband had been diagnosed with cancer. (Id.). As of that date, she was taking .75 mg of Klonopin daily; the doctor told her that she could double the dosage and take up to 1.5 mg total per day. (Id.).

On December 8, 2009, Dr. Ewaskio performed a medical assessment of plaintiff's abilities to do work-related activities. (Tr. at 369-71, 406-08 (same)). According to Dr. Ewaskio, the cumulative effect of her conditions was such that Ms. Rodriguez had

---

[40] She highlighted the fact that surgery had been performed on plaintiff's face, which deepened Ms. Rodriguez's depression. (Tr. at 370-71).

46

"poor" or no ability to relate to co-workers, to deal with the public, to deal with work stresses, to function independently, and to maintain attention concentration. (Tr. at 369-70, 406-07).[41] Moreover, Dr. Ewaskio noted that Ms. Rodriguez's ability to follow work rules and simple job instructions, use judgment, behave in an emotionally stable manner, relate predictably in social situation, demonstrate reliability, and interact with supervisors was "fair." (Id.).[42] She elaborated that plaintiff "has problems concentrating and is not capable of following instructions." (Tr. at 370, 407). Despite the foregoing, Dr. Ewaskio concluded that plaintiff would be able to "manage benefits in her own best interest." (Tr. at 371, 408).

On that same date, plaintiff had another visit with SW Maine. (Tr. at 428-29). Treatment notes indicate that Ms. Maine continued with the treatment goal of eliminating depressive symptoms and decreasing anxiety. (Tr. at 428). Ms. Maine observed that plaintiff was anxious and depressed over her "financial situation," and rated her GAF at 60. (Tr. at 429). Plaintiff agreed to continue

---

[41] A rating of "poor/none" indicates that the patient has "no useful ability to function" in the specified area. (Tr. at 369).

[42] A rating of "fair" indicates that the patient's ability to function in the specified area "is seriously limited, but not precluded." (Tr. at 369).

counseling and to take her medication as prescribed. (Id.).

On January 7, 2010, plaintiff saw Dr. Lee to check on her facial scar. (Tr. at 455). She stated that it was "much better." (Id.). She also complained of dry skin and face, and of hair loss. (Id.). Lab specimens that Dr. Lee had collected on January 7, 2010 reflected low "BUN" levels, a high white blood cell count (18.88 k/ul), and high triglycerides. (Tr. at 381-84, 388-91 (same)).

On January 8, 2010, plaintiff again saw SW Maine for her depression and anxiety. (Tr. at 431-32, 523-25 (same)). Plaintiff indicated that she was feeling depressed and remained unable to sleep despite taking her medication. (Tr. at 431). She reported being anxious because she was planning to help one of her daughters move from Louisiana to Puerto Rico. (Id.). SW Maine noted that plaintiff's mood was "sad" and "tearful," and she recommended that plaintiff attend therapy "bi-monthly." (Tr. at 432). She also rated plaintiff's GAF as 60. (Id.). Treatment notes also indicate that plaintiff would not be seen in February 2010 as she would be away helping her daughter move; her next appointment was set for March 12, 2010. (Id.).

On January 26, 2010, prior to the Louisiana trip, plaintiff

48

again saw Dr. Lee for persisting dermatological issues. (Tr. at 456). She complained of "white spots appearing all over" her body and of a "black spot appearing around" her lip. (Id.).

On January 28, 2010, plaintiff again saw Dr. Ewaskio. (Tr. at 233, 534). She indicated that her family had had a difficult Christmas because her daughter's husband had a bag to drain his liver. (Id.). Plaintiff therefore had experienced a "great" increase of anxiety and sadness, and complained of low energy, lack of motivation, and feelings of sadness. (Id.). She reported that the increased dosage of Lexapro to 20 mg helped "a little." (Id.). She also reported that she could not sleep, so she would take Klonopin. (Id.). She reported that it also helped "a little" but still kept her awake. (Id.). Dr. Ewaskio decided to prescribe plaintiff Ambien and Wellbutrin,[43] and set a follow-up appointment for March 11, 2010 to reassess her response to the new drugs. (Id.). Finally, the doctor noted that plaintiff was applying for SSI through an attorney who had requested her medical records. (Id.).

---

[43] Wellbutrin is a "norepinephrine-dopamine reuptake inhibitor" used to treat "depression, nicotine addiction, chronic neuropathic pain (such as pain from diabetic neuropathy, HIV, Herpes zoster, stroke, multiple sclerosis, etc), attention deficit hyperactivity disorder, bipolar disorder, [and] sexual dysfunction." Tennenhouse, supra note 4, at § 40.26.

On February 5, 2010, SW Maine and Dr. Ewaskio filled out another Treatment Review for plaintiff with respect to treating her mixed anxiety disorder. (Tr. 526-33, 548).[44] Plaintiff was still unemployed as of that date. (Tr. at 548). The first treatment goal identified was to reduce plaintiff's depression and anxiety, which would decrease as she continued to take her medication. (Tr. at 526). She was also to continue to take all of her medications to improve her general health. (Tr. at 529). Plaintiff did not meet discharge criteria as of that date, but would be considered for discharge "to a lower level of care when [she] [was] able to manage symptoms in a general health setting once stable." (Tr. at 532).

On March 19, 2010, plaintiff again met with SW Maine. (Tr. 535-36). She indicated that plaintiff was being seen for depressed mood and anxiety. (Tr. at 535). Plaintiff's short-term goals were to report having no depressed symptoms, be able to identify the triggers of her depression, and to experience anxiety less than three days per week. (Id.). Plaintiff reported that she had returned from Louisiana, and was "feeling okay . . . not depressed." (Id.). She would still continue to attend individual therapy bi-monthly. (Tr. at 536).

---

[44] The first page of this record is included at page 548.

50

On March 26, 2010, plaintiff saw Dr. Lee to reevaluate the
"dark spot" on her upper lip. (Tr. at 457). Plaintiff indicated
that it was "spreading." (Id.). She also reported that her skin was
"still very dry" and that she had "a lot of red spot[s]" on her
body. (Id.). On April 9, 2010, plaintiff visited Dr. Lee for a
follow-up appointment and a review of her lab tests. (Tr. at 449).
On April 23, 2010, plaintiff returned to Dr. Lee to treat an area
of dermatitis. (Tr. at 448).

Plaintiff next saw SW Maine on April 19, 2010 for depression
and anxiety. (Tr. at 537-38). Plaintiff's short-term goals were to
report having no depressed symptoms, to be able to identify the
triggers of her depression, and to experience anxiety less than
three days per week. (Tr. at 537). Plaintiff reported "feeling
depressed," "a little anxious," and having "problems concentrating"
because her son-in-law had to have a liver transplant, and during
that period her grandchildren had stayed in her apartment. (Id.).

On April 29, 2010 plaintiff again saw Dr. Ewaskio. (Tr. at
558). Plaintiff provided the doctor with "lots of papers" that she
needed to have filled out. (Id.). She complained of increased
tearfulness, sadness, and anxiety. (Id.). In response, Dr. Ewaskio
increased plaintiff's Wellbutrin from 300 to 450 mg. (Id.).

51

SW Maine and Dr. Ewaskio filled out a Treatment Plan Review for plaintiff on May 5, 2010. (Tr. at 539-47). Her Axis I diagnosis was mixed anxiety disorder, and her GAF was a 55, with a prior rating of 60. (Tr. at 539). She remained unemployed as of that date. (Id.). As for the goals of treatment, plaintiff was to continue to feel less depressed and anxious as she adhered to her medication regimen. (Tr. at 540, 543). As of that date, plaintiff was not yet "stable" and thus did not meed the discharge criteria. (Tr. at 546).

Plaintiff next saw SW Maine on May 10, 2010 for her depression and anxiety. (Tr. at 549). Ms. Maine identified the goals of treatment as eliminating plaintiff's "depressed symptoms," identifying her "triggers of depression," and limiting her anxiety to less than three out of seven days each week. (Id.). Plaintiff reported feeling "mildly depressed" and "a little stress[ed]" because her son-in-law had had a liver transplant and was not feeling well. (Id.). He had also been incarcerated for a day for driving a car that was purchased with stolen license plates. (Id.). She also continued to feel "a little anxious." (Id.).

On May 17, 2010, plaintiff was seen by Dr. Ewaskio. She reported that she was still "feeling sad" over her son-in-law's

52

illness. (Tr. at 553). Plaintiff indicated that her medications were "very helpful," and Dr. Ewaskio described her as "stable." (Id.). She was to return for a follow up on July 29, 2010. (Id.).

Plaintiff's next visit with SW Maine was on June 10, 2010. (Tr. at 550-51). SW Maine repeated the same treatment goals. (Tr. at 550). Plaintiff reported that she was "feeling depressed and anxious [because her] welfare case was closed in error." (Id.). She had also been "stressful and . . . crying a lot due to all the problems" that she was facing, and because her son, his wife, and her grandson were all staying at her home. (Id.).

On July 1, 2010, plaintiff returned to Dr. Lee to reevaluate her xerosis.[45] (Tr. at 385-87 (allergen testing), 458). She reported that her skin felt irritated. (Id.).

On July 9, 2010, plaintiff again saw SW Maine for her anxiety. (Tr. at 554). Ms. Maine again identified the goals of treatment as eliminating plaintiff's "depressed symptoms," identifying her "triggers of depression," and limiting her anxiety to less than three out of seven days each week. (Id.). Plaintiff reported

---

[45] Abnormal dryness of the eye, skin, or mouth. See Dorland's, supra note 3, at 1992.

53

"feeling mildly depressed and anxious" because she had to go to the welfare office "several times" to try to get her case reopened. (Id.).

She returned to see Dr. Lee on July 22, 2010, with regard to her xerosis. (Tr. at 459). She indicated that she was itchy. (Id.).

On August 5, 2010, plaintiff had a Treatment Plan Review with SW Maine and Dr. Ewaskio. (Tr. 569-76). She was still being treated for mixed anxiety disorder, and remained unemployed. (Tr. at 569). Her current GAF was 55, and her prior GAF rating was 60. (Id.). As for the goals of treatment, plaintiff was to continue to feel less depressed and have a decrease in her panic attacks as she adhered to her medication regimen. (Tr. at 570, 573). Plaintiff did not meet discharge criteria as of this date. (Tr. at 576).[46]

On August 9, 2010, plaintiff again saw SW Maine. (Tr. at 555-56). Ms. Maine rated her GAF at a 63. (Tr. at 556). She reiterated the goals of treatment as eliminating plaintiff's "depressed symptoms," identifying her "triggers of depression," and limiting her anxiety to less than three out of seven days each week. (Tr. at

---

[46] The signature page of this Treatment Report is not in the record.

555). Plaintiff reported that she was "still working on" having her welfare case reopened. (Id.). She also reported that she was "depressed and anxious" as she was dealing with her section 8 housing being changed to HUD. (Id.). She was "under lots of stress going from one appointment to another." (Id.). SW Maine described plaintiff as "remain[ing] stable with no[] thought disorder. (Tr. at 556).

On August 19, 2010, plaintiff again saw Dr. Lee. (Tr. at 460). She complained of a "growing" "stain" on her upper lip and itchy spots on her arms and face. (Id.).

On August 23, 2010, Dr. Ewaskio again met with plaintiff. (Tr. at 438-39). In her Treating Physician's Wellness Plan Report, the doctor stated that Ms. Rodriguez continued to suffer from depression with anxious mood, depression not otherwise specified, and an adjustment disorder. (Tr. at 438). She again noted that plaintiff continued to be depressed and anxious with stress brought on by her financial situation; the doctor determined that at the time of the examination, plaintiff was unable to work for at least twelve months, and that she may be eligible for long-term disability benefits. (Tr. at 438-39).

On September 9, 2010, plaintiff again saw SW Maine. (Tr. at 563-64). She reported feeling "lots of stress" and was "depressed and anxious." (Tr. at 563). She was in the midst of trying to obtain section 8 housing and SSI. (Id.). Her welfare case had been reopened. (Id.). SW Maine indicated that her mood was "a bit anxious" but her behavior was "appropriate." (Tr. at 564). She rated plaintiff's GAF as a 63. (Id.).

On September 16, 2010 plaintiff again saw Dr. Lee to follow up on her xerosis. (Tr. at 461). On September 23, 2010, plaintiff again saw Dr. Lee to evaluate a shave biopsy that had been taken of her nose. (Tr. at 462).

On October 7, 2010, plaintiff again saw SW Maine at Bronx Lebanon for depression and anxiety. (Tr. at 566-68). Plaintiff stated that she had been diagnosed with skin cancer for a second time, on her nose and lip. (Tr. at 565, 566-68). The diagnosis was making her depressed, frustrated, and overwhelmed, and she was "anxious not knowing what to do." (Tr. at 566-67). In addition, she reported that she was still suffering from financial issues. (Tr. at 567). Plaintiff was instructed to continue monthly counseling and to follow up with her physician. (Id.). SW Maine gave plaintiff a GAF rating of 63. (Tr. at 568).

On November 9, 2010 plaintiff underwent a psychiatric examination by Dr. Ketki Shah in connection for her application for disability benefits. (Tr. at 580-81). The doctor indicated that Ms. Rodriguez had a "long history suffering from mental illness, manifested by depressive symptoms, and anxiety disorders." (Tr. at 580). At the visit, plaintiff appeared "clean and well groomed" with good eye contact and cooperative behavior. (Id.). The doctor further noted that plaintiff had recently had surgery to remove skin cancer that had developed on her nose and lip, which had made her "more depressed and anxious." (Tr. at 581). Dr. Shah concluded that plaintiff's prognosis was "[f]air," and that her impairments were expected to last at lest twelve months, as she would continue to require treatment for depression and anxiety. (Id.).

On November 11, 2010, plaintiff returned to Dr. Shah for a medical assessment of her ability to perform work-related activities. (Tr. at 582-84). Plaintiff's limitations included depression and anxiety. (Tr. at 583). The doctor opined that Ms. Rodriguez had a "fair" ability to follow work rules, relate to co-workers, behave in an emotionally stable manner, relate predictably in social situations, demonstrate reliability, and use judgment. (Tr. at 582-83). Dr. Shah determined, however, that plaintiff had "poor" to no ability to deal with the public, interact with

57

supervisors, deal with work stresses, function independently, and maintain attention concentration. (Tr. at 582). Dr. Shah further determined that plaintiff had "poor" to no ability to understand, remember, and carry out detailed or complex job instructions, and had only a "fair" ability to understand and execute simple job instructions. (Tr. at 583). She elaborated that plaintiff "has problems concentrating" and "many times has difficulty following instructions." (Id.). Ultimately, Dr. Shah concluded that, due to her depression and anxiety, it would be "difficult for [plaintiff] to function adequately" in a work environment. (Tr. at 584).

On January 6, 2011, Dr. Ewaskio filled out a Psychiatric Assessment of Ms. Rodriguez in connection with her claim for SSI benefits. (Tr. at 637-641). The doctor described the nature and frequency of their treatment relationship, indicating that she prescribes plaintiff her medications and sees her every "2-3 months." (Tr. at 637). Dr. Ewaskio also noted that plaintiff sees SW Maine every "2-4 weeks." (Id.). With respect to plaintiff's "symptoms," the doctor noted that plaintiff suffers from "high anxiety at slight life stresses, frequent fearfulness," and, additionally, that she was "easily overwhelmed." (Id.). Most pertinently, Dr. Ewaskio diagnosed plaintiff with "Major Depression," which she described as "chronic." (Tr. at 638). Dr.

Ewaskio also noted that plaintiff continued to suffer from "high anxiety," and that she responded "poorly to stressful life events," "any of which [could] easily derail her fragile stability." (Id.). Dr. Ewaskio determined that the prognosis for Ms. Rodriguez was "[p]oor." (Id.).  She rated her GAF as 50.  (Id.).

That same day, Dr. Ewaskio also completed a medical assessment of plaintiff's ability to do work. (Tr. at 639-41). In her view, Ms. Rodriguez had no ability to relate to co-workers, interact with supervisors, deal with work stresses, function independently, maintain attention concentration, behave in an emotionally stable manner, or relate predictably in social situations. (Tr. at 639-40). In addition, Dr. Ewaskio indicated that Ms. Rodriguez was seriously limited in her ability to demonstrate reliability, to follow work rules, to deal with the public, and to use judgment. (Id.). In terms of her employability, the doctor determined that plaintiff had no ability to understand, remember, and carry out complex job instructions, and that she was seriously limited in her ability to understand, remember, and carry out even simple job instructions. (Tr. at 640). The doctor determined that plaintiff was "overwhelmed to a degree to impair functioning[,] [including] concentrating [and] cognition," and that she was "[e]asily overcome and tearful." (Id.). The doctor finally concluded that plaintiff

59

"becomes emotionally unstable with minor stressors," which would
"impair work relations" and cause "many missed days." (Tr. at 641).


B. Plaintiff's Medications


As of April 30, 2009, plaintiff was taking thirteen different
medications daily. For her sleep impairments and "insomnia," Ms.
Rodriguez was taking 100 mg of Trazodone once a day, as well as 10
mg of Zolpidem[47] before bed. (Tr. at 185). For her "pain,"
plaintiff was taking "APAP[48] #3 with Codeine" twice daily, 325 mg
Acetaminophen two times a day, a 600 mg tablet of Ibuprofen every
eight hours, and "Tylenol #4," and "APAP 4 (affiliated [with]
Codeine)" twice daily. (Id.). Furthermore, for her depression, Ms.
Rodriguez was prescribed 20 mg of Lexapro once a day, 25 mg of
Hydroxyzine twice a day, and 300 mg of Bupropion HCL (Wellbutrin)
once a day. (Id.). She also was taking .50 mg of Clonazepam[49] twice
a day for her anxiety. (Id.). Finally, as a "relaxer," plaintiff
took 500 mg of Ciprofloxacin twice a day and 50 mg of Arthrotec

---

[47] A sedative used to treat insomnia. Tennenhouse, supra note
4, at § 40.29.

[48] A pain medication. Tennenhouse, supra note 4, at § 40.4.

[49] A benzodiazepine used to treat "seizures, anxiety
disorders, insomnia, manic symptoms, panic disorder, [and]
psychosis." Tennenhouse, supra note 4, at § 40.6.

60

once a day. (Id.).


## II. Proceedings Before the SSA


Ms. Rodriguez appeared before ALJ Grossman on November 15, 2010, in Bronx, New York. (Tr. at 18, 35-66). With plaintiff was her attorney Daniel Berger. (Tr. at 33). Also appearing before the ALJ was Raymond Cester, an "impartial" vocational expert, and a Spanish interpreter, Julio Pravone, who assisted plaintiff in her testimony. (Id.).


### A. Plaintiff's Hearing Testimony


Ms. Rodriguez testified that she had been denied SSI benefits on June 26, 2009 and had requested a hearing next day. (Tr. at 35-36). At the hearing, plaintiff testified as to her employment history. In 2000, plaintiff had worked as a school cafeteria attendant in Puerto Rico. (Tr. at 40).[50] Between 2007 and 2008 she

---

[50] The ALJ inquired as to why she would be unable to do that job at the time of the hearing. Plaintiff stated that she did not "have the capacity of any kind to do that." (Tr. at 40). She continued that she "feel[s] bad," does not "have control of [herself] sometimes," does not want to eat, and spends some days in bed. (Id.). She also indicated that her life "wasn't easy" because she had come "all the way from Puerto Rico" and she had "had a lot of problems in [her] life, a lot." (Id.).

was employed for approximately 12 months "in a department inside of a child care service." (Tr. at 38). She later clarified that her position was akin to a "teacher['s] assistant." (Tr. at 49). Her hours at that job were approximately 9:00 a.m. until 2:00 p.m. (Tr. at 38). At the time of the hearing, plaintiff was unemployed. (Id.). She was receiving public assistance, but was not working for them because she reported that she was "not capable" of doing so. (Tr. at 54).

ALJ Grossman questioned Ms. Rodriguez as to whether she had attempted to work recently, to which she responded that she is incapable of working. (Tr. at 42). The ALJ inquired as to whether plaintiff had any physical ailments that would prevent her from working. She responded that she had skin cancer and could not be exposed to the sun. (Tr. at 42, 50). She stated further that she had "problems with [her] blood," specifically that her "blood thins a lot" and that her feet and hands get "really swollen." (Id.). She also testified that she could not sit or stand for "too long," nor did she have the "mental capacity" to perform even what the ALJ described as a "sitting job." (Id.). The ALJ inquired as to why she was physically incapable of performing a sitting job, and plaintiff stated that she would have problems sitting for two hours because she experienced back pain and swollen feet. (Id.). When asked if

she could sit for one hour, plaintiff again answered that she could not because she would be in "a lot of pain" and feel "a lot of pressure" in her back; she claimed, also, that her feet would "fall asleep." (Tr. at 42-43).

When prompted by ALJ Grossman to discuss her ailments, plaintiff stated that she "fell under a depressed spell" and that she had "problems" with her feet and legs. (Tr. at 39). She stated, moreover, that she was "really, really nervous" in her daily life. (Tr. at 40). Despite her inactivity and diminished appetite, she could not sleep. (Id.).

Prior to her testimony before ALJ Grossman, plaintiff had traveled to Louisiana to visit her daughter on an urgent matter -- her son-in-law was "in the army" and "he had to go." (Tr. at 41). The ALJ inquired as to how plaintiff felt in the wake of that trip; Ms. Rodriguez responded by stating that she "couldn't be over there [in Louisiana]" because she spent the "entire time crying." (Id.). She indicated that she did feel better when she returned from her trip because she was "with [her] daughter," but was "still depressed" upon her return to New York. (Id.).

Ms. Rodriguez testified further that she had broken her tibia

63

in 1985, for which she had had an operation. (Tr. at 43). She stated that her leg was "painful," and that her foot was asleep during the hearing. (Tr. at 43-44). She testified that she was currently taking Codeine for pain, which she had been taking for the past six or seven years -- ever since she had been in New York. (Tr at 44). Plaintiff clarified that she takes Tylenol with Codeine, which "calms the pain" but "doesn't take away all the pain." (Tr. at 51). She also testified that there are times during the day when she needed to elevate her legs, so that her blood could circulate properly. (Id.).

To this testimony, the ALJ responded "[b]ut despite that you were able to do childcare for 12 months correct?" (Tr. at 44). Mr. Berger objected. (Id.). In response, ALJ Grossman overruled his objection. (Tr. at 44-45). The ALJ took a brief recess, and when the hearing reconvened, the ALJ asked a more detailed question regarding plaintiff's child-care employment, to which attorney Berger again objected. (Tr. at 45-46). In response, the ALJ stated that "[t]his is an administrative hearing. This is not a murder trial, there is no jury here . . . [so] unless I'm asking a question which is improper, and none of these questions is [sic] improper, you have no objection . . . . I don't have to hear the objection it's overruled." (Tr. at 46). The ALJ also did not allow

64

counsel to comment on the question. (Tr. at 47). When Mr. Berger
stated that it was "not fair" for ALJ Grossman to deny his ability
to comment on the objectionable question (Tr. at 48), the ALJ said
that Mr. Berger "will preserve any objection [he] [has] for the
appeals council." (<u>Id.</u>).[51]

Upon questioning by ALJ Grossman regarding her skin cancer,
Ms. Rodriguez stated that she was -- at the time of the hearing --
receiving treatment. (Tr. at 50). The treatment consisted of
"check[ing]" plaintiff's "feet" and monitoring her blood. (<u>Id.</u>).
She stated, moreover, that she had to put "applicator" on and stay
out of the sun. (<u>Id.</u>).

During her testimony, Ms. Rodriguez also reported that she had
been seeing a psychiatrist for two years due to her depression.
(Tr. at 51). The depression was induced, she stated, by "economic
problems" and by the pressure of being a single mother. (<u>Id.</u>).
Furthermore, she stated that she was "very nervous," and that she

---

[51] After the ALJ resumed questioning, counsel commented on
the question, stating that plaintiff "didn't say she cared for
children, she said she worked in a place." (Tr. at 48). The ALJ
then adjourned the hearing. (<u>Id.</u>). An off-record discussion
ensued, and the hearing was reopened. (<u>Id.</u>). The ALJ explained
that if counsel objected, and he overruled that objection, he did
not want counsel to comment on the basis for the objection, as it
would be preserved for the appeals counsel. (Tr. at 48-49).

was shaking at the hearing. (Tr. at 51-52). Plaintiff also testified that she had been a victim of domestic violence, and that she had flashbacks and nightmares stemming from the abuse. (Tr. at 52). She claimed, moreover, that she would hear voices "call" to her. (Id. at 54). Prior to her testimony, she had, at times, had suicidal ideation, but "not in a while." (Id.).

Plaintiff stated that she was unable to sleep without "pills," and even they sometimes would not help her sleep. (Tr. at 52). She would spend entire days in bed -- without the desire to eat or bathe -- attempting to sleep. (Tr. at 53). Plaintiff testified that she had no appetite, and that her daughters "force" her to eat. (Id.). However, she testified that she weighed between 150 and 160 pounds. (Id.). Plaintiff suggested that her energy level was "slow, drawn out, tired." (Tr. at 54). She also testified to a lack of ability to concentrate, at times losing her focus and suffering from "dizziness." (Id.).

Before the close of the hearing, the ALJ confirmed with plaintiff's counsel that they had in their possession all of plaintiff's treatment notes from Dr. "Obsetio,"[52] her treating

---

[52] Presumably Dr. Ewaskio.

psychiatrist. (Tr. at 56-57). Counsel represented that they had all of the existing treatment records and there was no need to issue any subpoenas. (Tr. at 57). The ALJ also indicated that he wanted to order an orthopedic examination and a psychiatric examination to develop the record. (Tr. at 57-58). Counsel objected to sending plaintiff for a psychiatric examination to someone who was not her treating source. (Tr. at 59). The ALJ dismissed this objection, indicating that he was able to, and would, order plaintiff to undergo a psychiatric evaluation. (Tr. at 59-60).[53]

### B. The Vocational Expert's Hearing Testimony

Mr. Cester testified about the occupations available to "a hypothetical individual [of plaintiff's] age[54] and background that's limited [in] English skills[55] [but] can understand basic

---

[53] On December 21, 2010, plaintiff's counsel sent ALJ Grossman a letter regarding his request that plaintiff undergo two additional consultative examinations. (Tr. at 626-29). He indicated that he thought such further testing was unnecessary and in "in violation of the rules governing consultative examinations." (Tr. at 626). Plaintiff failed to attend either evaluation. (Tr. at 25).

[54] Ms. Rodriguez was born on May 3, 1969. (Tr. at 27). She was 39 years of age at the time the application for SSI was filed and 41 at the time of the hearing.

[55] Plaintiff testified that she can "[m]ore or less" understand a simple conversation in English. (Tr. at 37).

instructions, can read basic words, nothing much more than that in English, but is fluent in Spanish . . . , [and can perform] [s]imple repetitive tasks, sedentary, no other restrictions." (Tr. at 63). He concluded that such a person cold be an "order clerk," a "clerical worker," or a "bench assembler." (Tr. at 63-64). All of these tasks required only limited contact with the general public, and contact with supervisors would become minimal following initial interaction. (Tr. at 64). The vocational expert testified, however, that if an individual similar to Ms. Rodriguez was "off task[56] for more than five minutes during a typical hour" of the day, she could not do any of the aforementioned jobs. (Id.). Thus, such a person would "have to" "maintain . . . attention and concentration" to perform these jobs. (Tr. at 65).

C. The ALJ's Decision

ALJ Grossman issued his decision denying plaintiff SSI on May 13, 2011. (Tr. at 12-28). He applied the five-step evaluation process as required under 20 C.F.R. § 416.920(a) in determining

---

Moreover, she claimed that she is capable of reading "simple things in English." (Tr. at 37-38).

[56] During his testimony, Mr. Cester did not define what constitutes being "off task."

whether plaintiff was disabled under 20 C.F.R. § 1614(a)(3)(A), and concluded that plaintiff had "not been under a disability within the meaning of the Social Security Act since April 30, 2009." (Tr. at 18).

At the first step, ALJ Grossman found that plaintiff had not engaged in substantial gainful activity since April 30, 2009, the date of Ms. Rodriguez's SSI application. (Tr. at 20 (citing 20 C.F.R. § 416.971 et seq.)).

At the second step, ALJ Grossman found that plaintiff suffered from two "severe" impairments, "non-union fracture of the right leg with derangement" and "a depressive disorder with anxiety." (Id. (citing 20 C.F.R. § 416.920(c)). In accordance with 20 C.F.R. § 416.920(c), the ALJ found that these conditions "impose[d] more than slight limitations in the claimant's ability to function." (Id.). Furthermore, at this step, ALJ Grossman noted that a July 3, 2009 biopsy revealed that plaintiff was positive for basal cell carcinoma. (Id.). However, the ALJ stated that, subsequent to her surgery, plaintiff noted that she was "very happy with [the] results" (id.), and "[t]he only symptom noted . . . was relatively benign itchiness," which was treated with a topical cream. (Id.). As that "condition ha[d] not been shown to cause any impediment to

69

work," ALJ Grossman did not consider it a severe impairment. (Id.).

At the third step, ALJ Grossman concluded that plaintiff did not have an impairment or combination of impairments that met the criteria for any listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1.[57] (Id. (citing 20 C.F.R. §§ 416.920(d), 416.925, 416.926)). In regard to plaintiff's right-leg fracture, the ALJ noted that while an October 8, 2008 x-ray demonstrated "a fracture deformity of the right tibia and fibula with a non-union fracture of the midshaft fibula," a June 8, 2009 examination reflected her ability to "ambulate effectively." (Id.). The ALJ found that "[a]lthough she had a limp in which she favored the right, she used no assistive device to walk and she could heel/toe walk without difficulty." (Id. at 20). Ultimately, he concluded that plaintiff

---

[57] If a claimant has a "listed" impairment, she will be considered disabled per se without an additional assessment of vocational factors such as age, education, and work experience. If the plaintiff does not have a listed impairment, the Commissioner must consider plaintiff's residual functional capacity, which is her ability to do physical and mental work activities on a sustained basis despite limitations from her impairments. See, e.g., Bush v. Shalala, 94 F. 3d 40, 45 (2d Cir. 1996). To determine whether the applicant has a listed disorder, the ALJ must consult the relevant criteria for each listing. "The criteria in paragraph A substantiate medically the presence of a particular mental disorder" while "[t]he criteria in paragraphs B and C describe impairment-related functional limitations that are incompatible with the ability to do any gainful activity." 20 C.F.R. § 404, Subpt. P, App. 1, § 12(A).

did not meet the criteria of Listing 1.06.[58]


The ALJ also found that plaintiff's mental impairment did not "meet or medically equal the criteria of listing 12.04[59] or

---

[58] To be considered per se disabled under Listing 1.06, the claimant must have a "[f]racture of the femur, tibia, pelvis, or one or more of the tarsal bones" with both "[a] [s]olid union not evident on appropriate medically acceptable imaging and not clinically solid" and the inability to ambulate effectively, as defined in 1.00(B)(2)(b), with no actual or expected return of the ability to ambulate effectively within 12 months of onset. Under Listing 1.00(B)(2)(b), the inability to ambulate effectively is defined as the "[i]nability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities."

[59] Listing 12.04 concerns "affective disorders," which are "[c]haracterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation." 20 C.F.R. § 404, Subpt. P, App. 1, § 12.04. To satisfy the listed paragraph A criteria for affective disorders, the record must demonstrate "[m]edically documented persistence, either continuous or intermittent, of one of the following:"

1. "Depressive syndrome characterized by at least four of the following:" anhedonia or pervasive loss of interest in almost all activities; appetite disturbance with change in weight; sleep disturbance; psychomotor agitation or retardation; decreased energy; feelings of guilt or worthlessness; difficulty concentrating or thinking; thoughts of suicide or hallucinations, delusions, or paranoid thinking;

2. "Manic syndrome characterized by at least three of the following:" hyperactivity; pressure of speech; flight of ideas;

12.06[60]." (Tr. at 21). Specifically, the ALJ considered the

inflated self-esteem; decreased need for sleep; easy
distractibility; involvement in activities that have a high
probability of painful consequences which are not recognized; or
hallucinations, delusions or paranoid thinking; or


3. "Bipolar syndrome with a history of episodic periods
manifested by the full symptomatic picture of both manic and
depressive syndromes (and currently characterized by either or
both syndromes)."

To satisfy the criteria listed in Paragraph B of Listing
12.04, the record must demonstrate that the claimant's affective
disorder "[r]esulting in at least two of the following:" marked
restriction of activities of daily living; marked difficulties in
maintaining social functioning; marked difficulties in
maintaining concentration, persistence, or pace; or repeated
episodes of decompensation, each of extended duration. 20 C.F.R.
§ 404, Subpt. P, App. 1, § 12.04.

[60] Listing 12.06 concerns anxiety-related disorders. "In
these disorders anxiety is either the predominant disturbance or
it is experienced if the individual attempts to master symptoms;
for example, confronting the dreaded object or situation in a
phobic disorder or resisting the obsessions or compulsions in
obsessive compulsive disorders." A positive finding under
paragraph A requires "[m]edically documented findings of at least
one of the following:" generalized persistent anxiety accompanied
by three out of four of the following signs or symptoms, motor
tension, autonomic hyperactivity, apprehensive expectation, or
vigilance and scanning; a persistent irrational fear of a
specific object, activity, or situation which results in a
compelling desire to avoid the dreaded object, activity, or
situation; recurrent severe panic attacks manifested by a sudden
unpredictable onset of intense apprehension, fear, terror and
sense of impending doom occurring on the average of at least once
a week; recurrent obsessions or compulsions which are a source of
marked distress; and recurrent and intrusive recollections of a
traumatic experience, which are a source of marked distress. A
positive finding under Paragraph B requires a positive finding
under Paragraph A that results in at least two of the following:
marked restriction of activities of daily living; marked

criteria listed in paragraph B of Listings 12.04 and 12.06. (<u>Id.</u>).

ALJ Grossman determined that plaintiff had "mild restriction" in her activities of daily living. (<u>Id.</u>). Despite her testifying to being "tired, at two consultative examinations of June 2009 she reported that she attended to activities of daily living/household chores." (<u>Id.</u>). He also noted that she had reported at a F.E.G.S. appointment on September 23, 2008 that she could attend to activities of daily living and other household chores. (<u>Id.</u>).

The ALJ found that Ms. Rodriguez had "moderate difficulties" in social functioning. (<u>Id.</u>). In making this determination, he relied on reports from Dr. Ewaskio and Dr. Shah. (<u>Id.</u>). A November 2009 report from Dr. Ewaskio stated that plaintiff could be irritable at times, but rated her as having "good" or "fair," social abilities. The ALJ noted that these ratings were repeated by Dr. Shah in a November 2010 report (<u>id.</u>), although he briefly acknowledged a January 26, 2011 report from Dr. Ewaskio that assessed some aspects of plaintiff's social functioning as "poor." (<u>Id.</u>). The ALJ rejected these reports of "such limited levels of

---

difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. 20 C.F.R. § 404, Subpt. P, App. 1, § 12.06.

73

social dysfunctioning," as plaintiff was "consistently reported to be cooperative and calm when seen at visits in 2009 and 2010." (Id.). In making this finding, ALJ Grossman also referenced plaintiff's June 8, 2009 examination by a psychiatric consultant and a September 23, 2008 F.E.G.S. evaluation, during which Ms. Rodriguez stated that she socialized with her family and friends. (Id.).

ALJ Grossman further determined that Ms. Rodriguez suffered from "moderate difficulties" "[w]ith regard to concentration, persistence or pace." (Id.). In reaching this conclusion, he rejected Dr. Ewaskio's indication that plaintiff had a "poor" ability to "maintain attention/concentration." (Id.). He found that plaintiff's "treatment records do not support such a rating, as claimant's GAF rating over the period of treatment, began as 55, rose to 60 shortly thereafter and was last shown as 63, which would be indicative of overall mild symptoms." (Id.).[61] He also referenced plaintiff's 2010 Louisiana trip as an example of a behavior inconsistent with her claims of poor functioning. (Id.). Moreover, during a June 8, 2009 consultative psychiatric examination, the ALJ

---

[61] This statement is in error. Although SW Maine rated plaintiff's GAF at 63 on October 7, 2010, Dr. Ewaskio rated plaintiff's GAF at 50 in her January 6, 2011 Psychiatric Assessment. (Tr. at 637-641).

noted, a psychiatrist had determined that plaintiff "display[ed] intact attention and concentration." (Id.). In sum, he concluded that, in view of the aforementioned evaluations, "[t]hese factors are not in accord with a poor rating in this category of functioning." (Id.).

Furthermore, ALJ Grossman noted that Ms. Rodriguez had "experienced no episodes of decompensation . . . of extended duration. The record does not reflect any episodes of decompensation." (Id.). The ALJ ultimately concluded that "[b]ecause the claimant's mental impairment does not cause at least two 'marked' limitations or one 'marked' limitation and 'repeated' episodes of decompensation, each of extended duration, the 'paragraph B' criteria are not satisfied." (Tr. at 22).

Similarly, the ALJ concluded that Ms. Rodriguez's medical history did not support a finding that the "paragraph C" criteria for either Listing were satisfied at the time of his decision. (Id.).[62]

---

[62] If the claimant cannot satisfy both paragraphs A and B under Listing 12.04 or 12.06, the claimant can qualify as per se disabled by demonstrating that she meets the criteria listed in Paragraph C of the pertinent Listing. Paragraph C of Listing 12.04 requires a "[m]edically documented history of a chronic affective disorder of at least 2 years' duration that has caused

75

At step four, ALJ Grossman determined plaintiff had the residual functional capacity to perform sedentary work as defined in 20 C.F.R. § 416.967(1),[63] except that she was limited to "simple repetitive tasks" involving "limited contact with the public and with supervisors." (Id.). In making his findings, the ALJ explained that he had considered all of plaintiff's symptoms to the extent that they were reasonably consistent with the objective medical evidence and other evidence presented in the record, in accordance with 20 C.F.R. § 416.929 and Social Security Regulations ("SSRs") 96-4p and 96-7p. (Id.). The ALJ also stated that he had considered

more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:" repeated episodes of decompensation, each of extended duration; a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement. 20 C.F.R. § 404, Subpt. P, App. 1, § 12.04.

Paragraph C of Listing 12.06 requires an anxiety-related disorder that results in the complete inability to function independently outside the area of one's home. 20 C.F.R. § 404, Subpt. P, App. 1, § 12.06.

[63] 20 C.F.R. § 416.967 defines sedentary work as work that "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."

opinion evidence -- specifically the medical opinions of treating
sources and the consultative opinions of non-treating sources -- in
accordance with 20 C.F.R. § 416.927 and SSRs 96-2p, 96-5p, 96-6p,
and 06-3p. (Id.).

In considering plaintiff's symptoms, the ALJ followed a two-
step process. He first determined whether plaintiff suffered from
a "medically determinable" physical or mental impairment that
"could reasonably be expected to produce the claimant's pain or
other symptoms." (Id.). As such an impairment was shown, he then
evaluated "the intensity, persistence, and limiting effects" of
those symptoms, and the extent to which they limited plaintiff's
functioning. (Id.).

After providing an extensive summary of his interpretation of
plaintiff's treatment records (Tr. at 23-25), ALJ Grossman found
that plaintiff's "medically determinable impairments could
reasonably be expected to cause the alleged symptoms." (Tr. at 25).
However, the ALJ found that Ms. Rodriguez's "statements concerning
the intensity, persistence and limiting effects of these symptoms
are not credible to the extent they are inconsistent" with her
residual functional capacity assessment. (Id.).

In addressing her physical limitations, the ALJ concluded that because the record "support[ed] a conclusion that the claimant's nonunion fracture of the right leg would restrict her from walking/standing for six hours a day," she was "capable" of performing "only sedentary work." (Id.).

As for plaintiff's mental health, ALJ Grossman noted what he called "a number of irregularities in the record." (Id.). Specifically, the ALJ referenced the fact that plaintiff had told the examining consultative psychiatrist that she had suffered from a history of domestic violence, despite the fact that no such history is in the medical treatment records. (Id.).[64] ALJ Grossman also noted that plaintiff had "testified to hearing voices, while her treatment records consistently show no [audio hallucinations] and no [visual hallucinations]." (Tr. at 25-26). Furthermore, he

---

[64] Plaintiff claimed on several other occasions to be a domestic-violence victim. (See Tr. at 250 (F.E.G.S. report reflecting treatment period of April 10, 2007 through May 30, 2007); 597-98 (on November 5, 2008, plaintiff claimed that in the mid-1980s, she had been abused by her ex-husband, and that she had sought counseling for that abuse)). Plaintiff points to this statement as evidence that defendant concedes that the ALJ was "unfamiliar with the record" (Pl.'s Opp'n 4), although the ALJ did provide a detailed summary of the medical evidence in the record. (See Tr. at 20-27). Furthermore, as plaintiff claimed that the abuse had occurred some fifteen years prior, it is not surprising that the record provided reflects a lack of treatment for the abuse more than a decade after it occurred.

rejected Dr. Ewaskio's repeated findings of what the ALJ called
"limited mental functioning" -- which presumably refers to her
assessments of plaintiff's mental functional capacity -- because
they were "totally contrary to accompanying written narratives as
well as being unsupported by treatment notes." (Tr. at 26). He
stated that treatment "notes consistently show a GAF rating of 60
or higher (commensurate with mild to moderate symptoms),[65]
relatively benign clinical findings, the claimant's own reports of
only mild depression and even feeling happy," and the fact that Ms.
Rodriguez traveled to Louisiana to help her daughter. (Id.). He
found that that evidence suggested "someone with a substantial
ability to function." (Id.). The ALJ also referenced an independent
psychiatric consultation, which reflected the opinion that
plaintiff's psychiatric problems would not interfere with her daily
function, and plaintiff's statements that she performs household
chores and socializes with her family. (Id.). The June 8, 2009

---

[65] The ALJ mischaracterizes plaintiff's GAF ratings.
Treatment records generally reflect a GAF rating that fluctuates
between 55 and 60, with several instances of both higher and
lower ratings. (See, e.g., Tr. at 368 (November 16, 2009 GAF
rating was 50), 424 (November 9, 2009 GAF rating of 60), 429
(December 8, 2009 GAF rating of 60), 475 (May 5, 2009 GAF rating
was 55), 483 (February 5, 2009 GAF rating of 55), 492 (November
5, 2008 GAF rating of 60), 501 (November 5, 2009 rating of 55),
539 (May 5, 2010 GAF rating was 55), 556 (August 9, 2010 GAF
rating of 63), 564 (September 9, 2010 GAF rating was 63), 568
(October 7, 2010 GAF rating of 63), 569 (August 5, 2010 GAF
rating was 55), 637-41 (January 6, 2011 GAF rating of 50)).

examination of plaintiff by an independent consultative evaluator showed that although plaintiff complained of depressed mood and anxiety, she "was cooperative; she related adequately; her thought processes were coherent and goal directed; there was no evidence of psychosis; she was fully oriented with intact concentration, attention and memory; and her cognitive functioning was considered to be average." (Tr. at 25). The ALJ noted that this psychiatrist had concluded that plaintiff "would be able to perform all tasks necessary for vocational functioning . . . ." (Id.).

In view of the foregoing, ALJ Grossman held that plaintiff's psychiatric problems would cause "some restrictions for work activity, but these would not be preclusive of work." (Id.). He concluded that, "allowing for her depression and anxiety, she should nonetheless be able to handle simple, repetitive tasks that do not involve more than limited contact with the public and with supervisors." (Id.).

The ALJ also considered plaintiff's failure to attend two consultive examinations, one for a psychiatric assessment and one for an orthopedic assessment (Tr. at 57), which she had been directed to attend. (Tr. at 25). He found that this failure "diminishes her credibility," though he noted that he would have

reached the same conclusion even if he had not ordered the examinations. (Id.). Although he acknowledged counsel's objections to the examinations, he found them to be without merit; he explained that it was an ALJ's duty to develop the record and that he had deemed them necessary for an accurate disability determination, as the consultive examinations in the record were almost two years old. He also indicated that he would have appreciated the opinion of an independent examiner. (Id.). In this regard, he noted that plaintiff had not had treatment for her leg since those consultive examinations, which highlighted the need for a contemporaneous evaluation to properly evaluate her physical limitations. (Tr. at 26). He also cited the need for the examinations in light of his belief that Dr. Ewaskio's opinions and treatment records were filled with "inconsistencies." (Id.).

As part of the ALJ's step-four analysis, he determined that Ms. Rodriguez was unable to perform her past relevant work as a cafeteria attendant. (Id.). In reaching this conclusion, he stated that plaintiff's prior work exceeded her residual functional capacity, as it required light exertion. (Id.).[66]

---

[66] SSA regulations explain that light work "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when

At the conclusion of his decision, ALJ Grossman stated that, "[c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform." (Tr. at 27). Although the ALJ found that plaintiff did not have the residual functional capacity to perform the full range of sedentary work, he relied on the opinion of the vocational expert, who had testified that plaintiff could perform unskilled, sedentary work. (Id.). Consequently, the ALJ held that plaintiff is "capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (Id.).

ALJ Grossman ultimately held that "[a] finding of 'not disabled' is . . . appropriate under the framework" of 20 C.F.R. §§ 416.969 and 416.969(a). (Id.). In reaching this conclusion, the ALJ considered the opinion of plaintiff's treating psychiatrist, Dr. Ewaskio. However, he gave "little weight" to her "varying opinions"

--------

it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567 (b).

82

regarding plaintiff's level of functioning related to her ability
to hold a job. (Tr. at 24). He did so "pursuant to Social Security
Ruling 96-5p, [where] it is instructed that the issue of disability
is one that is reserved solely for the Commissioner." (Id.).
Additionally, the ALJ mentioned a report from Dr. Ewaskio dated
January 6, 2011. (Id.). The ALJ claimed that the report was written
"in an obviously different handwriting than the prior doctor's
reports of November 16, 2009 and December 8, 2009 . . ." and
indicated that in the 2011 report plaintiff had been rated as
having overwhelmingly "poor" abilities in mental function. (Id.).
In addition, he found that "[l]ittle narrative [was] provided to
support the opinion and no clinical findings [were] indicated in
the report." (Id.).

ALJ Grossman afforded no weight to the findings of Dr. Shah,
who had submitted reports from examinations dated November 9, 2010
and November 10, 2010 that reflected "poor" ratings in many areas
of mental functioning and a GAF rating of 50/50. (Tr. at 25). The
ALJ accorded Dr. Shah's "undocumented opinion" "no weight", as his
name did "not appear anywhere in the claimant's treatment records
and no address is shown in his reports." (Id.).

ALJ Grossman concluded his decision by stating that Ms.

83

Rodriguez "has not been under a disability, as defined in the Social Security Act, since April 30, 2009, the date the application [for SSI] was filed." (Tr. at 28).

### D. The SSA Appeals Council Decision

On May 31, 2011 plaintiff requested that the SSA Appeals Council review ALJ Grossman's decision. (Tr. at 11). In a notice dated August 31, 2011, the Appeals Council denied plaintiff's request without discussion of the merits and informed her of her option to file a civil action if she disagreed with the denial. (Tr. at 1-7).

## III. The Present Action

Plaintiff filed the present action on October 28, 2011. She seeks an order reversing the Commissioner's determination and granting her monthly maximum insurance and/or SSI benefits retroactively to the date of her claimed initial disability, March 1, 2002. Alternatively, she asks for an order remanding her claim for reconsideration of the evidence.

Following commencement of this action, the Commissioner filed

an answer on January 23, 2012 and has subsequently moved for judgment on the pleadings. He asserts that substantial evidence supports ALJ Grossman's decision that plaintiff retains the functional capacity to perform unskilled, sedentary work and was therefore not disabled. (Def.'s Mem. 1).

ANALYSIS

I. Standard of Review

When a claimant challenges the SSA's denial of SSI benefits, a court may set aside the Commissioner's decision only if it is not supported by substantial evidence or was based on legal error. Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000) (citing 42 U.S.C. § 405(g); Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998) (citing Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam))); see 42 U.S.C. § 405(g) (stating that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . .").

"Substantial evidence" is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S.

85

Case 1:11-cv-07720-CM-MHD   Document 24   Filed 09/28/12   Page 86 of 124

389, 401 (1971) (quoting <u>Consol. Edison Co. v. NLRB</u>, 305 U.S. 197,

229 (1938)); <u>see</u> <u>also</u> <u>Matthews v. Leavitt</u>, 452 F.3d 145, 152 n.9

(2d Cir. 2006); <u>Halloran v. Barnhart</u>, 362 F.3d 28, 31 (2d Cir.

2004). The substantial-evidence test applies not only to the

Commissioner's factual findings, but also to inferences to be drawn

from the facts. <u>E.g.</u>, <u>Carballo ex rel. Cortes v. Apfel</u>, 34 F.

Supp.2d 208, 214 (S.D.N.Y. 1999). In determining whether

substantial evidence exists, a reviewing court must consider the

whole record, examining the evidence from both sides, because an

analysis of the substantiality of the evidence must also include

that which detracts from its weight. <u>See</u>, <u>e.g.</u>, <u>Brown v. Apfel</u>, 174

F.3d 59, 62 (2d Cir. 1999) (quoting <u>Mongeur v. Heckler</u>, 722 F.2d

1033, 1038 (2d Cir. 1983) (<u>per</u> <u>curiam</u>)); <u>Williams ex rel. Williams</u>

<u>v. Bowen</u>, 859 F.2d 255, 258 (2d Cir. 1988).


It is the function of the Commissioner, not the courts, to

resolve evidentiary conflicts and to appraise the credibility of

witnesses, including the claimant. <u>See</u> <u>Veino v. Barnhart</u>, 312 F.3d

578, 588 (2d Cir. 2002); <u>Clark v. Comm'r of Soc. Sec.</u>, 143 F.3d

115, 118 (2d Cir. 1998); <u>Carroll</u>, 705 F.2d at 642. While the ALJ

need not resolve every conflict in the record, <u>Miles v. Harris</u>, 645

F.2d 122, 124 (2d Cir. 1981), "the crucial factors in any

determination must be set forth with sufficient specificity to

86

enable [a reviewing court] to decide whether the determination is supported by substantial evidence." <u>Ferraris v. Heckler</u>, 728 F.2d 582, 587 (2d Cir. 1984); <u>cf.</u> <u>Snell v. Apfel</u>, 177 F.3d 128, 134 (2d Cir. 1999) (holding that claimant was entitled to an explanation of why the Commissioner discredited her treating physician's disability opinion).

In addition to the consideration of the evidence in the record, a reviewing court must consider the ALJ's application of the law to the record before him. Even if the record, as it stands, contains substantial evidence of non-disability, the SSA decision may not withstand challenge if the ALJ committed legal error. <u>See</u> <u>Balsamo</u>, 142 F.3d at 79. Of particular importance, as disability benefits proceedings are non-adversarial in nature, the ALJ has an affirmative obligation to fully develop the administrative record, even when claimant is represented by counsel. <u>Lamay v. Comm'r of Soc. Sec.</u>, 562 F.3d 503, 508-09 (2d Cir. 2009); <u>Casino-Ortiz v. Astrue</u>, 2007 WL 2745704, at *7 (S.D.N.Y. Sept. 21, 2007) (citing <u>Perez v. Chater</u>, 77 F.3d 41, 47 (2d Cir. 1996)). To this end, the ALJ must make "every reasonable effort" to help an applicant get medical reports from his medical sources. 20 C.F.R. §§ 404.1512(d), 416.912(d). Ultimately, "[t]he record as a whole must be complete and detailed enough to allow the ALJ to determine the claimant's

residual functional capacity." <u>Casino-Ortiz</u>, 2007 WL 2745704, at *7 (citing 20 C.F.R. § 404.1513(e)(1)-(3)).

The ALJ must also adequately explain his reasoning in making the findings on which his ultimate decision rests, and in doing so he must address all pertinent evidence. <u>See</u>, <u>e.g.</u>, <u>Diaz v. Shalala</u>, 59 F.3d 307, 315 (2d Cir. 1995); <u>Ferraris</u>, 728 F.2d at 586-87; <u>see also</u> <u>Allen ex rel. Allen v. Barnhart</u>, 2006 WL 2255113, at *10 (S.D.N.Y. Aug. 4, 2006) (finding that the ALJ explained his findings with "sufficient specificity" and cited specific reasons for his decision). "'It is self-evident that a determination by the [ALJ] must contain a sufficient explanation of [his] reasoning to permit the reviewing court to judge the adequacy of [his] conclusions.'" <u>Pacheco v. Barnhart</u>, 2004 WL 1345030, at *4 (E.D.N.Y. June 14, 2004) (quoting <u>Rivera v. Sullivan</u>, 771 F. Supp. 1339, 1354 (S.D.N.Y. 1991)). An ALJ's "'failure to acknowledge relevant evidence or to explain its implicit rejection is plain error.'" <u>Kuleszo v. Barnhart</u>, 232 F. Supp.2d 44, 57 (W.D.N.Y. 2002) (quoting <u>Pagan v. Chater</u>, 923 F. Supp. 547, 556 (S.D.N.Y. 1996)).

The Act authorizes a court, when reviewing decisions of the SSA, to order further proceedings, as expressly stated in sentence four of 42 U.S.C. § 405(g): "The court shall have power to enter,

upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); <u>Butts v. Barnhart</u>, 388 F.3d 377, 382 (2d Cir. 2004). If "'there are gaps in the administrative record or the ALJ has applied an improper legal standard,'" the court will remand the case for further development of the evidence or for more specific findings. <u>Rosa v. Callahan</u>, 168 F.3d 72, 82-83 (2d Cir. 1999) (quoting <u>Pratts v. Chater</u>, 94 F.3d 34, 39 (2d Cir. 1996)). Remand is particularly appropriate where further findings or explanation will clarify the rationale for the ALJ's decision. <u>Pratts</u>, 94 F.3d at 39. If, however, the reviewing court concludes that an ALJ's determination to deny benefits was not supported by substantial evidence, a remand solely for calculation of benefits may be appropriate. <u>See</u>, <u>e.g.</u>, <u>Butts</u>, 388 F.3d at 386 (discussing <u>Curry v. Apfel</u>, 209 F.3d 117 (2d Cir. 2000)).


II. <u>Standards for SSI Benefits Eligibility</u>


An applicant is "disabled" within the meaning of the Act if she "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can

be expected to last for a continuous period of not less than twelve months."[67] 42 U.S.C. § 1382c(a)(3)(A). To qualify for SSI benefits, the claimed disability must result "from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." Id. § 1382c(a)(3)(C); accord Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999).[68] In addition to being disabled as defined by the statute, the applicant must also demonstrate that she is financially eligible for benefits. See 42 U.S.C. § 1382(a); Tejada, 167 at 773 n.2.[69]

The Act requires that the relevant physical or mental impairment be "'of such severity that [plaintiff] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of

---

[67] "Substantial gainful activity" is defined as work that "[i]nvolves doing significant and productive physical or mental duties" and "[i]s done (or intended) for pay or profit." 20 C.F.R. § 404.1510; see, e.g., Craven v. Apfel, 58 F. Supp.2d 172, 183 (S.D.N.Y. 1999); Pickering v. Chater, 951 F. Supp. 418, 424 (S.D.N.Y. 1996).

[68] Qualification for SSI benefits is not related to the date of plaintiff's last insurance, but SSI may not be granted to plaintiff for any period prior to April 2009, the month in which she filed her SSI application. See 20 C.F.R. § 416.330.

[69] Defendant does not dispute Ms. Rodriguez's financial eligibility for SSI.

substantial gainful work which exists in the national economy.'"
<u>Butts</u>, 388 F.3d at 383 (quoting 42 U.S.C. § 423(d)(2)(A)); 42
U.S.C.A. § 1382c(a)(3)(B) (SSI)). If the claimant can perform
substantial gainful work existing in the national economy, it is
immaterial, for purposes of the Act, that an opening for such work
may not be found in the immediate area where she lives or that a
specific job vacancy may not exist. 42 U.S.C. §§ 423(d)(2)(A),
1382c(a)(3)(B). In assessing a claim of disability, the
Commissioner must consider: "(1) objective medical facts; (2)
diagnosis or medical opinions based on those facts; (3) subjective
evidence of pain and disability testified to by claimant and other
witnesses; and (4) the claimant's background, age, and experience."
<u>Williams ex rel. Williams</u>, 859 F.2d at 259.

        The SSA regulations set forth a five-step sequential process
under which an ALJ must evaluate disability claims. 20 C.F.R. §§
404.1520(a)(4)(i)-(v), 416.920. The Second Circuit has described
this sequential process as follows:

> "<u>First</u>, the Secretary considers whether the
> claimant is currently engaged in substantial
> gainful activity. If [she] is not, the
> Secretary <u>next</u> considers whether the claimant
> has a "severe impairment" which significantly
> limits [her] physical or mental ability to do
> basic work activities. If the claimant suffers

> such an impairment, the <u>third</u> inquiry is
> whether, based solely on medical evidence, the
> claimant has an impairment which is listed in
> Appendix 1 of the regulations. If the claimant
> has such an impairment, the Secretary will
> consider him disabled without considering
> vocational factors such as age, education, and
> work experience; the Secretary presumes that a
> claimant who is afflicted with a "listed"
> impairment is unable to perform substantial
> gainful activity. Assuming the claimant does
> not have a listed impairment, the <u>fourth</u>
> inquiry is whether, despite the claimant's
> severe impairment, [she] has the residual
> functional capacity to perform his past work.
> <u>Finally</u>, if the claimant is unable to perform
> his past work, the Secretary then determines
> whether there is other work which the claimant
> could perform."

<u>Bush</u>, 94 F.3d at 44-45 (emphasis in original) (quoting <u>Rivera v.</u>

<u>Schweiker</u>, 717 F.2d 719, 722-23 (2d Cir. 1983)).


Plaintiff bears the burden of proof on the first four steps,

but the Commissioner bears the burden on the fifth step, that is,

demonstrating the existence of jobs in the economy that plaintiff

can perform. <u>See</u>, <u>e.g.</u>, <u>id.</u> (quoting same); <u>Poupore v. Astrue</u>, 566

F.3d 303, 306 (2d Cir. 2009).[70] Normally, in meeting his burden on

---

[70] In this case, plaintiff's alleged date of onset of
disability is March 1, 2002. 20 C.F.R. § 404.1560(c), before it
was amended on August 26, 2003, required the Commissioner to
"consider [a claimant's] residual functional capacity together
with [her] vocational factors of age, education, and work
experience to determine whether [she] can do other work [,
meaning] jobs that exist in significant numbers in the national

economy" if he found that a claimant could not perform past work. See <u>Correale-Englehart v. Astrue</u>, 687 F. Supp.2d 396, 440 n.60 (S.D.N.Y. 2010). The Second Circuit interpreted this to mean that the full burden to prove disability shifted from the claimant to the ALJ at the fifth step, requiring the ALJ to prove that the "claimant still retains a residual functional capacity to perform alternative substantial gainful work which exists in the national economy", and therefore prohibited the use during step five of an inference drawn during step four from the absence of medical evidence. <u>Curry</u>, 209 F.3d at 123 (quoting <u>Bapp v. Bowen</u>, 802 F.2d 601, 604 (2d Cir. 1986)). However, on August 26, 2003, 20 C.F.R. § 404.1560(c) was amended so that, upon finding that a claimant could not complete her prior work, the ALJ could "use the same residual functional capacity assessment [he] used to decide if [the claimant] could do [her] past relevant work when [he] decide[s] if [the claimant] can adjust to any other work . . . by considering [the claimant's] residual functional capacity [and the] vocational factors of age, education, and work experience. " 20 C.F.R. § 404.1560(c)(1). To determine whether the jobs that a claimant could perform existed in "significant numbers in the national economy (either in the region where you live or in several regions in the country)", the amended regulation made the ALJ "responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that [the claimant] can do, given [her] residual functional capacity and vocational factors." 20 C.F.R. § 404.1560(c)(2). However, the regulation explicitly states that the Commissioner, in making this determination, is "not responsible for providing additional evidence about [a claimant's] residual functional capacity because [he] will use the same residual functional capacity assessment that [he] used to determine if [the claimant] can do [her] past relevant work." <u>Id.</u> The Second Circuit has held that the amended regulation abrogated the standard of review put forward in <u>Curry</u>, and that an ALJ is not required to "provide additional evidence of the claimant's residual functional capacity." <u>Poupore</u>, 566 F.3d at 306.

The amended regulation became effective on August 26, 2003. See Clarification of Rules Involving Residual Functional Capacity Assessments; Clarification of Use of Vocational Experts and Other Sources at Step 4 of the Sequential Evaluation Process; Incorporation of "Special Profile" Into Regulations, 68 Fed. Reg. 51153 (Aug. 26, 2003). However, it is an open question in this

this fifth step, the Commissioner may rely on the Medical-
Vocational Guidelines contained in 20 C.F.R. Part 404, Subpart P,
Appendix 2, commonly referred to as "the Grid[s]."[71] Zorilla, 915
F. Supp. at 667. However, if plaintiff suffers from non-exertional
limitations,[72] exclusive reliance on the Grids is inappropriate. See

Circuit whether the amended regulation applies retroactively to a
claimant whose alleged onset of disability occurred prior to the
amendment becoming effective. See Poupore, 566 F.3d at 306;
accord Mancuso v. Astrue, 361 F. App'x 176, 177 (2d Cir. Jan 14,
2010). This issue might be relevant here because plaintiff's
alleged onset predates the amended regulation.

It appears that the ALJ applied the amended standard of
review in the present case. (See Tr. at 19-20 (stating that
"[a]lthough the claimant generally continues to have the burden
of proving disability at [the fifth] step, a limited burden . . .
shifts to the [SSA] . . . [to] provid[e] evidence that
demonstrates that . . . work exists in significant numbers in the
national economy that the claimant can do . . . .")). We need not
reach the issue, however, as remand is appropriate regardless of
who had the burden of demonstrating plaintiff's residual
functional capacity.

[71] "The Grid classifies work into five categories based on
the exertional requirements of the different jobs." Zorilla v.
Chater, 915 F. Supp. 662, 667 n.2 (S.D.N.Y. 1996). "Specifically,
it divides work into sedentary, light, medium, heavy and very
heavy, based on the extent of requirements in the primary
strength activities of sitting, standing, walking, lifting,
carrying, pushing, and pulling." Id. Based on these factors, the
SSA uses the Grids to evaluate whether the claimant can engage in
any other substantial gainful work that exists in the economy.
Id. at 667.

[72] "An exertional limitation is a limitation or restriction
imposed by impairments and related symptoms, such as pain, that
affect only a claimant's ability to meet the strength demands of
jobs (i.e., sitting, standing, walking, lifting, carrying,
pushing, and pulling)." Rosa, 168 at 78 n.2 (citing Zorilla, 915
F. Supp. at 667 n.3). "'[L]imitations or restrictions which

Butts, 388 F.3d at 383 (citing Rosa, 168 F.3d at 78).


III. Assessment of the Record


ALJ Grossman's decision rests on his determination that although plaintiff could not perform her prior work as a cafeteria attendant, she retained the residual functional capacity to perform repetitive, unskilled sedentary work. (See Tr. at 22). Given Ms. Rodriguez's residual functional capacity, the ALJ decided that there were a sufficient number of jobs available in the national economy that she would be capable of performing. For the reasons set forth below, we conclude that the ALJ's reasoning suffers from a number of defects that justify a remand for further development of the record and additional findings.


ALJ Grossman, having found Dr. Ewaskio's reports to be inconsistent or otherwise troubling, failed to reach out to Dr. Ewaskio for clarification or supplementation, even though her opinion was integral to determining plaintiff's mental capacity. It

---

affect [a claimant's] ability to meet the demands of jobs other than the strength demands, that is, demands other than sitting, standing, walking, lifting, carrying, pushing or pulling, are considered non-exertional.'" Samuels v. Barnhart, 2003 WL 21108321, at *11 n.14 (S.D.N.Y. May 14, 2003) (quoting 20 C.F.R. § 416.969a(a)); see also 20 C.F.R. § 404.1569a(c).

is also not clear exactly what deference, if any, he gave to Dr. Ewaskio's opinion. He also failed to consider other-source evidence from her treating social worker, Ms. Maine. In making his residual-functional-capacity decision, the ALJ also mischaracterized the evidence in the record and failed to consider the effects, if any, of plaintiff's medications on her functional capacity. Finally, the ALJ failed to adequately consider the combined effects, if any, of plaintiff's impairments on her residual functional capacity.

We first address, and reject, plaintiff's argument that the ALJ was hostile toward her and hence biased in reaching his disability determination, and then address the ALJ's legal errors.

A. The ALJ Did Not Demonstrate Bias Against Plaintiff

An ALJ "shall not conduct a hearing if he or she is prejudiced or partial with respect to any party . . . ." 20 C.F.R. § 404.940. Although the decision to remand to a new ALJ is one generally recognized to be within the Commissioner's purview, a federal judge may issue such an order when the ALJ's conduct "'gives rise to serious concerns about the fundamental fairness of the disability review process.'" Ocasio v. Astrue, 2009 WL 2905448, at *5 (S.D.N.Y. Sept. 4, 2009) (quoting Sutherland v. Barnhart, 322 F.

96

Supp.2d 282, 292 (E.D.N.Y. 2004)) (citing <u>Arshad v. Astrue</u>, 2009 WL 996055, at *6 (S.D.N.Y. Apr. 6, 2009)); <u>accord</u> <u>Whitfield v. Astrue</u>, 2012 WL 1352870, at *1 (2d Cir. Apr. 19, 2012) (quoting <u>Reddy v. Commodity Futures Trading Comm'n</u>, 191 F.3d 109, 119-20 (2d Cir. 1999) for the proposition that "in order to show that an ALJ's bias resulted in the denial of a fair hearing, a claimant must show that the ALJ exhibited a 'deep-seated favoritism or antagonism that would make a fair judgment impossible'").

We reject plaintiff's contention that the ALJ demonstrated "hostility" toward her when he suggested that she had fabricated a history of domestic abuse during an examination by a consultive psychiatrist. (<u>See</u> Pl.'s Opp'n 11-12). In his decision, the ALJ noted her mention to various doctors of a history of domestic violence in a consultive examination as an "irregularity," as he found no evidence of domestic-abuse treatment in the record. (Tr. at 25). The ALJ was not incorrect in stating that the record contained no documentation of any treatment (<u>see</u>, <u>e.g.</u> Tr. at 250 (plaintiff mentioned history of domestic violence but was not being treated for the abuse)), although his inference that this absence called plaintiff's credibility into question is difficult to understand since the abuse occurred several decades earlier. In any event, the ALJ's questionable inference may be well wide of the

97

mark, but does not itself demonstrate bias, and we decline to infer

hostility toward plaintiff based on this ground alone.

.

Nor did the ALJ show hostility by explaining his reasons for

not find credible certain medical records, such as the January 6,

2011 report from Dr. Ewaskio, which he found to be in a different

handwriting from prior reports and to have had an original GAF

assessment of 60/60 that was changed to 50/50. (<u>See</u> Tr. at 24).

Although, for reasons to be noted, the relaince on the handwriting

was erroneous, one can observe the altered numbering  by looking at

the relevant treatment record. (<u>See</u> Tr. at 368, 405). The ALJ's

decision does not demonstrate animus simply because one of the

stated  bases  of  his  credibility  assessment  may  have  been

unjustified. Finally, we note that the ALJ's performance of his

duties to gather a reasonably complete record, to seek further

evaluations of the plaintiff and to offer a detailed explanation of

his reasoning is inconsistent with plaintiff's bias complaint.


B. <u>ALJ Errors</u>


1. <u>Dr. Ewaskio</u>


The  SSA's  regulations  advise  that  "'a  treating  source's

opinion on the issue(s) of the <u>nature and severity of your impairment(s)</u>' will be given 'controlling weight' if the opinion is 'well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence'" in the record. <u>Green-Younger v. Barnhart</u>, 335 F.3d 99, 106 (2d Cir. 2003) (emphasis in original) (quoting 20 C.F.R. § 404.1527(d)(2)); <u>Shaw v. Chater</u>, 221 F.3d 126, 134 (2d Cir. 2000); <u>Rosa</u>, 168 F.3d at 78-79 (stating that "the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion" (quotation omitted)). Although the treating-physician rule generally requires deference to the medical opinion of a plaintiff's treating physician, <u>Schisler v. Sullivan</u>, 3 F.3d 563, 567-68 (2d Cir. 1993), the opinion of the treating physician is not afforded controlling weight if it is not consistent with other substantial evidence in the record, such as the opinions of other medical experts. <u>Halloran v. Barnhart</u>, 362 F.3d 28, 32 (2d Cir. 2004) (citing <u>Veino v. Barnhart</u>, 312 F.3d 578, 588 (2d Cir. 2002); 20 C.F.R. § 404.1527(d)(2)).

Even when the treating physician's opinion conflicts with other medical evidence, the ALJ must still consider various factors to determine how much weight to give the treating doctor's opinion. 20 C.F.R. § 404.1527(c)(2). Among those considerations are: (1) the

frequency of examination and the length, nature and extent of the treatment relationship; (2) evidence in support of the treating physician's opinion; (3) the consistency of the opinion with the record as a whole; (4) whether the opinion is from a specialist; and (5) other factors brought to the SSA's attention that support or contradict the opinion. 20 C.F.R. § 404.1527(c); see also Halloran, 362 F.3d at 32; Fox v. Astrue, 2008 WL 828078, at *8 (N.D.N.Y. Mar. 26, 2008). Additionally, the regulations direct the Commissioner to "always give good reasons . . . for the weight" afforded  to  a  treating  source's  opinion.  20  C.F.R.  § 404.1527(c)(2). An ALJ's failure to provide explicit "good reasons" for discrediting a treating source's opinion is a ground for remand. Snell, 177 F.3d at 133 (citing Schaal, 134 F.3d at 505).

    The ALJ discredited the "inconsistent" functional assessments of plaintiff's treating psychiatrist, Dr. Ewaskio, without attempting to contact her for an explanation. (See, e.g., Tr. at 26). In doing so, he failed to comply with his duty to develop the record.

    ALJ Grossman rejected Dr. Ewaskio's repeated assessments of plaintiff's mental capacity. (Tr. at 24, 26). He cited the November 16 and December 8, 2009 reports by Dr. Ewaskio in which she

assessed plaintiff to have poor to no ability to function in a number of areas. (Tr. at 24). For example, on December 8, 2009, the doctor determined that Ms. Rodriguez had "poor" or no ability to relate to co-workers, to deal with the public, to deal with work stresses, to function independently, and to maintain attention concentration. (Id.).[73] The ALJ stated that the narratives accompanying those ratings, however, did "not match" the doctor's functional assessment. (Tr. at 24). The ALJ noted that while the November 16, 2009 treatment notes indicated that plaintiff was "irritable at times" and "very stress[ed]," they also indicated that she had a clean appearance, was always well-groomed, that her attitude, judgement, and mood were good, her thought process was goal directed, and she was alert and oriented. (Id.). He also found it significant that plaintiff had originally been given a GAF rating of 60/60, which had been superceded by a rating of 50/50. (Id.).

ALJ Grossman, however, never asked Dr. Ewaskio to explain the perceived inconsistencies in her assessments, as he was required to do prior to dismissing her functional assessment. "[I]f a

---

[73] Again, a rating of "poor/none" indicates that the patient has "no useful ability to function" in the specified area. (Tr. at 369).

physician's report is believed to be insufficiently explained, lacking in support, or inconsistent with the physician's other reports, the ALJ must seek clarification and additional information from the physician, as needed, to fill any clear gaps before rejecting the doctor's opinion." E.g., Calzada v. Astrue, 753 F. Supp.2d 250, 278 (S.D.N.Y. 2010); Urena-Perez v. Astrue, 2009 WL 1726217, at *29 (S.D.N.Y. Jan. 6, 2009) (citing Rosa, 168 F.3d at 79 (citing Shaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998))); Lopez v. Barnhart, 2008 WL 1859563 at *13 (S.D.N.Y. Apr. 23, 2008) (court found that it was error for ALJ to reject treating physician's opinion without any attempt to obtain clarification regarding the perceived inconsistencies between his report and treatment notes).

The ALJ also rejected a January 6, 2011 report from Dr. Ewaskio. (Tr. at 24). The ALJ claimed that the report was written "in an obviously different handwriting than the prior doctor's reports of November 16, 2009 and December 8, 2009" and indicated that although plaintiff had been rated as having overwhelmingly "poor" abilities in mental function, "[l]ittle narrative [was] provided to support the opinion . . . ." (Id.). The ALJ had a duty to inquire about the perceived inconsistencies of this report prior to dismissing it, especially because "no legal principle which

states that a doctor must personally write out a report that he or she signs in order for it to be accorded controlling weight." McAninch v. Astrue, 2011 WL 4744411, at *15 (W.D.N.Y. Oct. 6, 2011). Since Dr. Ewaskio endorsed the allegedly suspect report, and there is no evidence indicating that the report does not represent her opinions, the ALJ erred in discounting Dr. Ewaskio's opinions on this basis alone. See id. at *14-15; Santiago v. Barnhart, 441 F. Supp.2d 620, 628 (S.D.N.Y. 2006).

There is no indication that the ALJ made any attempt to obtain clarification from Dr. Ewaskio regarding the perceived inconsistencies between her report and treatment notes. There is no reason to believe that such an attempt would have been unsuccessful, and further information could have resolved or explained any inconsistencies. Furthermore, clarification was especially important considering that the examination notes on which the ALJ focuses -- such as plaintiff's "clean" appearance, "cooperative" behavior, and "good" attitude and mood (see Tr. at 24) -- are not themselves an adequate basis for rejecting the doctor's functional assessments, as they are not necessarily inconsistent with a psychiatrically limited mental functional capacity.

By determining that Dr. Ewaskio's opinions and findings were not entitled to controlling weight without seeking additional clarification or information, the ALJ failed to properly develop the administrative record and thereby committed legal error. Accordingly, on remand, the ALJ should attempt to obtain clarification and more detailed findings from Dr. Ewaskio. Lopez, 2008 WL 1859563, at *13 (citing Cleveland v. Apfel, 99 F. Supp.2d 374, 380 (S.D.N.Y. 2000)).

Furthermore, in rejecting Dr. Ewaskio's opinions, the ALJ addressed only the third factor -- the consistency of her opinions with the rest of the record. (Tr. at 24-25).[74] The ALJ failed to address the remaining factors, including the duration and nature of the treating relationship, the evidence in support of the treating doctor's opinion, and whether the opinion was from a specialist. 20 C.F.R. § 404.1527(d)(2).

---

[74] The ALJ explained that he was discrediting Dr. Ewaskio's assessment of plaintiff's mental capacity based on its purported inconsistency with other evidence in her own treatment notes, as well as other evidence in the record. (See, e.g., Tr. at 25 (noting June 8, 2009 consultive examination performed by independent SSA psychiatrist, who had determined that plaintiff had "intact" concentration, attention, and memory and that her psychiatric problems . . . [did] not appear to be significant enought to interfere with" her ability to function)).

The ALJ had before him a long-documented history of plaintiff's mental-health treatment by a specialist in the relevant treatment area. While he was permitted to reject Dr. Ewaskio's opinions regarding whether plaintiff was able to work, 20 C.F.R. § 404.1527(d)(1), he failed to note myriad instances in the record that contradict the evidence he cites regarding plaintiff's depressive symptoms, and the doctor's assessments of plaintiff's mental functional capacity. (Tr. at 23-26). Although the ALJ did mention some evidence that supported Dr. Ewaskio's finding (see, e.g., Tr. at 23 (stating that plaintiff "displayed a depressed mood and affect" at a late September 2008 visit)), it is apparent that he failed to weigh the entirety of the evidence that would support the Dr. Ewaskio's psychiatric assessments.

While the ALJ did not necessarily err in refusing to give Dr. Ewaskio's opinions controlling weight in light of cited evidence in the record, he did commit legal error in failing to acknowledge or address the full scope of the evidence supporting Dr. Ewaskio's finding and also in failing to properly determine how much weight should be afforded to her opinion. The ALJ's incomplete analysis thus constitutes proper grounds for remand. See Hach v. Astrue, 2010 WL 1169926, at *11 (E.D.N.Y. Mar. 23, 2010) (citing, inter alia, Ellington v. Astrue, 641 F. Supp.2d 322, 331 (S.D.N.Y.

2009)).


        2. <u>SW Maine</u>


    The record reflects a number of reports from an additional treating source, Maria Maine, a licensed social worker with Bronx Lebanon. (<u>See</u> <u>generally</u> Tr.). The ALJ improperly disregarded Ms. Maine's opinion in reaching his disability conclusion.


    As a social worker, Ms. Maine is admittedly not an "acceptable medical source" for purposes of establishing plaintiff's medically determinable impairments. <u>See</u> 20 C.F.R. § 404.1513(a)(1)-(5). However, in determining the degree of plaintiff's functional limitations, the ALJ may consider evidence from "other sources," including social workers. <u>See</u> 20 C.F.R. §§ 404.1513(d), 416.913(d); <u>accord</u> <u>Lopez</u>, 2008 WL 1859563, at *15. Moreover, a court may review the ALJ's decision not to do so. For example, in <u>White v. Commissioner</u>, the court concluded that the ALJ had erred in not giving appropriate weight to claimant's social worker as "other source" evidence, particularly "given that [she] had a regular treatment relationship with plaintiff." <u>White v. Comm'r of Soc. Sec.</u>, 302 F. Supp.2d 170, 176 (W.D.N.Y. 2004); <u>accord</u> <u>Sweat v. Astrue</u>, 2011 WL 2532932, at *9 (N.D.N.Y. May 23, 2011) ("[W]hile an

106

'other source' opinion is not treated with the same deference as a treating physician's opinion, the assessment is still entitled to some weight, especially when there is a long-standing treatment relationship with the claimant.").

In this case, Ms. Maine saw plaintiff on a regular basis between May 2009 and October 2010. (See generally Tr. at 474-82, 566-68). Ms. Maine's observations would be relevant on the issue of the intensity and persistence of plaintiff's symptoms, which in turn affect her capacity for work and hence the ultimate disability determination. 20 C.F.R. § 404.1513(e)(1) & (3).

Although the ALJ is entitled to accord less weight to Ms. Maine's opinion since she is not an "acceptable medical source," there is no indication that he sought or considered her opinion about plaintiff's symptoms in making his disability determination. Therefore, on remand, the ALJ should address Ms. Maine's findings insofar as it is relevant to the severity of plaintiff's impairments.

### 3. Dr. Meadow

The ALJ implicitly relied squarely on the opinion of Dr.

Meadow, a consultive psychiatrist, in rejecting Dr. Ewaskio's findings and reaching his residual functional capacity determination. (See Tr. at 25-26). The ALJ erred in relying, with little meaningful explanation, on the opinion of this consultant to reject plaitiff's treating psychiatrists's opinion when determining her residual functional capacity.

Dr. Meadow had concluded that plaintiff's "psychiatric problems" would not "interfere" with her "ability to function on a daily basis." (Tr. at 25 (quoting Tr. at 292)). The ALJ stated that, in contrast to Dr. Ewaskio's "contrary" assessments and notes, Dr. Meadow had "provided a detailed examination of the claimant, in which it was determined that her psychiatric problems did not appear to be significant enough to interfere with her ability to function." (Tr. at 26).[75] However, Dr. Meadow's opinion

---

[75] The ALJ failed to mention a second consultive psychiatric examination performed by Dr. Apacible on June 24, 2009. (See Tr. at 304-13). However, the doctor not only made findings that were substantially similar to Dr. Meadow's, but also expressly adopted Dr. Meadow's assessment of plaintiff's residual functional capacity. (Tr. at 313 (adopting Dr. Meadow's conclusion that plaintiff "would be able to perform all tasks necessary for vocational training" as "consistent" with the medical evidence in the record)). Dr. Apacible diagnosed plaintiff with adjustment disorder with mixed anxiety and depressed mood, and with post-traumatic stress disorder. (Tr. at 305-06). The doctor found that she had no restrictions in activities of daily living, and mild difficulties maintaining social functioning and concentration, persistence or pace. (Tr. at 307). He also completed a residual

lacks adequate support for the conclusion that plaintiff did not suffer from psychiatric impairment.

"In order to accurately diagnose and evaluate the severity of a psychiatric impairment, it is imperative that the examiner procure longitudinal evidence to support any such conclusions." See Glavan v. Barnhart, 2004 WL 2326384, at *8 (E.D.N.Y. Aug. 17, 2004). Any one discrete evaluation of a patient in insufficient to determine baseline psychiatric functioning. See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(D)(2) ("[The claimant's] level of functioning may vary considerably over time. The level of [her] functioning at a specific time may seem relatively adequate or, conversely, rather poor. Proper evaluation of [her] impairment(s) must take into account any variations in the level of [her] functioning in arriving at a determination of severity over time.

---

functional capacity assessment, and determined that plaintiff was not significantly limited in the ability to understand and remember very short and simple instructions, but was moderately limited in her ability to understand and remember "detailed" instructions. (Tr. at 311). He also found that she was moderately limited in the ability to "carry out detailed instructions," but was not significantly limited in any other areas of sustained concentration and persistence, including the ability to maintain attention and concentration for extended periods and the ability to sustain an ordinary routine without special supervision. (Id.). He also concluded that plaintiff was not significantly limited in social interaction or in adapting to the workplace. (Tr. at 312).

Thus, it is vital to obtain evidence from relevant sources over a sufficiently long period prior to the date of adjudication to establish [her] impairment severity.").

Dr. Meadow's single examination of plaintiff cannot reasonably be held to override the conclusions of Dr. Ewaskio, which are based on more than twenty visits over the span of approximately two years. Indeed, it is noteworthy on this point that the ALJ rejected the opinions of Dr. Shah, who had seen plaintiff on at least two occasions and found her severely psychiatrically impaired, and the ALJ did so in principal part because Dr. Shah was assertedly not involved in plaintiff's treatment. (Tr. at 25).[76]

In sum, the ALJ erred in choosing to discredit Dr. Ewaskio's longitudinal opinion in favor of a single discrete consultive examination, at least without describing any compelling reason for making that choice and without acknowledging the advantage that the long-treating psychiatrist unavoidably has in assessing the plaintiff. On remand, the ALJ is to properly address the entirety

---

[76] The ALJ also stated that he was entirely disregarding Dr. Shah's report because it contained no address for her. The report is on what appears to be an SSA form, and it includes a fax number, thus reflecting that this doctor was presumably reachable for clarification and/or confirmation of the findings stated in the report. (Tr. at 580-84).

of plaintiff's psychiatric history in assessing her residual functional capacity.


### 4. Mischaracterization of Record Evidence


The ALJ mischaracterized the evidence in the record, largely ignoring evidence tending to support a finding of disability. The ALJ has a duty to consider relevant probative evidence in the record, and the failure to do so can constitute a basis for remand. See Boertlein v. Astrue, 2011 WL 1326585, at *2-3 (E.D.N.Y. Mar. 31, 2011); see also Kohler v. Astrue, 546 F.3d 260, 268-69 (2d Cir. 2008) (citing Lopez v. Sec'y of Health & Human Servs., 728 F.2d 148, 150-51 (2d Cir. 1984)) (noting that the Second Circuit has remanded Social Security appeals "where the ALJ has . . . failed to consider relevant probative evidence").


Most notably, Dr. Ewaskio's treatment records reflect fluctuations in plaintiff's mental health that the ALJ simply ignored in reaching his residual functional capacity assessment. We provide a few pertinent examples. On April 21, 2009, Dr. Ewaskio diagnosed plaintiff with adjustment disorder, mixed emotions, and depression. (Tr. at 317, 319, 320, 374). She described plaintiff as calm, alert, and cooperative, but also "anxious" with an

111

"overwhelmed mood." (<u>Id.</u>). The ALJ did not mention the record of
that visit in his opinion; he instead glossed over plaintiff's
mental health treatment between December 2008 and May 2009 by
stating that "[b]y May 29, 2009, the claimant was noted to be
'coping with mental illness' and reported feeling 'OK.'" (<u>See</u> Tr.
at 23). With respect to plaintiff's June 25, 2009 visit with Dr.
Ewaskio, the ALJ mentions only that plaintiff was "noted to be well
groomed, cooperative and pleasant, with no SI, no HI, no AH and no
VH." (Tr. at 23). However, at that June 25 visit, plaintiff
complained of frequent fearfulness, increased anxiety, and lack of
sleep, and Dr. Ewaskio described her affect as "anxious/dysthymic."
(Tr. at 417). Accordingly, the doctor increased the dosage of
plaintiff's Lexapro from 10 mg to 20 mg and the dosage of her
Trazodone from 50 mg to 100 mg. (Tr. at 415, 417). In describing
plaintiff's January 8, 2010 appointment with SW Maine for her
depression and anxiety, the ALJ noted only that plaintiff had been
rated as "calm and cooperative, fully oriented and appropriately
dressed and groomed" with a GAF rating of 60 at this visit and two
prior visits. (Tr. at 23). However, plaintiff indicated at the
January 8 appointment that she was feeling depressed and remained
unable to sleep despite taking her medication. (Tr. at 431). The
ALJ also noted that plaintiff had reported during the January 8
visit that she would be traveling to Louisiana to help her daughter

move, but failed to note that she had reported that the trip made her anxious. (Tr. at 24, 431). SW Maine had also noted at that appointment that plaintiff's mood was "sad" and "tearful," and she recommended that plaintiff attend therapy "bi-monthly." (Tr. at 432).

Records from other doctors reflect similar symptoms. Dr. Meadow performed a consultative examination of plaintiff on June 8, 2009. (Tr. at 290). The doctor noted that plaintiff had "difficulty falling asleep, [] a poor appetite, and . . . [had] lost 10 pounds in the past year." (Id.). Dr. Meadow also concluded, as part of his mental-status examination, that plaintiff appeared depressed and anxious. (Tr. at 291).

Furthermore, in discrediting treating-source opinions that plaintiff had limited mental functional capacity, the ALJ focused on factors that are not necessarily inconsistent with limited functioning. He mentioned that plaintiff at times reported "mild" depression, and was able to travel to Louisiana on one occasion to help her daughter. (Tr. at 26). He also focused on Dr. Meadow's consultive opinion that plaintiff's mental problems would not interfere with her ability to function, and her statements to Dr. Meadow that she attends to chores and socializes with her family.

113

(Id.). However, an ability to travel and socialize with family are not necessarily inconsistent with limited ability to function in the workplace.

The ALJ failed to consider the full extent of plaintiff's mental problems, ignoring years of complaints and diagnoses of depression and anxiety, which he referred to as "relatively benign clinical findings." (Id.). On remand, the ALJ should consider the full scope of the evidence of plaintiff's disability, including that tending to support a conclusion of disability.[77]

### 5. The ALJ Failed to Consider the Effects of Plaintiff's Medications

The ALJ failed to consider the effects of plaintiff's medications on her residual functional capacity. Pursuant to 20 C.F.R. Part 404, Subpart P, Appendix 1 § 12.00(G), the ALJ

> must give attention to the effects of medication on [a claimant's] symptoms, signs, and ability to function. While drugs used to

---

[77] We note also that the ALJ, in negatively evaluating plaintiff's credibility, relied in part on the purported absence of treatment records reflecting spousal abuse. In doing so, he ignored several mentions of it in the treatment history. (Tr. At 599, 604).

114

modify psychological functions and mental states may control certain primary manifestations of a mental disorder, e.g., hallucinations, impaired attention, restlessness, or hyperactivity, such treatment may not affect all functional limitations imposed by the mental disorder. In cases where overt symptomatology is attenuated by the use of such drugs, particular attention must be focused on the functional limitations that may persist. We will consider these functional limitations in assessing the severity of [a claimant's] impairment . . . .

Drugs used in the treatment of some mental illnesses may cause drowsiness, blunted effect, or other side effects involving other body systems. We will consider such side effects when we evaluate the overall severity of [a claimant's] impairment. Where adverse effects of medications contribute to the impairment severity and the impairment(s) neither meets nor is equivalent in severity to any listing but is nonetheless severe, we will consider such adverse effects in the RFC assessment.

As of the date of plaintiff's SSI application, she was taking seven medications daily for her depression, anxiety and sleep problems -- Trazodone, Lexapro, Hydroxyzine, Wellbutrin, Clonazepam, Ciprofloxacin, and Arthrotec -- many of which she had been taking for extended periods. (Tr. at 185).[78] Plaintiff has

---

[78] At her June 8, 2009 consultive examinations, plaintiff reported taking Lexapro, Hydroxyzine, Ciprofloxacin, Trazodone, and Arthrotec. (Tr. at 290, 294).

taken Lexapro since at least September 24, 2008 (Tr. at 278), has taken Trazodone since early November 2008 (Tr. at 592), and was prescribed Wellbutrin by Dr. Ewaskio in January 2010 because her increased Lexapro dosage had helped her depressive symptoms only "a little." (Tr. at 233, 534). Moreover, plaintiff was also taking several pain medications that, combination with all of the other pharmaceuticals she was consuming might well have added to the side effects that she may well have been experiencing. However, the ALJ did not mention, much less consider, the potential limiting effects of any of these medications during the hearing or in making his residual functional capacity assessment.[79]

On remand, the ALJ should consider the effects of these medications on her mental impairments, as well as the impact of the medications' side effects on both her mental and physical capacity.

### 6.  The ALJ Failed to Consider the Combined Effect of Plaintiff's Impairments and Medications

"The Commissioner is required to 'consider the combined effect of all of [the claimant's] impairments without regard to whether

---

[79] While the ALJ inquired about plaintiff's pain medication at the hearing, he did not inquire about her psychiatric medications and their side effects, if any. (Tr. at 44).

116

any such impairment, if considered separately, would be of sufficient severity' to establish eligibility for Social Security benefits." Burgin v. Astrue, 348 F. App'x 646, 647 (2d Cir. 2009) (alteration in original) (quoting 20 C.F.R. § 404.1523). "'[T]he combined effect of a claimant's impairments must be considered in determining disability; the [Commissioner] must evaluate their combined impact on a claimant's ability to work, regardless of whether every impairment is severe.'" Id. (alteration in original) (quoting Dixon v. Shalala, 54 F.3d 1019, 1031 (2d Cir. 1995)).

At step two, the ALJ found that plaintiff has two "severe" impairments -- a non-union fracture of the right leg with derangement and a depressive disorder with anxiety. (Tr. at 20). Although plaintiff's physical limitations alone may not alone demonstrate disability, the ALJ recognized that her leg problems cause her "more than slight limitations" in her ability to function adequately. (Id.). Nonetheless, ALJ Grossman does not appear to have considered the full range of the combined effects of these impairments on plaintiff's disability.

ALJ Grossman first considered plaintiff's leg-fracture deformity of the right tibia and fibula. (Id.). The ALJ then addressed plaintiff's mental impairment, concluding that it did not

117

"meet or medically equal the criteria" of listings 12.04 or 12.06.
(Tr. at 21). He concluded that plaintiff suffered from only "mild
restriction" in her activities of daily living, and "moderate
difficulties" with regard to social functioning and concentration,
persistence or pace. (Id.).

In addition, the ALJ did not consider plaintiff's skin cancer
to be a "severe impairment." (Tr. at 20). In so determining, he
relied on plaintiff's statement that she was "very happy" with the
results of her surgery and that she was "only" suffering from
"itchiness" following her excision. He thus concluded that her
cancer would not "cause any impediment to work." (Id.).

Even if, separately, none of plaintiff's impairments is
sufficient to sustain a disability finding, it is certainly
possible that their combined effects would be, particularly in
light of her concededly fragile psychiatric status. Cf. Wilson v.
Barnhart, 2005 WL 1787581, at *2 (E.D.N.Y. July 21, 2005) (citing
SSR 96-8p, 1996 WL 374184, at *5 (July 2, 1996)(court directed the
Commissioner to consider the combined effect of all of plaintiff's
impairments on remand as the ALJ's decision did not make clear
whether he had done so).; 20 C.F.R. § 404.1523) (stating that
"although certain impairments standing alone may not significantly

118

limit a claimant's work capacity, they may, in combination with the individual's other impairments, narrow the range of work the individual is capable of performing," so "[i]n assessing a claimant's RFC . . . the ALJ must consider the limitations and restrictions imposed by all of an individual's impairments, without regard to whether any such impairment, if considered separately, would be severe").

The ALJ's analysis is divided into a discussion of plaintiff's physical impairment and a separate explanation of his findings as to her mental impairment. (Tr. at 25-26 (explaining first that "in regard to [plaintiff's] physical problem," the record evidence supported a conclusion that plaintiff could perform only sedentary work, then going on to explain that "[a]s for the claimant's mental health," plaintiff's psychiatric problems would limit her to performing "simple, repetitive tasks" that involved limited contact with supervisors and the public)). Nowhere does the ALJ discuss the possible combined effects of plaintiff's right-leg derangement, depression, anxiety, and the medications that plaintiff takes or has taken to treat those impairments. In particular, he ignored the impact of decades-long persistent pain and discomfort in her leg as a stressor on her emotional status.

119

The ALJ's failure to consider the combined effect of plaintiff's impairments is reversible error. See, e.g., Kolodnay v. Schweiker, 680 F.2d 878, 879 (2d Cir. 1982).[80] Furthermore, it was error for the ALJ to fail to address the effect, if any, of plaintiff's non-severe limitations, such as her skin cancer, on her functional capacity. Burgin, 348 F. App'x at 647. For, example, Dr. Ewaskio indicated that plaintiff's depression had worsened after her skin-cancer surgery. (Tr. at 370). On remand, the ALJ should discuss the combined effects of plaintiff's limitations, severe or not, on her residual functional capacity.


## IV. We Recommend Remand as the Proper Remedy


For the reasons that we have cited, the Commissioner's decision cannot stand. Under the Act, a reviewing court can order further proceedings when appropriate. "The court shall have power

---

[80] Defendant asserts that the ALJ had to have considered the combined effects plaintiff's physical and mental impairments in reaching his residual-functional-capacity determination because that determination includes both non-exertional and exertional limitations -- namely, he concluded that plaintiff can perform sedentary work that involves only simple repetitive tasks and requires only limited interaction. (See Def.'s Reply Mem. 5-6). However, this argument is flawed. Just because the ALJ's determination involves both physical and mental components does not necessarily mean that he had to have considered the combined effects of those impairments in reaching that determination, and his findings do not suggest that he did.

120

to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); Butts, 388 F.3d at 384. Remand is warranted where "'there are gaps in the administrative record or the ALJ has applied an improper legal standard.'" Rosa, 168 F.3d at 82-83 (quoting Pratts, 94 F.3d at 39); cf. Butts, 388 F.3d at 384. Remand is particularly appropriate where further findings of explanation will clarify the rationale for the ALJ's decision. Pratts, 94 F.3d at 39; see also Butts, 388 F.3d at 385. If, however, the record provides "persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose," the court may reverse and remand solely for the calculation and payment of benefits. Parker v. Harris, 626 F.2d 225, 235 (2d Cir. 1980); see e.g., Carroll, 705 F.2d at 644; accord Balsamo, 142 F.3d at 82.

The question remains whether the case should be remanded for further consideration, or simply for calculation of benefits. There exist some evidentiary gaps in the record, and the ALJ committed a number of legal errors in his assessment of that record. Specifically, he failed to seek clarification from plaintiff's treating psychiatrist and to properly explain his reasoning for

121

discrediting her medical opinions, he did not consider the opinion of SW Maine, he failed to take into account the full scope of medical evidence in the record, he neglected to examine the effects of plaintiff's medications on her functional capacity, and he did not adequately consider the combined effects of plaintiff's various impairments on her disability status. Therefore, we conclude that remand for further consideration is warranted.[81]

The alternative remedy of an order directing an award of benefits is not justified on the current record. Depending on the nature of any additional evidence procured by the ALJ to fill gaps in the record and his supplemental findings, it is certainly possible that he may defensibly conclude that plaintiff is not disabled. Hence we recommended that the court order remand for reconsideration rather than calculation of benefits.

<u>CONCLUSION</u>

For the reasons noted, we recommend that plaintiff's motion be GRANTED in part, that the Commissioner's motion be DENIED, and that

---

[81] If the case is remanded, the ALJ may legitimately seek a follow-up consultative examination. If so plaintiff would be expected to comply.

122

the case be remanded for further administrative proceedings.

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable Colleen McMahon, Room 1350, and to the chambers of the undersigned, Room 1670, 500 Pearl Street, New York, New York, 10007. Failure to file timely objections may constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. See Thomas v. Arn, 474 U.S. 140, 150 (1985); Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(d).

DATED: New York, New York
       August 24, 2012

RESPECTFULLY SUBMITTED,

MICHAEL H. DOLINGER
UNITED STATES MAGISTRATE JUDGE

123

Copies of the foregoing Report and Recommendation have been mailed
this date to:

David E. Levine, Esq.
Law Office of Daniel Berger
1000 Grand Concourse, Suite 1A
Bronx, New York 10451

Susan C. Branagan, Esq.
Assistant United States Attorney
    for the Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007